COLLEEN M. MELODY
Civil Rights Division Chief
MARSHA CHIEN
MITCHELL A. RIESE
Assistant Attorneys General
Wing Luke Civil Rights Division
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, | NO. |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. CUSTOMS AND BORDER PROTECTION; MARK MORGAN, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection, | |
| Defendants. | |

## I.    INTRODUCTION

1.   The State of Washington (the State or Washington) brings this action to protect the State and its residents from the federal government's unlawful, unconstitutional, and deeply harmful policy of coopting Washington state courts to carry out federal civil immigration arrests.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 442-4492

2.   Like all court systems, Washington's relies for the fair administration of justice on the full participation and trust of parties, victims, witnesses, and the public. When parties, victims, and witnesses fail to appear, justice is delayed and sometimes left undone. The U.S. Department of Homeland Security's (DHS) policy of patrolling Washington courthouses—including their courtrooms, hallways, parking lots, sidewalks, and front steps—and arresting those they believe violate federal civil immigration laws, deters victims and witnesses from appearing in court, prevents residents from vindicating their rights, hinders criminal prosecutions, hampers the rights of the accused, undermines public safety and the orderly administration of justice, and erodes trust in the court system.

3.   When immigrants are too fearful to come to court, cases are left unadjudicated or adjudicated with incomplete facts. State resources are wasted when prosecutors, defense attorneys, and court staff must prepare for proceedings that are canceled or continued, and judges must issue bench warrants or rearrange crowded dockets to accommodate those interruptions. Yet more state resources are wasted as those same officials—as well as others from across the justice system including interpreters, legal aid lawyers, domestic violence advocates, and statewide agency staff—scramble to respond to the spike in civil immigration enforcement activity at state and local courthouses.

4.   Although a broad range of actors from across the Washington court system have taken steps to counteract these harms, including repeatedly requesting that DHS stop interfering with Washington's judicial system, DHS enforcement actions at Washington courthouses have increased dramatically since 2017. The regularity of DHS's public and aggressive enforcement activities in and around courthouses has chilled participation in Washington courts. Crime victims, especially domestic violence and sexual assault victims, endure abuse rather than risk arrest by DHS. Defendants fail to appear for hearings, even in instances when the result of the hearings will most likely be dismissal of their case. Others forego assertions of their civil legal rights for fear of DHS arrest, including housing rights, consumer rights, and family law rights

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

2

that fall under the exclusive jurisdiction of state courts. Residents needing to access state and county services housed inside the courthouse leave ordinary civic business unattended. The public spectacle and disturbance that attends courthouse arrests debases the dignity of the courts and creates a public safety risk for bystanders and staff. And, worst of all, immigrant communities lose trust in state and local governments when courthouses are used as a trap. All of this amounts to a multi-front intrusion on Washington's sovereign duty to operate a court system governed by the principles of order, justice, and fairness.

5.   DHS's policy of arresting noncitizens at or near courthouses is unlawful. First, DHS lacks statutory authority to issue and implement the policy. Indeed, both the U.S. Supreme Court and the Washington Supreme Court have long recognized privileges against civil arrests for those attending court—privileges that rest on the simple principle that a judicial system cannot function if parties and witnesses fear that their appearance in court will result in civil arrest. Even when authorizing civil arrests for violations of federal immigration law, Congress left intact these longstanding federal and state common-law privileges. By purporting to authorize civil arrests in violation of these privileges, DHS exceeded its authority and violated the Administrative Procedures Act (APA).

6.   Second, DHS's policy is arbitrary and capricious. It is vague and insufficiently explained, including by failing accurately to describe who is subject to the policy and how it can coexist with congressional requirements that certain non-citizens *must* attend state court proceedings to be eligible for certain forms of immigration relief. In addition, DHS failed to consider the far-reaching and predictable harms inflicted on Washington's sovereign judicial system by a policy of routinely arresting noncitizens at or near courthouses, or the reliance interests that had developed as a result of DHS's previous policies limiting enforcement at courthouses.

7.   Third, DHS's policy violates the Tenth Amendment, which preserves Washington's core sovereign autonomy to control the operation of its judiciary and prosecute criminal violations

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

3

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

without federal interference. By coopting the state's justice system, and using it as a tool to engage in exclusively federal immigration enforcement, DHS infringes on that autonomy.

8. Fourth, DHS's policy violates the constitutional right to access the courts, which prohibits systemic official action that frustrates the right to prepare and file suits or to defend oneself. By interfering with police and prosecutors' ability to investigate crime, file cases, and pursue justice in criminal matters, and by making Washington residents choose between pursuing their rights or risking civil arrest, DHS frustrates the right to access the courts.

9. For these reasons, and as set forth below, Washington asks this Court to declare unlawful and enjoin DHS's policy of civilly arresting noncitizen parties, victims, witnesses, and others at state and local courts in Washington.

## II.  JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. The United States waived its sovereign immunity pursuant to 5 U.S.C. § 702.

11. Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because this is an action against an officer, employee, and/or agency of the United States, the State is a resident of the Western District of Washington, and a substantial part of the events or omissions giving rise to this action have occurred in the Western District of Washington.

## III.  PARTIES

12. Plaintiff State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. Washington operates its state court system under the authority and requirements of its state constitution and laws. The Attorney General is Washington's chief law enforcement officer and is authorized under Washington Revised Code § 43.10.030 to pursue this action.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

13. Washington is aggrieved by Defendants' actions and has standing to bring this action because DHS's policy of arresting noncitizens at or near state courthouses harms Washington's sovereign, quasi-sovereign, and proprietary interests and will continue to cause injury unless and until DHS's policy is permanently enjoined.

14. Defendant the U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). Its mandate includes the administration of the interior enforcement provisions of the country's immigration laws. DHS agents execute civil arrests in and around Washington state and local courthouses.

15. Defendant Chad Wolf is the Acting Secretary of DHS and is sued in his official capacity.

16. Defendant U.S. Immigration and Customs Enforcement (ICE) is a sub-agency of DHS and is responsible for enforcing federal immigration laws. ICE agents execute civil arrests in and around Washington state and local courthouses.

17. Defendant Matthew T. Albence is the Acting Director of ICE and is sued in his official capacity.

18. Defendant U.S. Customs and Border Protection (CBP) is a sub-agency of DHS and is responsible for enforcing federal immigration laws. CBP agents execute civil arrests in and around Washington state and local courthouses.

19. Defendant Mark Morgan is the Acting Commissioner of CBP and is sued in his official capacity.

## IV.    ALLEGATIONS
### Before 2017, DHS operates according to specified immigration enforcement priorities that avoid courthouse arrests

20. Section 8 of Article I of the U.S. Constitution grants Congress authority over the nation's immigration laws. Congress enacted the Immigration and Nationality Act of 1952 (INA), which governs the presence of noncitizens in the United States and authorizes the removal of those

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

present without federal authorization. *See* Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified at 8 U.S.C. §§ 1101-1537).

21. The INA contains provisions authorizing civil immigration arrests. Such arrests may occur with or without a warrant. *See* 8 U.S.C. §§ 1226(a) and 1357(a)(2). If an arrest is made pursuant to a warrant, the warrant is typically issued by DHS officials—not federal judges or magistrates. *See* 8 C.F.R. §§ 236.1 and 241.2.

