1
2
3

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

4
5
6

STATE OF WASHINGTON,

       Plaintiff,

7
8

   v.

9

U.S. DEPARTMENT OF HOMELAND
SECURITY; CHAD WOLF, Acting
Secretary of U.S. Department of
Homeland Security; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
MATTHEW T. ALBENCE, Acting
Director of U.S. Immigration and Customs
Enforcement; U.S. CUSTOMS AND
BORDER PROTECTION; MARK
MORGAN, Acting Commissioner of
U.S. Customs and Border Protection,

       Defendants.

C19-2043 TSZ

ORDER

10
11
12
13
14
15
16

THIS MATTER comes before the Court on defendants' motion to dismiss, docket
no. 118. Having reviewed all papers filed in support of, and in opposition to, the motion,
the Court enters the following order.

17
18
19

## **Background**

20

This litigation serves as a reminder that our Constitution establishes "a healthy
balance of power between the States and the Federal Government," and thereby reduces
"the risk of tyranny and abuse from either front." <u>See</u> <u>Gregory v. Ashcroft</u>, 501 U.S. 452,

21
22
23

458 (1991).  Recognizing that "[i]n the tension between federal and state power lies the promise of liberty," *id.* at 459, the Court considers three basic principles:  (i) when Congress wields the "extraordinary power" authorized by the Supremacy Clause to impose its "will" on the States, it must do so in "unmistakably clear" statutory language, *id.* at 460 (citing U.S. CONST., art. VI, cl. 2 and *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)); (ii) administrative agencies may not act outside the scope of the authority delegated to them by Congress, *see* 5 U.S.C. § 706(2)(C); and (iii) despite the frequent changes within the executive branch, administrative agencies must maintain a sense of consistency, departing from prior policies only when "good reasons" support a new direction, *see* *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) [hereinafter "*Fox*"].[1]  This case, brought by the State of Washington ("State") against a federal agency, the U.S. Department of Homeland Security ("DHS"), and two of its operational components, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"),[2] relies upon these doctrines, which are designed to preserve our federalist system of government.

---

[1] In *Fox*, the Supreme Court clarified that an agency need not show that "the reasons for the new policy are *better* than the reasons for the old one."  556 U.S. at 515 (emphasis in original).  Rather, the new policy must simply be "permissible under the statute," supported by "good reasons," and "believe[d]" by the agency to be "better," where such belief would be reflected by a "conscious change of course."  *Id.*

[2] The States also sues (i) Chad Wolf, Acting Secretary of DHS, (ii) Matthew Albence, Acting Director of ICE, and (iii) Mark Morgan, Acting Commissioner of CBP.

In this matter, the State challenges defendants' practice of civilly[3] arresting people in or near Washington state courthouses, which is an administrative action referred to as a "courthouse arrest." The State contends that, prior to January 20, 2017, when President Donald J. Trump assumed office, "courthouse arrests" were rarely, if ever, conducted, and when performed, they involved only aliens considered particularly dangerous. *See* Compl. at ¶ 30 (docket no. 1) (citing Philip T. Miller,[4] *Guidance Update: Enforcement Actions At or Near Courthouses* (Jan. 26, 2015), Ex. J to Melody Decl. (docket no. 7-10)).

Since early 2017, however, "courthouse arrests" have occurred in 20 of the 39 counties in Washington, including in four of the five largest counties, "all of which have a significant percentage of noncitizen residents and families of mixed immigration status." Compl. at ¶ 52 (docket no. 1).[5] The Complaint describes these "courthouse arrests" as occurring in a clandestine manner, with agents dressed in plain clothes confronting individuals within, or while in transit to or from, state courthouses, and arrestees being placed into sometimes unmarked cars. *See id.* at ¶¶ 49-51 & 70. The State raises concerns about the risks to bystanders, court personnel, or law enforcement

---

[3] The State does not challenge defendants' authority to conduct criminal arrests at or in the vicinity of state courthouses. *See* 8 U.S.C. § 1357(a)(4).

[4] Philip Miller was formerly the Assistant Director for Field Operations, DHS, ICE, Enforcement and Removal Operations ("ERO").

[5] Paragraph 52 of the Complaint lists Adams, Benton, Clark, Cowlitz, Franklin, Grant, Grays Harbor, King, Kitsap, Kittitas, Mason, Okanogan, Pacific, Pierce, Skagit, Spokane, Thurston, Walla Walla, Whatcom, and Yakima Counties as having experienced "courthouse arrests" since 2017.

officers who might misinterpret these surreptitious "courthouse arrests" as "kidnappings" or other crimes, _see id._ at ¶¶ 51, 70, & 78, and it alleges that "courthouse arrests" have had "a noticeable chilling effect on courthouse attendance" in almost 60% of Washington's counties, _see id._ at ¶ 69.[6]

The State has pleaded five claims, three of which allege that defendants have violated the Administrative Procedure Act ("APA"), one of which is premised on the Tenth Amendment of the United States Constitution, and last of which asserts that, in conducting "courthouse arrests," defendants are interfering with certain constitutional and statutory rights of access to state courts. _See id._ at § V, ¶¶ 110-33. Defendants move to dismiss this matter pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting that the Court lacks jurisdiction to hear the State's claims and, alternatively, that the State has failed to articulate claims for which relief may be granted.

**Discussion**

**A.    Jurisdiction**

Defendants' challenges to the Court's jurisdiction relate solely to the State's APA and right-of-access-to-court claims; defendants make no separate argument that the Court lacks jurisdiction with regard to the State's Tenth Amendment claim.[7] The State's APA

---

[6] Paragraph 69 of the Complaint indicates that, in at least 23 of Washington's 39 counties, prosecutors, public defenders, legal aid providers, domestic violence advocates, and/or others have reported the "chilling effect" of defendants' "courthouse arrests."

[7] Defendants contend that "the unavailability of APA review dooms all of the State's claims" because such claims rely on the waiver of sovereign immunity contained in the APA. Reply at 2 n.1 (docket no. 128). Defendants did not raise this argument in their motion, and a footnote in a reply brief is not an appropriate manner of presenting it for the first time. Moreover, the issue need not be addressed in light of the Court's ruling that the State may proceed under the APA.

claims are asserted under two different provisions of the APA, namely (i) 5 U.S.C. § 706(2)(C), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and (ii) 5 U.S.C. § 706(2)(A), which requires that agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" be set aside.