22. The INA's statutory arrest provisions give the federal government the same type of civil arrest authority that has historically been used to institute civil proceedings. The INA gives no indication that the arrest authority Congress conferred differs in any way from the civil arrest authority that existed at common law—including the limitations privileging those attending court from civil courthouse arrest.

23. Before 2017, DHS's general policy was to arrest and detain noncitizens according to defined enforcement priorities and publicly released memoranda setting forth those priorities.

24. In November 2000, the Commissioner of the U.S. Immigration and Naturalization Service, Debra Meissner, set forth a list of factors for immigration agents to consider when conducting enforcement actions, including the immigrant's criminal history, length of residence in the United States, family ties to the United States, and home country conditions. *See* Memorandum from Doris Meissner, Comm'r, Immigration & Naturalization Serv., to Reg'l & Dist. Dirs., Chief Patrol Agents, & Reg'l & Dist. Counsel, Immigration & Naturalization Serv., *Prosecutorial Discretion* (Nov. 17, 2000).

25. After 9/11, INS was overhauled and reorganized into the U.S. Department of Homeland Security. Yet, the principles of prosecutorial discretion set forth in the Meissner memo continued and were repeatedly reaffirmed. In October 2005, for example, ICE Principal Legal Advisor William J. Howard issued a memo to all Chief Counsel within the Office of the Principal Legal Advisor discouraging the issuance of charging papers to noncitizens with viable family petitions or those with sympathetic factors such as parents of citizen children. *See* Memorandum from

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

6

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

William J. Howard, Principal Legal Advisor, DHS, to OPLA Chief Counsel, ICE, *Prosecutorial Discretion* (Oct. 24, 2005).

26. In March 2011, the then-ICE Director issued a memorandum further identifying ICE's civil immigration enforcement priorities. *See* ICE Policy No. 10072.1, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011). Policy Number 10072.1 observed that ICE only has the resources to remove approximately 4 percent of the estimated removable population each year and directed agents to prioritize the removal of noncitizens who pose a danger to national security or a risk to public safety, i.e., those engaged in or suspected of terrorism or espionage, those with criminal convictions or outstanding criminal warrants, or those who participated in organized criminal gangs ("Priority 1"). After Priority 1, ICE directed agents to prioritize "recent illegal entrants," and then noncitizens "who are fugitives or otherwise obstruct immigration controls."

27. In June 2011, ICE further issued policies to protect crime victims, witnesses, and individuals pursuing legitimate civil rights complaints. *See* ICE Policy No. 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011). Policy Number 10076.1 stated "it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime" and directed ICE agents to "exercise all appropriate prosecutorial discretion to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice." The policy also directed that "it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties."

28. On March 19, 2014, ICE issued further guidance regarding enforcement actions at courthouses, instructing that arrests at or near courthouses will "only be undertaken against Priority 1 aliens" and not against individuals who may be "collaterally" present, such as family members or friends who may accompany the noncitizen to court appearances or functions. *See* Memorandum from Philip T. Miller, Assistant Dir. for Field Operations, ICE, to Field Office

7

Dirs. & Deputy Field Office Dirs., DHS, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014).

29. In November 2014, DHS issued a policy memorandum to both ICE and CBP, superseding DHS's previous policies and setting agency-wide policies for the apprehension, detention, and removal of noncitizens. *See* Memorandum from Jeh Johnson, Sec'y of Homeland Sec., to DHS Component Heads, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014). Again, DHS outlined its civil immigration enforcement priorities and directed that Priority 1 is to remove noncitizens who pose threats to "national security, border security, and public safety."

30. ICE updated its courthouse-arrest policy to align with the November 2014 policy. ICE continued to limit courthouse arrests to a narrow subset of noncitizens. *See* Memorandum from Philip T. Miller, Assistant Dir. for Field Operations, ICE, to Field Office Dirs. & Deputy Field Office Dirs., DHS, *Guidance Update: Enforcement Actions at or Near Courthouses* (Jan. 25, 2015). The *Guidance Update* directed that only four categories of Priority 1 noncitizens were subject to courthouse arrest: (1) "aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security," (2) "aliens convicted of a crime for which an element was active participation in a criminal street gang," (3) "aliens convicted of an offense classified as a felony in the convicting jurisdiction," and (4) "aliens convicted of an 'aggravated felon[y]'" as defined under federal immigration law. The *Guidance Update* again instructed that "[e]nforcement actions at or near courthouses will only take place against specific, targeted aliens, rather than individuals who may be 'collaterally' present, such as family members or friends who may accompany the target alien to court appearances or functions."

**In 2017, DHS rescinds its prior civil immigration**
**priorities, including the restrictions on courthouse arrests**

31. On January 25, 2017, five days after his inauguration, President Trump issued an Executive Order that repealed the deportation prioritization programs of both the Bush and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

1   Obama Administrations. *See* Enhancing Public Safety in the Interior of the United States, Exec.

2   Order 13,768, 82 Fed. Reg. 8,799 (Jan. 25, 2017). Rather than prioritizing the removal of

3   dangerous or fugitive noncitizens, the Executive Order specified that immigration laws would

4   be fully executed "against *all* removable aliens." *Id*. (emphasis added).

5       32. Pursuant to Trump's Executive Order, then-DHS Secretary John Kelly rescinded the

6   agency's November 2014 memorandum setting forth enforcement priorities, as well as all other

7   directives, memoranda, and field guidance regarding enforcement of the country's immigration

8   laws—with the exception of Deferred Action for Childhood Arrivals (DACA) and Deferred

9   Action for Parents of Americans (DAPA), which the Trump Administration rescinded

10  separately. *See* Memorandum from John Kelly, Sec'y of Homeland Sec., to DHS Component

11  Heads, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017).

12  Most relevant here, then-Secretary Kelly's memorandum rescinded the policies directing that

13  enforcement actions at courthouses be restricted to certain Priority 1 noncitizens. Instead, DHS

14  announced that "the Department no longer will exempt classes or categories of removable aliens

15  from potential enforcement." *Id.*

16      33. Since early 2017, DHS's practice of arresting noncitizens has changed dramatically.

17  Following Executive Order 13,768 and Secretary Kelly's February 2017 memorandum, DHS

18  increasingly began coopting the state court system by using noncitizens' appearances in state

19  courts as an opportunity to arrest them for purposes of civil immigration enforcement. DHS

20  adopted a policy of routinely conducting civil immigration arrests in and around state and local

21  courthouses (Courthouse Arrest Policy or Policy), and implemented it nationwide.

22      34. Throughout 2017, DHS publicly affirmed its Policy of conducting civil immigration

23  arrests at state courthouses. On March 29, 2017, in response to concerns about ICE's increased

24  presence at California courthouses raised by the Chief Justice of the California Supreme Court,

25  then-DHS Secretary Kelly and then-Attorney General Jeff Sessions acknowledged the practice

26  of arresting noncitizens at state courthouses and stated adamantly that it would continue. *See*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                        9                **ATTORNEY GENERAL OF WASHINGTON**
                                                               Civil Rights Division
                                                               800 Fifth Avenue, Suite 2000
                                                               Seattle, WA  98104
                                                               (206) 442-4492

Letter from Jefferson B. Sessions, U.S. Attorney Gen., & John F. Kelly, Sec'y of Homeland Sec., to Tani G. Cantil-Sakauye, Chief Justice, Supreme Court of Cal. (Mar. 29, 2017), https://www.politico.com/f/?id=0000015b-23c8-d874-addf-33e83a8c0001.     Then-Secretary Kelly and then-Attorney General Sessions admitted that ICE favors arresting noncitizens at courthouses: "Because courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting officers and persons being arrested are substantially decreased." *Id.*

35. On April 4, 2017, a DHS spokesperson defended the Courthouse Arrest Policy, even as applied to victims and witnesses, by stating, "Just because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien. Just because they're a witness doesn't mean they might not pose a security threat for other reasons." Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post, Apr. 4, 2017, https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html.