The State makes two claims under § 706(2)(C), one premised on a state common-law privilege against civil arrest in or near a courthouse, and the other based on a similar federal common-law privilege. The State contends that these privileges existed when the Immigration and Nationality Act of 1952 ("INA") was enacted, that the INA did not abrogate these privileges, and that defendants exceeded the authority delegated to them by the INA when they recently adopted a policy permitting "courthouse arrests" of aliens meeting certain criteria. *See* Compl. at ¶¶ 111-13 & 116-18 (docket no. 1).

The State has pleaded a different claim under § 706(2)(A) of the APA. Under the "arbitrary or capricious" standard, the State alleges that defendants (a) have not sufficiently explained their "courthouse arrest" policy, (b) have adopted a policy that is not consistent with statutory requirements for non-citizens to appear in state courts, (c) have failed to consider the foreseeable harms and costs of their practice, (d) have not provided legitimate reasons for prioritizing "courthouse arrests" in light of the harms triggered by those arrests, and (e) have not adequately justified their changes to policies that were in effect during prior administrations. *See id.* at ¶¶ 121-22.

Defendants contend that the Court lacks jurisdiction as to the State's APA claims

for the following reasons: (i) the "courthouse arrest" policy is not a "final agency action"

subject to judicial review under the APA; (ii) the decision to engage in "courthouse

arrests" is committed to DHS's, ICE's, and/or CBP's discretion and cannot be reviewed;

and/or (iii) the State of Washington lacks standing because it is not asserting its own

interests, but rather those of third parties, and it is not within the "zone of interest"

protected by the civil arrest provisions of the INA, 8 U.S.C. §§ 1226[8] and 1357.[9] With

regard to the right-of-access-to-court claim, defendants assert the State lacks standing

because it has not identified a cognizable harm to itself, as opposed to third parties, that

stems from the "courthouse arrest" policy. Most of these arguments have previously

been rejected. *See Ryan v. U.S. Immigration & Customs Enforcement*, 382 F. Supp. 3d

142, 152-55 (D. Mass. 2019); *see also New York v. U.S. Immigration and Customs*

*Enforcement*, --- F. Supp. 3d ---, 2019 WL 6906274 at *3-7 (S.D.N.Y. Dec. 19, 2019).

### 1. **Final Agency Action**

The agency action on which the State's APA claims are primarily based is the

issuance of ICE's Directive No. 11072.1, titled "Civil Immigration Enforcement Actions

---

[8] "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).

[9] "Any officer or employee of the [Immigration and Naturalization] Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of . . . law or regulation and is likely to escape before a warrant can be obtained for his arrest . . . ." 8 U.S.C. § 1357(a)(2). In 1993, the Immigration and Naturalization Service was abolished and its functions divided among ICE, CBP, and U.S. Citizenship and Immigration Services. *See* Ex. B to Melody Decl. (docket no. 7-2).

Inside Courthouses," and dated January 10, 2018.  _See_ Directive No. 11072.1, Ex. Q to Melody Decl. (docket no. 7-17).  The Directive offers the following purpose and background statement:

> Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband.  Accordingly, civil immigration enforcement actions taken _inside courthouses_ can reduce safety risks to the public, targeted alien(s), and ICE officers and agents.  When practicable, ICE officers and agents will conduct enforcement actions discreetly to minimize their impact on court proceedings.

> Federal, state, and local law enforcement officials routinely engage in enforcement activity in courthouses throughout the country because many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations.  ICE's enforcement activities in these same courthouses are wholly consistent with longstanding law enforcement practices, nationwide.  And, courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails.

_Id._ at ¶ 1 (emphasis added).  The Directive then sets forth the following policy:

> ICE civil immigration enforcement actions _inside courthouses_ include actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

> Aliens encountered during a civil immigration enforcement action _inside a courthouse_, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions.

> . . . .

> Civil immigration enforcement actions _inside courthouses_ should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.

*Id.* at ¶ 2 (emphasis added).  The Directive defines "civil immigration enforcement action" as an action "taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations."  *Id.* at ¶ 3.1.

The APA authorizes judicial review as to "[a]gency action made reviewable by statute" or "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  For an agency action to be considered "final," it must (i) "mark the 'consummation' of the agency's decisionmaking process . . . [and] not be of a merely tentative or interlocutory nature," and (ii) be an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (holding that a biological opinion constituted final agency action).  Directive No. 11072.1 satisfies both prongs of this test.  It constitutes ICE's most recent and "final" word on who may be arrested *inside a courthouse*, and it has legal consequences for such individuals.

Defendants assert that Directive No. 11072.1 merely provides guidance to agents in exercising their discretion and therefore cannot be treated as a "final agency action." In a similar case in the Southern District of New York, this argument was rejected in light of the 1,700% rise in "courthouse arrests" in New York following the promulgation of Directive No. 11072.1.  *See New York*, 2019 WL 6906274 at *6-7.  The *New York* Court reasoned that the sheer magnitude of the increase indicated that the policy at issue "embodies ICE's novel interpretation of its statutory authority to conduct courthouse arrests, and not merely case-by-case guidance to individual officers."  *Id.* at *6.

The State of Washington relies on defendants' own figures to suggest that Washington has experienced a 600% upsurge in "courthouse arrests" since 2017, the year before Directive No. 11072.1 was issued,[10] and the anecdotal information offered by the State conveys the sense of a systemic change. _See_ Compl. at ¶¶ 20-67 (docket no. 1). The record supports a conclusion that the effect of Directive No. 11072.1 was essentially to eliminate prior constraints on "courthouse arrests," not just with respect to ICE agents, but also as to CBP personnel.