36. The next day, during an April 5, 2017, hearing before the Senate Committee on Homeland Security, Senator Kamala Harris asked then-Secretary Kelly whether he was aware of the DHS spokesman's comment confirming that immigration agents may arrest crime victims and witnesses at courthouses. He replied, "Yes," and then rejected Senator Harris's suggestion that DHS initiate a different policy that would exempt from courthouse arrests those crime victims and witnesses who do not have a serious criminal backgrounds.

37. In September 2017, an ICE spokesperson affirmed that, "ICE plans to continue arresting individuals in courthouse environments." Linley Sanders, *Federal Immigration Officials Will Continue Nabbing Suspects at New York Courthouses to Subvert Sanctuary City Status*, Newsweek, Sept. 15, 2017, https://www.newsweek.com/new-york-immigration-courthouse-arrests-continue-sanctuary-city-665797.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

10

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

**In 2018, DHS confirms the Courthouse Arrest Policy in writing**

38. On January 10, 2018, DHS issued Directive Number 11072.1, *Civil Immigration Enforcement Actions Inside Courthouses* (Jan. 10, 2018) (the Directive), which sets forth ICE's policy to make civil arrests in any courthouse location when ICE deems the arrest "necessary." The Directive explicitly recognizes the advantage in relying on state court systems for federal immigration enforcement purposes, i.e., "[i]ndividuals entering courthouses are typically screened by law enforcement personnel," and it can "reduce safety risks to the public, targeted alien[s], and ICE officers and agents."

39. While the Directive appears to acknowledge that the Courthouse Arrest Policy interferes with state court systems, it imposes no meaningful controls to prevent those harms. For example, the Directive suggests that ICE officers and agents should "conduct enforcement actions discreetly to minimize their impact on court proceedings," but says that they should do so only "[w]hen practicable." *Id.* Later, the Directive states simply that ICE officers and agents should "exercise sound judgment . . . and make substantial efforts to avoid unnecessarily alarming the public." *Id.*

40. The Directive also authorizes the arrest of any noncitizen at the courthouse. The Directive states that ICE's courthouse arrests will "include" actions against "specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed but have failed to depart, and aliens who have re-entered the country illegally after being removed[,]" but it nowhere limits its arrests to those "targeted aliens." *Id.*

41. Although the Directive suggests those "encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted aliens" will not be subject to enforcement "absent special circumstances," the Directive provides no information as to what ICE considers "special circumstances." *Id.* Instead, the Directive states only that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with [DHS] policy." *Id.* The "DHS policy" referred to consists of two

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

1   DHS memoranda from 2017—neither of which says anything about courthouse arrests. *Id.*

2   Instead, the memoranda reiterate Executive Order 13,768 and DHS's position that it will "no

3   longer will exempt classes or categories of removable aliens from potential enforcement." *See*

4   Memorandum from John Kelly, Sec'y of Homeland Sec., to DHS Component Heads,

5   *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017). Together,

6   the Directive and cited memoranda clearly suggest that anyone who is potentially removable

7   may be subject to a courthouse arrest.

8   42. On September 25, 2018, ICE published answers to "Frequently Asked Questions"

9   regarding "Sensitive Locations and Courthouse Arrests." In the FAQ, ICE confirmed that

10   courthouse arrests were occurring "more frequently" while also confirming that, by September

11   2018, the Policy had been in place "for some time." ICE responded to the question of whether

12   there is "any place in a courthouse where enforcement will not occur" by stating, in effect, no.

13   Although the FAQ answers that "ICE officers and agents will *generally* avoid enforcement

14   actions in courthouses, or areas within courthouses, that are dedicated to non-criminal . . .

15   proceedings," it affirms that enforcement actions in non-criminal areas of courthouses may be

16   conducted when "operationally necessary." (emphasis added).

17   43. Although the Directive and FAQ specifically state that courthouse arrests are

18   "necessitated by the unwillingness of jurisdictions to cooperate with ICE," Washington's

19   experience is that local jurisdictions *do* cooperate with the "transfer . . . of aliens from their

20   prisons and jails" when doing so is consistent with federal and state law.

21   44. Regardless, DHS's stated motive for directing courthouse arrests raises federalism and

22   constitutional concerns. Defendants' given rationales for the Courthouse Arrest Policy appear to

23   be to retaliate against states and localities for their constitutionally protected decisions regarding

24   their use of police resources, and a desire by DHS to coopt the state's judicial system to simplify

25   immigration enforcement.

26

COMPLAINT FOR DECLARATORY                    12         **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                            Civil Rights Division
                                                             800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104
                                                                  (206) 442-4492

45. Contrary to DHS's public statements, the Directive, and the FAQs' suggestions that DHS focuses its arrests on only dangerous noncitizens, courthouse arrests in Washington are frequently conducted even where immigrants have no criminal history, are not "gang members" or "national security or public safety threats," and where there is no evidence that the noncitizen is a "fugitive" who has previously evaded immigration enforcement.

46. In an April 2018 email, for example, a Spokane-based supervisory CBP agent e-mailed several Grant County employees requesting misdemeanor court dockets in Moses Lake and Ephrata because CBP was "looking to make a run out there tomorrow and wanted to have some time [] to find quality targets." The email suggests that CBP had no particular target in mind and was using the court docket as the starting place for the next day's enforcement action. In another email to Grant County prosecutors, the same CBP supervisory agent indicated that CBP had "developed several targets off criminal aliens that have skipped their court dates," further confirming that DHS uses the state's judicial system to generate targets in the first place—and not to simply locate noncitizens it had unsuccessfully attempted to locate elsewhere.

47. On November 21, 2019, Attorney General William Barr and Acting DHS Secretary Chad Wolf again confirmed the Courthouse Arrest Policy. In a letter to Washington Supreme Court Chief Justice Mary Fairhurst and Oregon Supreme Court Chief Justice Martha Walters, the Attorney General and Acting Secretary criticize the Justices for considering court rules that might limit "ICE . . . and . . . CBP . . . from making administrative arrests in and around courthouses in your respective states." Letter from William P. Barr, U.S. Attorney Gen., & Chad F. Wolf, Acting Sec'y of Homeland Sec., to Martha Walters, Chief Justice, Or. Supreme Court, & Mary E. Fairhurst, Chief Justice, Wash. Supreme Court (Nov. 21, 2019), https://www.justice.gov/ag/page/file/1219556/download. The letter states that no state court rules will alter DHS's ongoing practice of "making administrative arrests on property that is otherwise open to the public," including courthouses. *Id.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

48. Under the terms of the Courthouse Arrest Policy, both as publicly disclosed and as applied in Washington, DHS uses state court systems to both identify and catch anyone suspected of a civil immigration violation whether they are criminal defendants, victims, witnesses, parties to civil proceedings, or individuals merely present at the courthouse to conduct civic business.