Defendants point out that Directive No. 11072.1 was issued by ICE, and that CBP has not provided similar written guidance to its officers. A policy, however, need not be written, or even made known to the public, to be judicially reviewable. _See R.I.L.-R v._

---

[10] In response to the State's separate motion for a preliminary injunction, docket no. 6, which is not addressed in this Order, defendants provided the following statistics:

| Agency | Year | Number of "Courthouse Arrests" |
|---|---|---|
| Immigration and Customs Enforcement (ICE) | 2017 | 17 |
| | 2018 | 25 |
| | 2019 | 23 |
| Customs and Border Protection (CBP) | FY 2018 | 55 |
| | FY 2019 | 96 |

Asher Decl. at ¶ 8 (docket no. 97); Watts Decl. at ¶ 8 (docket no. 96) ("FY 2018" runs from October 1, 2017, to September 30, 2018, and "FY 2019" runs from October 1, 2018, to September 30, 2019). The State has deduced from the data provided by defendants that "courthouse arrests" have increased by 600% over the last three years (from 17 in 2017 to 119 in 2019). _See_ Reply at 4-5 (docket no. 109). The Court recognizes the State has ignored the fact that ICE and CBP have annualized their figures differently, but defendants have not offered a different calculation for purposes of analyzing whether Directive No. 11072.1 is a "final agency action." The Court also acknowledges that defendants' "courthouse arrest" figures were not set forth in the State's Complaint, but in ruling on a factual (as opposed to a facial) jurisdictional attack, like the one now asserted by defendants, the Court may consider materials outside the pleadings. _See Safe Air for Everyone v. Meyer_, 373 F.3d 1035, 1039 (9th Cir. 2004).

*Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable. A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" (citations omitted)); *see also Wagafe v. Trump*, 2017 WL 2671254 at *1 & *10 (W.D. Wash. June 21, 2017) (denying a motion to dismiss an APA challenge to "an allegedly secret and unlawful government program").[11] Defendants' "CBP has no policy" argument suggests that CBP agents should be viewed as conducting "courthouse arrests" without the agency's approval. The Court cannot accept the notion that CBP personnel engaged in such activity without prior, formal authorization, especially given the volume of "courthouse arrests" over the past two years and the foreseeable public outcry such arrests have generated. Moreover, because CBP has done nothing to disassociate itself from its agents' behavior, it must be viewed as at least ratifying the "courthouse arrests" at issue and the furtive manner in which they have been performed.

     Defendants also contend that, because Directive No. 11072.1 does not concern arrests other than those effected "inside" courthouses, the State has not identified a final policy regarding arrests "near" courthouses that is susceptible to challenge under the

---

[11] *See also Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206-09 (S.D. Cal. 2019) (concluding that the Trump Administration's unwritten "turnback" policy was subject to judicial review); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 166 (E.D.N.Y. 2018) (observing that "[o]ther courts have found a defendant agency's behavior relevant to inferring the existence of a policy"); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018) (ruling that DHS's unwritten "immigration deterrence" policy constituted "final agency action" for purposes of APA review); *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) ("Determination of the finality of agency action for purposes of judicial review is to be made in a pragmatic way. For example, an agency's failure to act, which is not likely to be in writing, may constitute a final agency action for purposes of judicial review." (citations omitted)).

APA. Defendants' narrow reading of the Directive is disingenuous. To the extent

Directive No. 11072.1 does not authorize arrests "near" courthouses, then the applicable

policy for such arrests is the guidance issued in January 2015 by then ICE ERO Field

Operations Assistant Director Philip Miller, which was not explicitly superseded by

Directive No. 11072.1. *Compare* Miller's *Guidance Update*, Ex. J to Melody Decl.

(docket no. 7-10) *with* Directive No. 11072.1, Ex. Q to Melody Decl. (docket no. 7-17).

The January 2015 policy limits arrests "near" courthouses to "priority" aliens, meaning

those suspected of terrorism or espionage or who had been convicted of a criminal "street

gang" offense, a felony involving immigration history, or an "aggravated felony" as

defined in the INA. *See* Ex. J to Melody Decl. (docket no. 7-10). Defendants make no

assertion that the 65 individuals subjected by ICE to "courthouse arrests" between 2017

and 2019 posed a threat to national security or had the requisite criminal history. Indeed,

of these 65 aliens, 11 had no conviction at all. Asher Decl. at 3 n.4 (docket no. 97). With

respect to the 54 arrestees who had convictions, the record is silent concerning whether

such convictions satisfied the criteria set forth in the January 2015 guidance. *See id.* at

¶ 10(c).

Based on this record, a reasonable inference can be drawn that, in conducting the

65 "courthouse arrests" at issue, ICE agents relied on the broader categories of aliens set

forth in Directive No. 11072.1, paying no attention to the "letter" of the Directive, which

limits its scope to the *inside*, and *not* the vicinity, of a courthouse. ICE personnel having

done so, defendants cannot now assert that the Directive does not involve arrests "near"

courthouses and is not coextensive with the "courthouse arrest" policy that the State

seeks to enjoin.  Defendants will not be permitted to release officers from the previous restrictions on "courthouse arrests" by disseminating a formal, written, and numbered policy, and then characterizing it as something other than a "final agency action."

### 2. **Agency Discretion**

By its own terms, the APA applies except to the extent that (1) a statute precludes judicial review, or (2) the action at issue "is committed to agency discretion by law." 5 U.S.C. § 701(a).  Defendants rely on the second exception to judicial review under the APA, arguing that 8 U.S.C. §§ 1226(a)[12] and 1357(a)(2)[13] commit to DHS's, ICE's, and/or CBP's discretion the determination of where civil enforcement actions against aliens present in the United States will occur.  Defendants, however, reference no specific language in either § 1226(a) or § 1357(a)(2) that concerns the location of an arrest, let alone commits the subject of where arrests may be conducted to DHS's, ICE's, and/or CBP's discretion.[14]  Moreover, defendants' invocation of "agency discretion" is particularly misleading because it presupposes that the State will lose on the merits of its

---

[12] *See* *supra* note 8.

[13] *See* *supra* note 9.

[14] In contrast, 8 U.S.C. § 1357(a)(3) provides explicit guidance concerning the boundaries of an immigration officer's authority to conduct warrantless searches for aliens.  The statute allows an agent "*within a reasonable distance* from any external boundary of the United States, to board and search for aliens any vessel *within the territorial waters of the United States* and any railway car, aircraft, conveyance, or vehicle, and *within a distance of twenty-file miles* from any such external boundary to have access to private lands, but *not dwellings*, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."  8 U.S.C. § 1357(a)(3) (emphasis added).  Section 1357(a)(3) illustrates how Congress defines a geographic scope of authority when it intends to do so.