**DHS's arrests in state courthouses dramatically
increase starting in 2017 and continue today**

49. DHS agents in Washington typically enter courtrooms to identify possible targets, watch while cases are called, identify a target through their appearance on the record, wait for the person to leave the courtroom or courthouse, and then apprehend them in the hallway, lobby, or outside the courthouse.

50. Confusion often reigns during the arrests because DHS agents are in plain clothes, making it difficult for both courthouse officials and the public to discern the authority of the person(s) conducting the arrest. A public defender in Grant County called the police, not knowing that the plain-clothed man lurking in the courthouse parking lot was actually a federal immigration agent. Another time, a public defender called courthouse security when his client got into an argument with a plain-clothed man in the courtroom, only to later discover that the plain-clothed man was a federal immigration agent surveilling the courtroom.

51. The fact that the DHS agents are in plain clothes makes it all the more disturbing and dangerous when noncitizens are chased and tackled during the course of the arrest. Some bystanders who witness the arrest at first wonder whether the noncitizen is being kidnapped. One noncitizen reports that DHS agents in plain clothes pulled him so hard that they tore his pants and that the DHS agents taunted him as they told him they were "going to make America great again." Upon seeing plain-clothes individuals they suspect of being DHS agents, noncitizens have locked themselves in courthouse bathrooms for hours for fear of arrest.

52. Beginning in early 2017, DHS's presence in Washington state courthouses has spiked dramatically and is now routine. According to a compilation of statements of federal officials,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

public records, court records, news articles, data gathered by the University of Washington's Center for Human Rights, witness statements, and other sources, DHS has made hundreds of courthouse arrests in Washington since 2017. ICE and CBP courthouse arrests have been documented in or around superior, district, and municipal courthouses in 20 of 39 Washington counties: Adams, Benton, Clark, Cowlitz, Franklin, Grant, Grays Harbor, King, Kitsap, Kittitas, Mason, Okanogan, Pacific, Pierce, Skagit, Spokane, Thurston, Walla Walla, Whatcom, and Yakima. This list includes four of the five largest counties in Washington, all of which have a significant percentage of noncitizen residents and families of mixed immigration status.

53. Though DHS's Policy suggests it only targets noncitizens charged with the most serious crimes, DHS agents routinely surveille courthouses and arrest noncitizens at both municipal and district court, where misdemeanors and non-criminal ordinance violations are heard and where a variety of other civic business is conducted. Many of the individuals DHS targeted for civil courthouse arrests have no criminal history at all, or are charged with a non-violent misdemeanor such as driving with no valid operator's license. The following is a list of illustrative, but hardly exclusive, examples.

54. In October 2017, a man went to pay a traffic ticket at the Auburn Justice Center in King County. After paying the ticket, he went back to his car that was parked in a lot across the street. ICE officers surrounded his car and arrested him.

55. In March 2018, ICE arrested a man at a Grant County courthouse after he attended a hearing for driving without a license. His wife, who waited in the car for him while their child was sleeping, was left without any information about where to find him.

56. In October 2018, a single mother went to an Adams County courthouse in Othello regarding a car accident. She never came home to her children ranging in ages from 10 months to 10 years old. Only after two weeks did her oldest child receive a call reporting that DHS had arrested her as she was leaving the courthouse and that she was detained at the Northwest Detention Center, a facility in Tacoma that detains federal immigration detainees.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

57. In October 2018, a man with no prior criminal history was arrested outside the Spokane County District Court after attending a pretrial hearing on a misdemeanor charge. DHS agents attended and observed the pretrial hearing and then followed him as he entered his car. He was detained for several months before being released, which delayed the resolution of the criminal case for all parties and the court.

58. In December 2018, ICE agents arrested a man outside of the Seattle Municipal Court before his court appearance on a misdemeanor charge related to alleged shoplifting at Goodwill. ICE agents did this despite Seattle Municipal Court's rule discouraging immigration arrests at its courthouse. Not knowing the reason for his absence, the Seattle Municipal Court issued a warrant for his failure to appear and the case was delayed.

59. In January 2019, a Washington resident accompanied his nephew to the Othello District Court in Adams County so that the nephew could pay a ticket related to a car accident. The man was arrested by immigration agents while he accompanied his nephew on this errand.

60. In February 2019, a woman accompanied her uncle to the Adams County District Court in Ritzville because the uncle needed to post bond for another relative who had been arrested. Neither the woman nor her uncle were involved in the matter that led to the relative's arrest. The woman and her uncle were both arrested by immigration agents in the courthouse parking lot after posting the bond.

61. In March 2019, at the Ephrata courthouse in Grant County, ICE arrested a father who was handling a ticket related to not having proper car insurance. ICE arrested him in the parking lot with his paperwork related to his ticket in-hand. The father is married to a U.S. citizen, with U.S. citizen children, and had a pending application for permanent residency at the time of his arrest.

62. In April 2019, a Washington resident went to the Grant County courthouse in Ephrata to pay a traffic ticket. When he did not return home, his family sought the advice of immigrant

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

16

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

advocates, who only then confirmed through DHS's detainee-locator system that he had been arrested by immigration officials.

63. In August 2019, a man was arrested by DHS at the Moses Lake District Court in Grant County when he went to the courthouse to pay a traffic ticket. He had no criminal history and was not charged with any crime at the time of the arrest; he was there just to pay the ticket.

64. Also in August 2019 at the same courthouse, a man was arrested by DHS after completing his final court appearance and having his driver's license reinstated following a misdemeanor charge for driving with a suspended license. His license had been suspended for non-payment of a 2018 traffic ticket.

65. In November 2019, a man was arrested by DHS in Grant County after transferring a vehicle title to his name at the Department of Licensing window inside the Ephrata courthouse. Plain-clothes men were listening to conversations that patrons were having with the licensing clerk. After the man finished his transaction, agents followed him outside and questioned him on the courthouse steps. They did not know his name and apparently only became interested in him after overhearing his Spanish-language conversation with the clerk.

66. In November 2019, a man was arrested at the Kitsap County Courthouse after appearing in court on a charge of driving without a license. His wife and 4-year old child were left waiting in the car outside for more than an hour, not knowing what happened. The man owns a restaurant in East Bremerton and is the father of three children, including one with significant disabilities.

67. Civil immigration enforcement occurring at Washington courthouses targets a broad swath of noncitizens, often individuals with no criminal history or who are charged with non-violent offenses.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

17

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

**DHS's Courthouse Arrest Policy sends a deep
chilling effect through Washington's immigrant community**

68. DHS's Policy of arresting noncitizens at or near state courthouses is well-known throughout the immigrant community. As a result, many Washington residents refuse to attend Washington state courts for fear of civil arrest and detention.

69. In at least 23 of Washington's 39 counties, prosecutors, public defenders, legal aid providers, domestic violence advocates, and others report a noticeable chilling effect on courthouse attendance because of the Courthouse Arrest Policy. Those counties are: Adams, Benton, Chelan, Clark, Cowlitz, Franklin, Grant, Grays Harbor, King, Kitsap, Kittitas, Lewis, Mason, Okanogan, Pacific, Pierce, Skagit, Snohomish, Spokane, Thurston, Walla Walla, Whatcom, and Yakima.