APA claim, which is premised on the theory that 8 U.S.C. §§ 1226(a) and 1357(a)(2) do not grant discretion to conduct "courthouse arrests." _See_ _New York_, 2019 WL 6906274 at *5. Defendants have not yet established such absence of merit in the State's APA claim.

The APA's exception for actions committed to agency discretion is "very narrow." _See_ _Citizens to Preserve Overton Park, Inc. v. Volpe_, 401 U.S. 402, 410 (1971). The exception applies in only "those rare instances" in which statutes are drawn "in such broad terms that in a given case there is no law to apply." _Id._ Neither § 1226(a) nor § 1357(a)(2) satisfy this test. Indeed, if the State prevails on its argument that those two provisions of the INA incorporate a pre-existing state and/or federal common-law privilege against civil arrest while at or in transit to or from a courthouse, then "an obvious standard against which to evaluate the agency's exercise of discretion" would exist. _See_ _New York_, 2019 WL 6906274 at *5.[15] This possibility belies defendants' assertion that the validity of their "courthouse arrest" policy is unreviewable.

Defendants cite _Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs_, 104 F.3d 1349 (D.C. Cir. 1997), for the proposition that §§ 1226(a) and 1357(a)(2) "grant ICE broad discretion to determine the location of a civil enforcement action against an alien present in the United States." Defs.' Resp. at 17 (docket no. 95). Defendants have misrepresented the holding of _Legal Assistance_. In

---

[15] The _New York_ Court further observed: "Even assuming _arguendo_ that plaintiffs were wrong on the merits of this [common-law privilege] argument, their contention satisfies their burden at this stage of the litigation to present a _prima facie_ case for reviewability." 2019 WL 6906274 at *5 (emphasis in original, citing _Robinson v. Overseas Military Sales Corp._, 21 F.3d 502, 507 (2d Cir. 1994)).

*Legal Assistance*, the plaintiffs challenged as discriminatory, as well as arbitrary and capricious, a State Department "consular venue" policy, which required that the visa applications of certain Vietnamese and Laotian migrants be processed in their home countries. *See* 104 F.3d at 1350. While the case was pending, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") was enacted. *Id.* at 1351. IIRIRA contained a provision that "entrusted to the discretion of the State Department" consular venue determinations. *Id.* at 1351-53 (citing 8 U.S.C. § 1152(a)(1)(B)). The Ninth Circuit held that the consular venue policy was not reviewable under the APA. *See id.* at 1353.

*Legal Assistance* involved an entirely different provision (*i.e.*, § 1152) of the INA than the ones at issue in this matter (*i.e.*, §§ 1226 & 1357). In addition, the language of § 1152 (IIRIRA § 633) specifically reserved to the Secretary of State discretion regarding where visa applications will be handled, while neither § 1126(a) nor § 1357(a)(2) refer to the location of arrests or purport to impart unfettered discretion to DHS, ICE, and/or CBP to conduct arrests at or near courthouses. *Legal Assistance* does not in any way support defendants' position.

Defendants also attempt to bring the "courthouse arrest" policy within the ambit of the decisions by the Attorney General for which no judicial review is available, namely the "Attorney General's discretionary judgment regarding the application" of § 1226, and "any action or decision by the Attorney General" under § 1226 regarding "the detention or release of any alien or the grant, revocation, or denial of bond or parole." *See* 8 U.S.C. § 1226(e). Defendants' analysis is fatally flawed. Section 1226(e), which insulates only

the Attorney General's exercise of discretion, does not apply because the "courthouse arrest" policy was not promulgated or executed by the Attorney General, but rather is an invention of DHS (and/or its operational components, ICE and CBP), a separate agency that is not part of the U.S. Department of Justice ("DOJ"). Notably, the State has not named either the DOJ or United States Attorney General William Barr as defendants in this action. The Court concludes that, contrary to defendants' assertion, the "courthouse arrest" policy did not arise from the unreviewable "exercise of prosecutorial discretion," *see* Defs.' Mot. at 9 (docket no. 118), and defendants cannot seek refuge under § 1226(e).

### 3. Standing

Article III standing consists of (i) constitutional standing, and (ii) prudential standing. *See Ryan*, 382 F. Supp. 3d at 152-55; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014). Defendants challenge both the constitutional and prudential standing of the State of Washington to assert its APA claims. With respect to the State's right-of-access-to-court claim, defendants attack only the State's constitutional standing.

### a. Constitutional Standing

To satisfy Article III's "case or controversy" requirement, a plaintiff must have (1) "suffered an injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "that is likely to be redressed by a favorable judicial decision." *See, e.g., Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). With respect to the APA claims, defendants argue that the State does not having standing because (i) it is complaining of injuries stemming from the "independent" decisions of third parties not to

appear for proceedings in state courts,[16] and (ii) it is asserting the interests of such third

parties, as to whom the State "possesses no legitimate interest in protecting . . . from the

government of the United States," *see* *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d

253, 269 (4th Cir. 2011) (quoted in Defs.' Mot. at 4 (docket no. 118)).  In moving to

dismiss the right-of-access-to-court claim, defendants also question the State's ability to

assert the harms suffered by prosecutors in moving their cases forward.

All of defendants' contentions ignore the "special solicitude" owed to any state in

evaluating its standing.  *See* *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015),

*aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).  A state is entitled to such

"special solicitude" when its suit against a federal agency (1) involves the "proper

construction of a congressional statute," (2) does not purport to "immunize [state]

citizens from federal law," and (3) seeks to advance the state's "'quasi-sovereign'

interests" by, for example, (i) questioning federal assertions of authority to regulate

matters alleged to be within the state's control, (ii) denying federal preemption of state

law, or (iii) alleging federal interference with enforcement of state law.  *Id.* at 151-53

(alteration in original, citing *inter alia* *Massachusetts v. Envtl. Prot. Agency*, 549 U.S.

497, 516-20 (2007), and *Virginia ex rel. Cuccinelli*, 656 F.3d at 270).

This litigation satisfies all of these criteria, and the State has "constitutional"

standing.  The State presents claims requiring interpretation of both the INA and the

---

[16] Contrary to defendants' assertion, when victims, witnesses, or accused persons are civilly arrested and held in custody, their subsequent absence from state court proceedings is quite the opposite of an "independent" decision.