70. The chilling effect of even one courthouse arrest can spread wide and fast in that community, a damaging ripple effect that DHS either fails to understand or fails to appreciate. In June 2019, for example, a Washington resident was leaving the Thurston County courthouse when three ICE agents arrested him. Onlookers at first believed it was a kidnapping or a civilian fight. None of the ICE agents wore any uniform or obvious identification and the resident struggled against them. The disruption was sufficiently violent that state court officers went running to the scene. Eventually, the ICE agents handcuffed him and put him in the back of an unmarked Dodge truck.

71. Several community advocates report their clients express fear stemming from the June 2019 arrest in Thurston County. A board member of the Washington Commission on Hispanic Affairs, for example, reports that a noncitizen was scheduled for a hearing in the Thurston County courthouse shortly after the June 2019 arrest, but as soon as he heard that DHS had arrested a noncitizen at the courthouse, he left and missed the hearing. Based on his failure to appear, the court had to issue a warrant for his arrest.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

18

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

72. Another noncitizen is currently fighting for his parental rights in Thurston County. After learning that his son was placed in dependency proceedings, the noncitizen moved from another state, found a place to live in Washington, and is attempting to reunify with his son. However, while the noncitizen would like to attend every hearing to show the court how much he wants to be with his son, especially an upcoming hearing over whether his parental rights should be terminated, the June 2019 DHS arrest at the Thurston County courthouse may prevent him from attending. The father now must balance the need to protect his parental rights with the risk of being arrested. If the noncitizen were arrested and deported by DHS, it would mean he could no longer pursue reunification or any relationship with his son, and he would be likely to lose his parental rights permanently.

73. Similar stories of the ripple effects of courthouse arrests come from across the state. For example, in April 2017, in Clark County, a man was arrested for driving an unregistered vehicle. When the man went to the Clark County District Court for his misdemeanor hearing, he observed what appeared to be ICE agents at the courthouse and, due to fear of arrest, left before his hearing. Clark County issued a warrant because of his failure to appear for the misdemeanor permit infraction.

74. The Northwest Justice Project, the largest legal aid provider in Washington with 120 attorneys working in 19 statewide offices, now must repeatedly counsel individuals who refuse to move forward with civil legal claims for fear that filing cases and appearing in court would expose those individuals to immigration arrest and possible deportation. Attorneys in the Northwest Justice Project's Wenatchee, Omak, Yakima, Thurston, and Pierce County offices, as well as attorneys in Seattle who staff the statewide legal-help hotline, all report situations in the last ninth months where a client was hesitant or unwilling to go to court for fear of immigration consequences. Clients now frequently decline to access the family law system—a legal framework exclusively available in state court—due to fear of immigration arrest. Examples from the Seattle and Wenatchee offices include: a domestic violence victim who declined to seek

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 442-4492

a modified a parenting plan, a domestic violence victim who declined to file for divorce from an opposing party incarcerated for sexual abuse, a parent whose minor child was sexually assaulted by the opposing party, and a client whose children were taken by the opposing party while under the influence.

75. The Washington Immigrant Solidarity Network (WAISN), a coalition of 150 immigrant and refugee-rights organizations and individuals in Washington, receives routine calls from noncitizens concerned about appearing in court to attend civil matters or obtain court services. For example, the network received an April 2019 call from a domestic violence survivor who was scared to appear at divorce proceedings at the Ephrata courthouse in Grant County. The same month, a caller expressed fear about going to the same courthouse to obtain her U.S.-citizen child's passport. Also in April 2019, a DACA recipient, called with concerns about going to the Franklin County Courthouse in Pasco to attend a court hearing for driving without a valid license. In August 2019, a crime victim from Quincy requested accompaniment to the Yakima County Courthouse so that she could participate in the case with an advocate alongside her in case she was arrested.

76. The chilling effect reaches beyond counties where DHS is known routinely to arrest noncitizens at courthouses. Although few courthouse arrests are known to have occurred in Walla Walla County, a local bilingual legal advocate reports that she is aware of at least 15 individuals who contacted the YWCA for assistance navigating domestic violence protection orders or parenting plans, but who declined to take legal action because it would require them to appear in court.

77. In Snohomish County, a juvenile sought home release from state custody pending additional proceedings on a criminal charge; however, his older brother, who was the juvenile's legal guardian and only family member in Washington, feared DHS's Courthouse Arrest Policy and did not appear at a court hearing to attest that he could support his little brother. As a result, the juvenile was transferred into the custody of the Washington Department of Children, Youth,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 442-4492

and Families and placed at a youth shelter. This is despite no reported arrests of noncitizens at the Snohomish County courthouse.

78. DHS's Policy also makes noncitizens vulnerable to others who would take advantage of their immigration status by enabling opposing parties to threaten them with courthouse arrest. In Snohomish County, for example, a noncitizen reported a second degree assault to the police, only to have the defendant's investigator threaten to have him arrested by immigration officials at the courthouse. When the noncitizen was later arrested by DHS, he sought to drop the criminal charges so that everything could go back to the way it was before he had reported the assault. The noncitizen had no reason to draw the attention of DHS officials other than the defense investigator's knowledge of his noncitizen status. In Wenatchee, an opposing party in a child custody case threatened to call ICE and direct them to appear at the courthouse to arrest a Northwest Justice Project client who was a victim of domestic violence. In another case, a domestic violence perpetrator threatened to get a victim deported if she filed for divorce.

79. The chilling effect of the Courthouse Arrest Policy also undermines Washington's ability to administer basic services. For example, the Thurston County courthouse shares its facilities with the county auditor, county treasurer, and the Community Planning and Economic Development Department. The June 2019 arrest at the Thurston County courthouse not only discouraged those needing to attend court hearings, but also residents who seek to access the auditor's office for their families' passports or vehicle licenses, the treasurer's office to pay their taxes; and the Community Planning and Economic Development Department for building and environmental health permits.

80. In addition to foregoing local government services, Washington residents have become fearful of accessing state-provided resources. At the Washington State Law Library, for example, reference librarians help individuals find legal materials and understand critical legal issues affecting their lives. Particularly for those who cannot afford an attorney, such services are an essential resource to access justice. Yet, in September 2019, a law librarian reports that she

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 442-4492

learned that a Spanish-speaking couple was afraid to enter the Temple of Justice, where both the Washington Supreme Court and the Washington State Law Library are co-located. Although the library is meant to be a refuge where all are welcome, courthouse arrests made the couple fearful of entering.

81. The fear of courthouse arrest is so great that noncitizens are discouraged from reporting crimes to state law enforcement. A Washington resident who paid cash to rent a home, for example, was assaulted and robbed of cash, some jewelry, and personal documents by his would-be landlord. When a Commissioner of the Washington State Commission on Hispanic Affairs learned of the incident and encouraged the victim to report the crime to the police, the victim refused because he was afraid of DHS's Policy, stating that immigration officials had been "arresting people in the Courts."

82. These examples demonstrate the broad-reaching harms that DHS's arrests at or near courthouses cause Washingtonians and their communities by making individuals afraid to cooperate with law enforcement and the court system. When noncitizens are afraid to seek police help or participate in the justice system, the entire community is made less safe.

**DHS's Policy disrupts Washington's ability to administer a fair and orderly system of justice and impacts stakeholders from across the justice system**

83. DHS's Policy of arresting noncitizens at or near state courthouses has fundamentally interfered with Washington's judicial system. Civil plaintiffs, criminal defendants, crime victims, prosecutors, defense attorneys, civil legal aid providers, court staff, interpreters, and domestic violence advocates all suffer the negative effects of the chill on the immigrant community's willingness to engage with courts. In deterring victims, witnesses, and defendants from accessing state courts, DHS's Policy has deeply disrupted Washington state courts' ability to provide access to justice.