APA, thereby raising questions "eminently suitable to resolution in federal court."

_Massachusetts_, 549 U.S. at 516.  Moreover, unlike in _Virginia ex rel. Cuccinelli_, on

which defendants rely,[17] in this action, the State is not attempting to insulate Washington

residents from the proper application of the INA or any other federal law.  Rather, the

State is asserting its own, rather than any third party's, interest in expeditiously

prosecuting criminal matters,[18] protecting the rights and safety of its residents, and

---

[17] The Fourth Circuit's holding that the Commonwealth of Virginia lacked standing to challenge the "individual mandate" of the Patient Protection and Affordable Care Act ("ACA") provides no support for defendants' position.  _See_ 656 F.3d at 266-67.  In _Virginia ex rel. Cuccinelli_, the Fourth Circuit observed that the "individual mandate," which imposes a "penalty" on individual taxpayers who fail to "maintain" adequate health insurance, did not "directly burden Virginia," "commandeer Virginia's enforcement officials," or "threaten Virginia's sovereign territory."  _Id._ at 267-68.  The Fourth Circuit further reasoned that the Virginia Health Care Freedom Act ("VHCFA"), signed by the Governor of Virginia the day after the ACA was enacted, which "regulate[d] nothing," administered "no state program," and merely sought "to nullify federal law," did not create the type of conflict between state and federal law that would confer standing on Virginia, but rather was "a smokescreen for Virginia's attempted vindication of its _citizens'_ interests."  _Id._ at 269-70 (emphasis in original).  In this matter, the State of Washington does not rely on a similar "smokescreen."  Rather, the State alleges what the Commonwealth of Virginia could not with respect to the ACA, namely that defendants' challenged "courthouse arrest" policy (i) imposes direct burdens on the State, some of which are financial, _see_ Delostrinos Decl. at ¶¶ 13 & 17 (docket no. 20) (indicating that the Washington Supreme Court's Minority & Justice Commission has spent over $18,000 in staff time and direct expenses addressing the issue of increased federal immigration enforcement activity at or near state courthouses, diverting resources from other work of the Commission); Hedman Decl. at ¶ 10 (docket no. 27) (stating that the Washington Defender's Association has devoted almost 1,300 hours at a cost of over $92,000 in state and local funds to deal with the impact of the "courthouse arrest" policy), (ii) commandeers state resources, and (iii) threatens the State's areas of sovereignty, particularly its ability to effectively operate its courthouses and prosecute its criminal cases.

[18] Although criminal matters are generally handled by elected county prosecutors and their deputies, every prosecution is brought on behalf of the State, and in the event of a conflict of interest on the part of a county prosecutor, the Attorney General of the State of Washington will manage the case.  _See_ WASH. CONST. art. 4, § 27 ("The style of all process shall be, 'The State of Washington,' and all prosecutions shall be conducted in its name and by its authority."); _see also_ _State v. McCarthy_, 178 Wn. App. 90, 103, 312 P.3d 1027 (2013) (affirming the disqualification of a county prosecutor's entire office, after which the case was prosecuted by the Office of the Attorney General); _State v. Fisk_, 151 Wn. 323, 326, 275 P. 940, 278 P. 156 (1929).

operating a fair, just, and orderly court system.  Like their argument that the location of civil arrests is committed to DHS's, ICE's, and/or CBP's discretion, defendants' contention that the State lacks constitutional standing improperly presupposes that the State will not prevail on the merits of its legal theory that, with respect to civil arrests, its courthouses are sacrosanct.  The State is entitled, however, to have the merits of its claims adjudged separately from its standing to assert the claims.

### b.    <u>Prudential Standing</u>

Defendants argue that the State lacks prudential standing to proceed on its APA claims because "the interests it seeks to vindicate do not 'fall within the zone of interest protected by the law invoked.'"  Defs.' Mot. at 4 (docket no. 118).  This contention misconstrues the doctrines of prudential standing.  In <u>Lexmark</u>, on which defendants rely, Justice Scalia, writing for the majority, acknowledged that the term "prudential" standing is a misnomer.  572 U.S. at 127.  He characterized prudential standing as encompassing three broad principles:  (i) a general prohibition on a litigant raising another person's legal rights; (ii) a rule barring the adjudication of generalized grievances more appropriately addressed in the representative branches of government; and (iii) a requirement that a plaintiff's claim fall within the "zone of interests" protected by the law invoked.  <u>Id.</u> at 126.  Except as addressed in connection with constitutional standing, defendants do not assert that the State's APA claims fail under either the first or second precepts of prudential standing; they raise only the third "zone of interests" hurdle.

The <u>Lexmark</u> Court clarified that the "zone of interests" test is one of two components of an inquiry evaluating "statutory standing."  <u>Id.</u> at 128 n.4 & 129.  The

other element of "statutory standing" is proximate causality.  *Id.* at 129, 132-34.  If both

of these standards are met, then the court has jurisdiction to adjudicate the case.  *See id.* at

128 n.4.  In evaluating "statutory standing," the inquiry is whether the plaintiff has a

cause of action under the statute at issue.  *Id.* at 128.  In answering this question, the

Court must apply "traditional principles of statutory interpretation."  *Id.*  In the context of

the APA, the "zone of interests" test is "not 'especially demanding,'" and it forecloses a

suit only when a plaintiff's interests are "so marginally related to or inconsistent with the

purposes implicit in the statute" that Congress cannot be reasonably understood to have

authorized such plaintiff to sue.  *Id.* at 130.  This lenient approach preserves "the

flexibility of the APA's omnibus judicial-review provision, which permits suit for

violations of numerous statutes of varying character that do not themselves include

causes of action for judicial review."  *Id.*

  In arguing that the State lacks standing because the INA does not provide the State

with any right of action, defendants ignore the fact that the State sues under the APA, not

the INA, and they fail to acknowledge the distinction drawn by the *Lexmark* Court

between the APA and other statutes.[19]  As recognized by the unanimous decision in

*Lexmark*, the APA provides an avenue of judicial review even when the statute pursuant

---

[19] As support for their position, defendants cite to *Immigration & Naturalization Serv. v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301 (1993), which is not an opinion on the merits by a majority of the Justices of the United States Supreme Court, but is simply an order by Justice O'Connor granting a stay of a district court's decision pending appeal to the Ninth Circuit.  In her order, Justice O'Connor merely speculated about how the relevant standing doctrines would later develop, and her predictions were not accurate.  *See Cook Cty. v. McAleenan*, 417 F. Supp. 3d 1008, 1021 (N.D. Ill. 2019).

to which a federal agency has acted or failed to act offers no such cause of action.  *Id.*  To hold, as defendants propose, that DHS, ICE, and CBP may avoid judicial review simply because the INA does not itself contemplate all the ways in which the agency or its operational components might violate the statute would essentially elevate DHS to "a fourth branch of government, with unfettered discretion not subject to any meaningful review by any constitutional court."  *New York*, 2019 WL 6906274 at *4.