84. For example, DHS agents arrested a domestic violence survivor outside of the Grant County courthouse as the domestic violence survivor was attempting to seek a protection order.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

1   DHS's arrest only further deters domestic violence survivors from seeking the state's protection

2   from abuse.

3       85. Prosecutors, such as Thurston County Prosecutor Jon Tunheim, can no longer give

4   assurances to witnesses or victims that DHS does not engage in enforcement efforts at

5   courthouses. King County Prosecutor Dan Satterberg observes that his office is able to hold

6   violent offenders accountable precisely because of the brave cooperation from undocumented

7   residents who are witnesses or victims of crime. But prosecutors across Washington now must

8   develop and give advice to victims and witnesses about the risks and impact of filing cases and

9   attending required court appearances. As the Criminal Advocate Supervisor and the Program

10  Manager for the Domestic Violence Unit of the King County Prosecutor's office confirm,

11  victims and witnesses frequently decline or fail to appear in court for fear that their immigration

12  status or their partner's immigration status will be made public—resulting in charges being

13  reduced, cases not going to trial, and/or cases being dismissed.

14      86. Similarly, defense attorneys have questioned whether they should be advising their

15  clients to attend court hearings when they might be walking them into a trap. Many defendants,

16  including those with no prior criminal convictions, are caught in a Catch-22. Although they are

17  entitled to their day in court and a bench warrant will issue if they do not appear, they also risk

18  arrest by DHS when they do appear. There is little incentive for noncitizens to cooperate with

19  their defense attorney, attend court, or resolve their case if an immigration arrest is the likely

20  outcome of doing so. Some defense attorneys have tried to negotiate with the court for waivers

21  of appearance to avoid risking an immigration arrest, but that option is not available in all

22  counties or cases.

23      87. Defense attorneys report that they themselves are on edge now that the specter of

24  immigration enforcement looms in or near state courthouses. A Spokane public defender reports

25  that he now offers to accompany noncitizen clients to and from their car when arriving or leaving

26  the courthouse and that he is extremely vigilant when he sees unknown persons observing

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                23                ATTORNEY GENERAL OF WASHINGTON
                                                        Civil Rights Division
                                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA  98104
                                                        (206) 442-4492

courtroom proceedings. The misdemeanor public defenders in Grant County came to a similar decision and agreed to an office-wide policy of advising their clients to wait in the courthouse until the end of the day and then the defenders would walk the clients to their cars.

88. In some instances, DHS has tried to intimidate the attorneys who represent noncitizens in state court. One defense attorney witnessed plain-clothes CBP agents physically manhandle and arrest his Spanish-speaking client as they left the courthouse. When the defense attorney asked to see a warrant, the CBP agent claimed he did not need a warrant. When the CBP agents became unnecessarily physical, the defense attorney requested the Spanish-speaking CBP agent interpret for him so that he could tell the client what was happening. The Spanish-speaking CBP agent refused and threatened to arrest the defense attorney for obstruction of justice.

89. Attorneys for the Northwest Justice Project have also changed their practice in response to DHS's Policy. Northwest Justice Project attorneys now regularly advise clients in Spanish-speaking communities about the risks and impact of filing cases and required court appearances. Increasingly, legal-aid attorneys are having to advise clients about whether particular cases can be filed without the client having to make any court appearance, and to seek court consent for the client not to appear in person.

90. Court interpreters, who generally contract with state courthouses to provide language interpretation in court proceedings, are similarly impacted. Court interpreters in Washington have reported that DHS agents seek to coopt interpreters and use them to transmit questions and effect arrests. DHS agents, for example, have requested court interpreters, who are easily identifiable and wear state-issued interpreter badges, to interpret for them and noncitizens in court hallways and have requested interpreters to ask noncitizens to come out of courtrooms to speak with them. When DHS agents ask for assistance, interpreters are made complicit in federal immigration enforcement actions, though they are not paid by the federal government. In fact, court interpreters are ethically required to serve limited English proficient residents in communicating with their attorneys, prosecutors, and court staff—not assist in their arrest.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

91. Government agencies and non-profits that serve crime victims are also impacted by the Courthouse Arrest Policy. The Washington Department of Commerce Office of Crime Victim Advocacy (OCVA), for example, is a government office tasked with advocating for and helping crime victims obtain needed services and resources. Based on his experience coordinating crime victim services, the Managing Director of OCVA believes federal immigration enforcement in courthouses discourages victims from reporting crimes, making it all the harder for OCVA to provide the necessary services to crime victims. In Whatcom County, the danger for those accessing victim services is also well known. Advocates report DHS officials using services created for victim safety, such as the victim notification service called VINELink, to track and arrest noncitizens. Similarly, the Executive Director of the Office of Civil Legal Aid (OCLA), an independent Washington judicial branch agency that monitors the capacity of the civil legal aid system to address ongoing needs of low-income residents, reports that the effectiveness of legal aid is diminished by the current and threatened federal immigration enforcement activities at or near courthouses. As reported to OCLA, the Latinx community is reticent to seek recourse through the civil justice system, to seek help from court system-related service providers, or even to seek information and advice about their legal rights for fear of courthouse-based immigration enforcement activity.

92. The Courthouse Arrest Policy forced WAISN to develop an entirely new service program. In fall 2018, following the increase in arrests at courthouses and the immigrant community's corresponding fear of being apprehended, WAISN began offering "accompaniment" to people who need to continue with civil court matters, access services, appear as a witness, or file for a protection order. Accompaniment is a service where network volunteers arrange to meet the individual before court and walk side-by-side with them during their attendance. When the noncitizen is arrested by immigration officials during the accompaniment, which has happened, the volunteer is there to remind the immigrant of their constitutional rights, document the arrest through photos or video, ask to see any warrant that

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

25

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

officers may possess, and notify the person's family and friends of what happened. WAISN now routinely receives requests for accompaniment to courthouses in many counties.

93. Judges likewise express concern about the impact DHS's arrests have on their courts. Presiding Judge Brett Buckley of Thurston County's District Court, for example, worries deeply about the serious chilling effects on the ability and willingness of targeted populations to access justice. From a judicial administration standpoint, Judge Buckley observes that cases cannot move forward and courthouse resources are wasted when participants do not show up. Although the Court may issue bench warrants for failure to appear, that tool is useless when a party's appearance results in a DHS arrest that makes the individual unable to attend future court proceedings. Further, issuing bench warrants for failing to appear only creates more criminal cases for judges, prosecutors, and defenders to handle, and sends more people to jail if they are released from immigration detention and then arrested on the bench warrant. All of this exacerbates the waste of state resources.

94. Stakeholders at all levels also recognize that trust in Washington's court system by immigrant communities is being lost. Judges, prosecutors, domestic violence advocates, defense attorneys, immigrant-rights advocates, and immigrants who have experienced courthouse arrest all report that, even though it is federal officers who are conducting the arrests, the arrests cause distrust in county and local officials and courts. The loss of trust in Washington's justice system is a devastating harm for the state court system, and one that will likely take time and dedication by state and local officials to repair, even if the Courthouse Arrest Policy stops operating.