In bringing the APA claims at issue, the State advances interests that are much more than "marginally related" to, and are entirely consistent with, the underlying purposes of the INA.  The INA reflects Congress's "preference that federal immigration enforcement not impede state criminal law enforcement."  *Ryan*, 382 F. Supp. 3d at 155 (citing 8 U.S.C. § 1231(a)(4)(A) (barring the Attorney General from removing "an alien who is sentenced to imprisonment until the alien is released from imprisonment")); *see also New York*, 2019 WL 6906274 at *4 (citing 8 U.S.C. § 1101(a)(15)(U) (providing immigration status to alien victims of crime who assist law enforcement)).  The State's APA claims aim to confine defendants' activities within the scope of authority granted to them by the INA, and thereby foster the goals of the INA.[20]  Despite defendants' efforts

---

[20] *Fed'n for Am. Immigration Reform, Inc. ("FAIR") v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), on which defendants rely is distinguishable.  *FAIR* concerned the standing of an association whose members challenged the favorable treatment that other persons, namely certain Cuban nationals, might receive, in the form of "parole" into the United States and an ability to apply for lawful permanent resident status.  *See* 93 F.3d at 899-901.  The District of Columbia Circuit concluded that FAIR's members, who claimed they would be adversely affected by a "rush of immigrants," which might increase local unemployment, reduce wages, and place burdens on public services in the community, were not the intended beneficiaries of the INA provisions at issue.  *Id.* at 900-04.  The State of Washington is not an association of individuals like FAIR, and it is not suing over how any section of the INA is applied in a particular case; it is challenging a policy of an

to show otherwise, the State satisfies the "zone of interests" standard and has "statutory" or "prudential" standing.  _See_ _Texas_, 809 F.3d at 152 ("the states are within the zone of interests of the . . . INA").  Having concluded that the State has both "constitutional" and "prudential" standing, the Court hereby DENIES defendants' Rule 12(b)(1) motion to dismiss this matter for lack of jurisdiction.

**B.**     **Well-Pleaded Claims**

A complaint challenged by a Rule 12(b)(6) motion to dismiss need not provide detailed factual allegations, but it must offer "more than labels and conclusions," contain more than a "formulaic recitation of the elements of a cause of action," and indicate more than mere speculation of a right to relief.  _See_ _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 555 (2007).  In ruling on a motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in the plaintiff's favor.  _Usher v. City of L.A._, 828 F.2d 556, 561 (9th Cir. 1987).  The question for the Court is not whether the plaintiff has presented a prima facie case or is likely to prevail, but rather only whether the facts in the complaint sufficiently state a "plausible" ground for relief.  _See_ _Twombly_, 550 U.S. at 570.  Under this standard, the State of Washington's operative pleading passes muster.

---

administrative agency on the grounds that such policy conflicts with the INA and is otherwise arbitrary or capricious.

### 1.    **Administrative Procedure Act**

#### a.    **Exceeding Authority**

With regard to the State's APA claims that defendants' "courthouse arrest" policy exceeds their authority, defendants proffer three arguments:  (i) the state common-law privilege against "courthouse arrest" is "irrelevant" because federal law governs; (ii) any federal common-law privilege is either extinct or "narrow," applying to only service of process in a private civil suit when the target has travelled across state lines for litigation purposes; and (iii) any privilege against "courthouse arrest" was pre-empted by the INA. Defendants' arguments are more appropriately reserved for a motion pursuant to Federal Rule of Civil Procedure 56.  For purposes of ruling on defendants' Rule 12(b)(6) motion, the Court is satisfied the State has adequately alleged that state and/or federal common-law privileges against "courthouse arrest" existed at the time the INA was enacted, that Congress did not abrogate the privilege or privileges when it passed the INA,[21] and that, in issuing their "courthouse arrest" policy, defendants exceeded the authority delegated to them in the INA.  *See New York*, 2019 WL 6906274 at *8-11; *Ryan*, 382 F. Supp. 3d at

---

[21] Defendants' contention that the privilege developed under state law is "irrelevant" or, at least, not incorporated into the INA via legislative silence misses the crux of the State's related APA claim, which is premised on the doctrine that federal statutes must be interpreted to maintain "the usual constitutional balance" between the states and the federal government unless a contrary purpose is expressed in "unmistakably clear" statutory language.  *See New York*, 2019 WL 6906274 at *10 (quoting *Gregory*, 501 U.S. at 460); *see also Ryan*, 382 F. Supp. 3d at 157 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952))).  Defendants have not identified any provision of the INA indicating a Congressional intent to displace the state common-law privilege against "courthouse arrests."

157-59.  The State has done all that is necessary at this stage of the litigation, namely to set forth a "plausible" claim for relief under § 706(2)(C) of the APA.

### b.    Arbitrary or Capricious

Defendants expended little effort in seeking to dismiss the State's claim under § 706(2)(A) of the APA.  In the two paragraphs contained in their motion, defendants stated in conclusory fashion that their "courthouse arrest" policy is "not an unexplained departure from past practice," that Directive No. 11072.1 is essentially self-explanatory, and that the Directive and its predecessors reflect "consideration of the consequences" of "courthouse arrests" on "state courts, victims, witnesses, and family members of target aliens."  Defs.' Mot. at 16 (docket no. 118).  These bald assertions[22] do not support dismissal of the State's APA claim alleging that defendants' "courthouse arrest" policy is the product of arbitrary or capricious agency action.