95. In sum, the Courthouse Arrest Policy interferes with Washington's ability to administer justice. Many victims and witnesses will no longer participate at all. For crimes in which the immigrant victims or witness is critical to the case, the prosecution is almost impossible. Where victims still consider participation, victim advocates must spend additional time finding ways for them to feel comfortable attending court, diverting their resources from their other responsibilities. When defendants are detained in the middle of their case or refuse to appear for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

26

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

1 fear of courthouse arrest, victims never get justice and the resources of judges, court staff,

2 prosecutors, defense attorneys, and police are wasted in investigating cases, charging crimes,

3 and preparing for hearings and trials that do not occur. Agencies and non-profits large and small

4 are forced to divert staff and resources to respond to courthouse arrests instead of focusing on

5 other duties. Order, decorum, and public safety at the courthouse are threatened. And, at a

6 fundamental level, trust in state courts is lost.

7 **Washington officials repeatedly attempt to address DHS's Courthouse Arrest Policy**

8 96. Stakeholders participating in every facet of Washington's justice system have recognized

9 the pervasive and destabilizing effect that the Courthouse Arrest Policy has had on the proper

10 functioning of this core state institution. Beginning in early 2017, Washington was one of the

11 first states to respond to the significant increase in federal immigration enforcement actions,

12 including enforcement actions taken at or near state courthouses.

13 97. On February 23, 2017, Governor Jay Inslee issued Executive Order No. 17-01,

14 prohibiting executive agencies from using state agency or department resources to apprehend or

15 arrests persons for violation of federal civil immigration laws, except as otherwise required by

16 federal or state law.

17 98. On March 22, 2017, the Chief Justice of the Washington Supreme Court and co-chair of

18 the Board for Judicial Administration Mary Fairhurst wrote to then-DHS Secretary Kelly

19 expressing concern that ICE's immigration actions at or near courthouses "impede the

20 fundamental mission of [Washington's] courts, which is to ensure due process and access to

21 justice for everyone." *See* Letter from Mary E. Fairhurst, Chief Justice, Wash. Supreme Court,

22 to   John   F.   Kelly,   Sec'y   of   Homeland   Sec.   (Mar.   22,   2017),

23 https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/KellyJohnDHS

24 ICE032217.pdf. Chief Justice Fairhurst's letter requested that DHS designate courthouses as

25 "sensitive locations" where immigration enforcement would be limited. *Id.* DHS never

26 responded to Chief Justice Fairhurst's letter.

99. On June 1, 2017, the Washington State Bar Association became the first statewide bar association to raise concerns about the Courthouse Arrest Policy and request that then-Secretary Kelly reconsider it.

100. Nearly two years later, in response to CBP's courthouse arrest practices, Chief Justice Fairhurst wrote to then-CBP Commissioner Kevin McAleenan. Letter from Mary Fairhurst, Chief Justice, Wash. Supreme Court, to Kevin K. McAleenan, Comm'r, CBP (Apr. 15, 2019), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/KevinMcAleenanUSCustomsBorderProtection041519.pdf. In her April 15, 2019, letter, Chief Justice Fairhurst reiterated her concern that enforcement actions at or near courthouses impact the courts' mission and the communities they serve. She invited Commissioner McAleenan or his staff, including local CBP officials, to meet in person to discuss these concerns and again reiterated her request that courthouses be designated as "sensitive locations" so that Washington courts can be "the safe and neutral public forum all Washington residents deserve." *Id.*

101. On October 8, 2019, Chief Justice Fairhurst joined the Chief Justice of the Oregon Supreme Court, Martha Walters, and met with U.S. Attorneys for the Western District of Washington, Eastern District of Washington, and District of Oregon as well as local ICE and CBP representatives to express their concerns that courthouse arrests in Washington and Oregon are negatively impacting the administration of justice.

102. On October 15, 2019, Chief Justices Fairhurst and Walters followed up on their meeting and wrote to the U.S. Attorneys indicating that both Washington and Oregon would be considering court rules to offer protection where necessary to individuals coming to and leaving courthouses. Letter from Martha L. Walters, Chief Justice, Or. Supreme Court, & Mary Fairhurst, Chief Justice, Wash. Supreme Court, to Brian T. Moran, U.S. Attorney for the W. Dist. of Wash., William D. Hyslop, U.S. Attorney for the E. Dist. of Wash., & Billy J. Williams, U.S. Attorney for the Dist. of Or. (Oct. 15, 2019). The Chief Justices further requested

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

28

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

information as to the degree of "dangerousness" that the federal government believes noncitizens pose and that justifies the frequency of courthouse arrests. *Id.*

103. Individual courthouses have also sought to counteract the direct harms of DHS's civil Courthouse Arrest Policy. The Seattle Municipal Court, for example, issued a policy on April 7, 2017, modeled after King County Superior Court's policy that prohibits the execution of arrest warrants based on immigration status within any courtroom unless directly ordered by presiding judicial officer or when public safety is at immediate risk. In November 2019, Thurston County Superior Court and Thurston County District Court adopted an interim policy providing county security officers and court staff with guidelines on handling armed law enforcement officers who enter any courthouse facility.

104. On November 13, 2019, the Washington Attorney General Bob Ferguson met with the U.S. Attorneys for the Western and Eastern Districts of Washington, along with legal counsel for ICE and CBP. Attorney General Ferguson specifically requested ICE and CBP stop their practice of arresting noncitizens in or around state courthouses. Federal officials declined to do so.

105. The Washington Administrative Office of the Courts houses several Supreme Court Commissions. One of the commissions is the Minority and Justice Commission, which seeks to foster and support a fair and bias-free system of justice. The Administrative Manager for the Minority and Justice Commission reports that, since last spring, it has had to devote almost $19,000 to organizing and preparing several stakeholder meetings to address the community's concerns about DHS arrests and to consider ways in which to reduce the impacts of increased federal immigration activity at Washington courthouses.

106. Other statewide organizations have likewise had to organize and respond to DHS's civil Courthouse Arrest Policy. The Washington Defender Association (WDA), for example, provides training and technical assistance to public defenders across Washington. In response to DHS's Policy, WDA has had to address the issue of immigration arrests at or near courthouses when

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

29

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

providing individual case consultations, developing practice advisories, and training public defenders. WDA estimates that it has devoted more than 1,000 hours to the specific issue of courthouse arrests, equivalent to over $92,000 of its state and local funding.

107. Despite all of these efforts by the Governor, Chief Justice, individual courthouses, prosecutors, defenders, court administrators, state and local organizations, and the Attorney General, DHS arrests in and around Washington courthouses have continued at a high rate and the impact on the state judicial system remains constant.

108. On November 21, 2019, U.S. Attorney General William Barr and Acting DHS Secretary Chad Wolf responded to the October 15, 2019, letter from the Chief Justices of Washington and Oregon. Attorney General Barr and Acting Secretary Wolf did not deny the existence or impact of the DHS Courthouse Arrest Policy and did not address the Justices' concerns about the impact of the Policy on the administration of state court systems. Instead, Attorney General Barr and Acting Secretary Chad Wolf admonished the Justices for considering court rules that would clarify the circumstances under which a civil arrests at courthouses may appropriately be carried out. Letter from William P. Barr, U.S. Attorney Gen., & Chad F. Wolf, Acting Sec'y of Homeland Sec., to Martha Walters, Chief Justice, Or. Supreme Court, & Mary E. Fairhurst, Chief Justice, Wash. Supreme Court (Nov. 21, 2019), https://www.justice.gov/ag/page/file/1219556/download.