The scope of review under § 706(2)(A) is narrow, and the Court must refrain from substituting its judgment for that of the agency.  _Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co._, 463 U.S. 29, 43 (1983) [hereinafter "_MVMA_"].  Nevertheless, in responding to an "arbitrary or capricious" challenge, an agency must

---

[22] Defendants' motion does not even mention, let alone offer a reason to dismiss, two of the State's five accusations, namely that the "courthouse arrest" policy is incompatible with federal laws "requiring certain non-citizens to appear in state courts to qualify for immigration relief," and that defendants have not made clear exactly who are the targets of their "courthouse arrest" policy.  _See_ Compl. at ¶ 122 (docket no. 1); _see also_ _supra_ pages 10-12 (comparing the wording of Directive No. 11072.1, which applies "inside" courthouses, with ICE's and CBP's activities, which have occurred "near," but "outside" courthouses, leaving the criteria for targeting an alien for "courthouse arrest" uncertain).  Thus, these grounds for challenging the "courthouse arrest" policy under § 706(2)(A) of the APA would remain in the case even if defendants prevailed on their motion to dismiss.

articulate "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" _Id._ Agency action may be deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when (i) the agency has relied on factors that Congress did not intend for it to consider, (ii) the record contradicts the agency's conclusion, (iii) the agency's rationale is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or (iv) the agency has inexplicably acted inconsistently with its prior decisions. _See id._; _Organized Vill. of Kake v. U.S. Dep't of Agric._ [hereinafter "_Kake_"], 795 F.3d 956, 966 (9th Cir. 2015) (en banc); _Saget v. Trump_, 345 F. Supp. 3d 287, 298 (E.D.N.Y. 2018). An agency may not "depart from a prior policy _sub silentio_ or simply disregard rules that are still on the books." _Saget_, 345 F. Supp. 3d at 298 (quoting _Fox_, 556 U.S. at 515). Rather, in altering course, the agency must display an awareness that it is changing its position and show that good reasons support the new policy. _Fox_, 556 U.S. at 515.

The State has pleaded a "plausible" claim that defendants' "courthouse arrest" policy cannot survive scrutiny under the standards articulated in _Fox_, _MVMA_, and _Kake_. _See_ _Twombly_, 550 U.S. at 570. Defendants' contention that their "courthouse arrest" policy is "not an unexplained departure" from prior practices is undermined by their own position that Directive No. 11072.1 applies only to arrests "inside" courthouses, while defendants have engaged in arrests "near" courthouses, in violation of prior guidance that apparently remains in effect. Moreover, to the extent Directive No. 11072.1 charts a new course with respect to "courthouse arrests," it does not reflect the requisite awareness of

such change, having failed to reference, let alone supersede, prior policies. Whether, in light of the yet-to-be-filed administrative record, the State can sustain its allegation that the "courthouse arrest" policy improperly departed *sub silentio* from prior practices is a question for another day.

Likewise, the merits of the State's attack on the explanations given for defendants' "courthouse arrest" policy are not now appropriately before the Court. Defendants assert that their "courthouse arrest" policy was necessitated by the "unwillingness" of various jurisdictions, including the State of Washington, to "cooperate with ICE in the transfer of custody of aliens from their prisons and jails." Directive No. 11072.1, Ex. Q to Melody Decl. (docket no. 7-17). Defendants, however, cite no authority for the proposition that such retaliatory motive constitutes a factor that Congress intended for them to consider or that such motive would survive constitutional scrutiny. In addition, in a report submitted by the State, the University of Washington's Center for Human Rights ("UWCHR") suggests that, "[f]ar from being a response to the limitations imposed by so-called 'sanctuary' provisions," arrests in or near courthouses occur more frequently in Washington counties where "local authorities collaborate *most* with federal immigration enforcement." *See* Ex. A to Godoy Decl. (docket no. 23-1 at 13) (emphasis in original).[23]

---

[23] Of the 48 "courthouse arrests" catalogued by UWCHR from sources other than DHS, which occurred during the Trump Administration, 27 or 56.25% took place in three Washington counties, namely Adams, Clark, and Grant, which are not "sanctuary" areas for undocumented immigrants. *See* Ex. A to Godoy Decl. (docket no. 23-1 at 14-16). Although the State cited to the UWCHR report in its pleading, *see* Compl. at ¶ 52 (docket no. 1), it did not highlight these findings. The Court has relied on this material only to reach the conclusion that whether "courthouse arrests" actually correlate with local "sanctuary" efforts is a question of fact not susceptible to resolution on a Rule 12(b)(6) motion.

Defendants also contend that "courthouse arrests" promote safety because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband," _see_ Defs.' Reply at 9 (docket no. 128) (quoting Directive No. 11072.1), but their reasoning does not extend to arrests conducted (i) by agents in plain clothes whose actions might be misinterpreted, or (ii) in the vicinity (_i.e._, outside) of courthouses, where any weapons ban would have no effect. Contrary to defendants' arguments, the State has pleaded a "plausible" claim that defendants' "courthouse arrest" policy is arbitrary or capricious.

>    **2.** **Tenth Amendment**

Defendants move to dismiss the State's claim under the Tenth Amendment on the ground that the "courthouse arrest" policy does not compel the State to act or refrain from acting. In making this argument, defendants rely exclusively on "anticommandeering" jurisprudence, which prevents Congress from issuing orders directly to the states or their officers. _See Murphy v. Nat'l Collegiate Athletic Ass'n_, 138 S. Ct. 1461, 1475-76 (2018); _Printz v. United States_, 521 U.S. 898, 935 (1997). Defendants cite no authority interpreting the Tenth Amendment in the context of a policy issued by a federal administrative agency, as opposed to Congress or another branch of government. In referring to the various anticommandeering cases, defendants appear to suggest that Congress is not otherwise restricted from encroaching on states' rights, a proposition fully contradicted by the Constitution itself, _see Murphy_, 138 S. Ct. at 1476 (observing

that Congress has "only certain enumerated powers"),[24] and they seemingly fail to appreciate that, while they have been delegated certain authority by Congress, they are not Congress and cannot invoke legal doctrines applicable to Congress.