109. Despite Washington's efforts to persuade DHS to limit its arrests at Washington state courthouses, DHS's ongoing, publicly affirmed Courthouse Arrest Policy continues to deter noncitizens from participating in the judicial process. Washington courts, like all courts, rely on parties and witnesses to file and attend proceedings. When parties and witnesses fail to come forward, meritorious cases are never filed or result in continued or abandoned proceedings. This all results in uncertainty, wasted resources, and delayed or denied justice for litigants, victims, witnesses, and family members. Courthouse arrests have, and continue to, significantly interfere

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

30

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

with Washington courts' basic functioning. Washington now brings suit to vindicate its sovereign right to operate its court system free from unlawful and unconstitutional interference.

## V.    CAUSES OF ACTION

### FIRST CLAIM
**(Administrative Procedure Act – Federal Common Law Privilege)**

110. Washington realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

111. Administrative agencies may only exercise authority validly conferred by statute. Under the APA, courts must hold unlawful and set aside federal agency action that is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(C).

112. A long-established federal common-law privilege forbids civil arrests in or near courthouses. This privilege extends to parties, witnesses, and all people attending the courts on business.

113. Congress did not displace the federal common-law privilege when it enacted the INA, and the privilege was incorporated as a limit on DHS's civil arrest authority. DHS's Courthouse Arrest Policy thus exceeds DHS's statutory authority and violates the APA.

114. Defendants' violation causes ongoing harm to Washington and its residents.

### SECOND CLAIM
**(Administrative Procedure Act – State Common Law Privilege)**

115. Washington realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

116. Administrative agencies may only exercise authority validly conferred by statute. Under the APA, courts must hold unlawful and set aside federal agency action that is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(C).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

31

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

117. A long-established state common-law privilege forbids civil arrests in or near courthouses. This privilege to parties, witnesses, and all people attending the courts on business.

118. Congress did not displace the state common-law privilege when it enacted the INA, and the privilege was incorporated as a limit on DHS's civil arrest authority. DHS's Courthouse Arrest Policy thus exceeds DHS's statutory authority and violates the APA.

119. Defendants' violation causes ongoing harm to Washington and its residents.

**THIRD CLAIM**
**(Administrative Procedure Act – Arbitrary and Capricious)**

120. Washington realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

121. Under the APA, courts must hold unlawful and set aside federal agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

122. DHS's Courthouse Arrest Policy is arbitrary and capricious because Defendants do not sufficiently explain to whom the Policy applies, do not explain how the Policy complies with congressional statutes requiring certain non-citizens to appear in state courts to qualify for immigration relief, fail fully to consider the foreseeable harms and/or costs of the Policy, do not adequately explain its prioritizing of civil arrests in or near courthouses over the harms triggered by those arrests, and do not adequately justify the change from Defendants' prior policies on courthouse arrests.

123. Defendants' violation causes ongoing harm to Washington and its residents.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

32

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

**FOURTH CLAIM**
**(Tenth Amendment of the U.S. Constitution)**

124. Washington realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

125. The Tenth Amendment preserves the states' historic, sovereign, and fundamental autonomy to control the operation of their judiciaries and to pursue criminal prosecutions.

126. The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.

127. DHS's Courthouse Arrest Policy commandeers Washington's judicial system and unduly interferes with Washington's core sovereign judicial and police functions in violation of the Tenth Amendment.

128. Defendants' violation causes ongoing harm to Washington and its residents.

**FIFTH CLAIM**
**(Right of Access to the Courts)**

129. Washington realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

130. The constitutional right of access to the courts prohibits systemic official action that bans or obstructs access to the courts, including the filing or presenting of suits.

131. DHS's Courthouse Arrest Policy impermissibly obstructs access to the courts by Washington (including its criminal prosecutors) and its residents. *See* Wash. Rev. Code 9A.08 (criminal violations); Wash. Rev. Code 7.69 (victim, survivor, and witness rights); Wash. Rev. Code 7.80 (civil infractions); Wash. Rev. Code 7.90 (sexual assault protection orders); Wash. Rev. Code 7.92 (stalking protection orders); Wash. Rev. Code 11.12 (wills, estates, probates, and trusts); Wash. Rev. Code 13.36 (guardianship); Wash. Rev. Code 19.86 (consumer protection); Wash. Rev. Code 19.144 (mortgage lending); Wash. Rev. Code 26.04 (marriage); Wash. Rev. Code 26.09 (dissolution); Wash. Rev. Code § 26.09.184 (parenting plans); Wash.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

33

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

Rev. Code 26.18 (child support); Wash. Rev. Code 28A.155 (special education); Wash. Rev. Code 26.50 (domestic violence); Wash. Rev. Code 31.04 (consumer loans); Wash. Rev. Code 34.05 (administrative agency decisions); Wash. Rev. Code 36.70B (land use permits and project reviews); Wash. Rev. Code 49.46 (minimum wage); Wash. Rev. Code 49.60 (discrimination); Wash. Rev. Code 59.12 (unlawful detainer); Wash. Rev. Code 59.18, 59.20 (landlord-tenant laws); Wash. Rev. Code 61.12 (mortgages and foreclosures); Wash. Rev. Code 74.34 (abuse of vulnerable adults).

132. Defendants' actions deprive Washington and its residents of meaningful access to the courts in violation of rights under the First, Fifth, Sixth, and Fourteenth Amendments.

133. Defendants' violation causes ongoing harm to Washington and its residents.

## VI.      PRAYER FOR RELIEF

Wherefore, Washington respectfully requests that this Court:

134. Declare that DHS's Courthouse Arrest Policy in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

135. Declare that DHS's Courthouse Arrest Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

136. Declare that DHS's Courthouse Arrest Policy is unconstitutional;

137. Issue an order holding unlawful, vacating, and setting aside Directive Number 11072.1 (Jan. 10, 2018), that formalizes, in part, Defendants' unlawful Policy;

138. Enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from civilly arresting parties, witnesses, and any other individual coming to, attending, or returning from state courthouses or court-related proceedings;

139. Award Washington its reasonable fees, costs, and expenses, including attorneys' fees; and

140. Grant such other and further relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

34

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 442-4492

1

DATED this 17th day of December 2019.

2

3                                    Respectfully Submitted,

4                                    ROBERT W. FERGUSON
                                     Attorney General
5

6                                    s/ Marsha Chien

7                                    COLLEEN MELODY, WSBA #42275
                                     Civil Rights Division Chief
8                                    MARSHA CHIEN, WSBA #47020
                                     MITCHELL A. RIESE, WSBA #11947
9                                    Assistant Attorneys General
10                                   Attorneys for Plaintiff State of Washington
                                     Wing Luke Civil Rights Division
11                                   Office of the Attorney General
                                     800 Fifth Avenue, Suite 2000
12                                   Seattle, WA 98104-3188
                                     Phone: (206) 464-7744
13                                   Colleen.Melody@atg.wa.gov
14                                   Marsha.Chien@atg.wa.gov
                                     Mitchell.Riese@atg.wa.gov
15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY                      35                **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                                      Civil Rights Division
                                                                       800 Fifth Avenue, Suite 2000
                                                                           Seattle, WA  98104
                                                                             (206) 442-4492