The Court recognizes that the State uses the term "commandeer" in summarizing its Tenth Amendment claim, but the State also alleges that the "courthouse arrest" policy "unduly interferes with Washington's core sovereign judicial and police functions" in violation of the rights reserved to it by the Constitution.  _See_ Compl. at ¶ 127 (docket no. 1).  The facts pleaded in the State's complaint lend support to this contention, and the Court concludes that, regardless of whether state courthouses, judges, or officials have been "commandeered," the State is entitled to proceed forward on its Tenth Amendment claim.  _Cf._ _New York_, 2019 WL 6906274 at *12 (ruling that the State of New York had alleged the "type of commandeering similar to those that the Supreme Court has found to lie at the heart of a Tenth Amendment cause of action").

### 3.    Right of Access to Court

Right-of-access-to-court claims generally fall into two categories:  (i) "forward-looking" claims asserting that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and (ii) "backward-looking" claims

---

[24] _See also_ _Garcia v. San Antonio Metro. Transit Auth._, 469 U.S. 528, 550-56 (1985) (federal law that impacts a state's "residuary and inviolable sovereignty" must be examined in light of the "procedural safeguards inherent in the structure of the federal system," recognizing that the states occupy "a special and specific position," which the limited scope of Congress's authority must reflect (quoting THE FEDERALIST No. 39, at 285 (James Madison) (B. Wright ed., 1961))); _New York v. United States_, 505 U.S. 144, 187 (1992) ("[T]he Constitution protects us from our own best intentions:  It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.").

alleging that "specific cases . . . cannot now be tried (or tried with all material evidence)" regardless of any future official action.  *See* *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002).  A forward-looking claim seeks to remove an obstacle to the desired litigation, while a backward-looking claim focuses on a time when, as a result of some impediment, a case ended poorly, was not commenced, or could have produced a remedy that is now unobtainable.  *Id.*

The State raises only a forward-looking claim.[25]  *See* Pla.'s Resp. at 22 (docket no. 127).  Defendants offer three grounds for dismissing the State's claim:  (i) the State may not assert First Amendment and Sixth Amendment claims on behalf of aliens who are not lawfully present in the United States; (ii) the "courthouse arrest" policy does not violate aliens' rights of access to the courts; and (iii) the State's inability to procure witnesses for its criminal prosecutions is not a constitutional injury.

Defendants' first set of arguments extend the cited authorities far beyond their intended bounds.  Defendants rely on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), for the proposition that the First Amendment right to petition the government for a redress of grievances does not apply to unlawfully present aliens.  *Verdugo-Urquidez* does not so hold.  The issue in *Vergudo-Urquidez* was whether the Fourth Amendment protected against a warrantless search of property located in Mexico and owned by a nonresident alien.  *Id.* at 261-62.  The case did not involve the right of access to the

---

[25] Thus, the Court need not address defendants' argument that the State's operative pleading does not satisfy the standards applicable to backward-looking claims, which are set forth in *Christopher*.

courts, and defendants' extrapolation is improper. Moreover, in interpreting the phrase "the people," which appears in both the First and Fourth Amendments, as referring to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," the *Verdugo-Urquidez* Court did not preclude unlawfully present aliens from asserting rights secured by the First Amendment. *Id.* at 265.

Defendants also misconstrue *United States v. Sabatino*, 943 F.2d 94 (1st Cir. 1991). In *Sabatino*, a husband and wife were convicted of federal offenses in connection with the operation of an escort service. *Id.* at 95. On direct appeal, the wife asserted that she had been prejudiced by the incompetent performance of her husband's trial attorney. *Id.* at 96 n.1. The First Circuit rejected the wife's argument because she could not assert her husband's Sixth Amendment right to counsel and because her husband's lawyer's behavior (*i.e.*, informing the jury about the contents of certain prosecution witnesses' plea agreements) did not constitute error. *Id.* *Sabatino* says nothing about the right of access to the courts, and does not support defendants' assertion that the State may not bring a claim under the Sixth Amendment.

Defendants' second group of contentions concerning why the "courthouse arrest" policy does not violate aliens' rights of access to the courts are unpersuasive. Defendants assert that aliens have no right to evade arrest, and that a person's "voluntary" decision not to appear for court to avoid arrest is not protected by the Sixth Amendment, but these arguments are circular; the question is not whether aliens can elude arrest, but rather whether aliens have a right to come and go from state courthouses without fear of arrest.

Defendants also accuse the State of failing to provide evidence that defendants have acted with the goal of preventing the State or individuals from filing suit, but in doing so, defendants have put the proverbial cart before the horse; the State has pleaded its claim, and a Rule 12(b)(6) motion does not force it to present any evidence. Defendants' argument that Congress can or has displaced the State's authority to prosecute criminal matters and/or control its courthouses is repetitive of assertions made elsewhere, *see supra* pages 12-15 & note 21, and the Court reaches the same conclusion here, namely that defendants have not made the requisite showing to invoke the Supremacy Clause.

In advancing their final basis for seeking dismissal of the State's right-of-access-to-court claim, defendants again refer to a case way out of context. Defendants quote from *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), in which the Supreme Court observed:

> The mere fact that the Government deports such [illegal-alien] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

*Id.* at 872-73. *Valenzuela-Bernal* does not concern the right of access to the courts. In addition, it does not involve a state's ability to prosecute a criminal matter, but rather a defendant's right to "secure the attendance and testimony" of "*witnesses in his favor*." *Id.* at 867 (emphasis in original). Finally, contrary to defendants' assertion, *Valenzuela-Bernal* does not suggest that the unavailability of prosecution witnesses resulting from fear of or actual civil arrest cannot, as a matter of law, constitute a constitutional harm; rather, the case would merely require a showing that the lost evidence is material and

favorable to the State. For purposes of defendants' Rule 12(b)(6) motion, the Court presumes the State can meet this standard by averring that it cannot proceed to trial in the absence of the victim and/or a witness to the crime. The State has pleaded a "plausible" right-of-access-to-court claim.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)    Defendants' motion to dismiss, docket no. 118, is DENIED.

(2)    Defendants' related motion to stay discovery, docket no. 120, pending the Court's ruling on defendants' motion to dismiss, is STRICKEN as moot.

(3)    Defendants are DIRECTED to file the administrative record in this matter within sixty (60) days of the date of this Order.

(4)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 10th day of April, 2020.

Thomas S. Zilly
United States District Judge