The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON,

                Plaintiff,

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

                Defendants.

CASE NO.  19-CV-2043-TSZ

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Matthew T. Albence, pursuant to 28 U.S.C. §1746, declare under penalty of perjury as follows:

1.      I am the Deputy Director and Senior Official Performing the Duties of the Director for U. S. Immigration and Customs Enforcement ("ICE").  In this capacity, I am the highest ranking official within ICE and oversee all of its component groups, including the day-to-day operations of the agency, an annual budget of over $8 billion, and more than 20,000 employees.  I have been the Deputy Director of ICE since August 2018 and was temporarily appointed as the Acting Director of ICE on July 5, 2019.  I was also the Executive Associate Director for ICE Enforcement and Removal Operations from January 2017 to August 2018.  In total, I have over 25 years of federal law enforcement experience, beginning with the former United States Immigration & Naturalization Service, and

subsequently within the United States Department of Homeland Security, to include ICE and the Transportation and Security Administration.

2.      The facts attested to herein are based upon my personal knowledge or upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      The documents listed in the accompanying Administrative Record Index and contained in the files annexed hereto constitute, to the best of my knowledge and belief, a true and complete copy of all documents and materials considered by ICE in issuing the policy directive at issue in this case, dated January 10, 2018, and entitled Directive 11072.1 "Civil Immigration Enforcement Actions Inside Courthouses."

I certify under penalty of perjury that the foregoing is true and correct. Executed this 29th day of May, 2020 in Washington, D.C.

Matthew T. Albence
Deputy Director and Senior Official
Performing the Duties of the Director
Immigration and Customs Enforcement

The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON,

CASE NO.  19-CV-2043-TSZ

                    Plaintiff,

            v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

                    Defendants.

## CERTIFIED  INDEX  TO  ADMINISTRATIVE  RECORD

| DOCUMENT | | PAGE |
|---|---|---|
| 1. | Department of Homeland Security, Implementation of Section 1367 Information Provisions, Directive 002-02 (Nov. 1, 2013) | ICE CAR 001-004 |
| 2. | Department of Homeland Security, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes, Directive 215-01 (Nov. 6, 2013) | ICE CAR 005-007 |
| 3. | Department of Homeland Security, Department Reporting Requirements, Directive 034-06, Revision 1 (Oct. 23, 2015) | ICE CAR 008-010 |
| 4. | Department of Homeland Security, Implementation of Section 1367 Information Provisions, Instruction 002-02-001 (Mar. 28, 2017) | ICE CAR 011-038 |
| 5. | Department of Homeland Security, Implementation of Section 1367 Information Provisions, Instruction 002-02-001 (Nov. 7, 2013) | ICE CAR 039-054 |
| 6. | Department of Homeland Security, Implementation of Section 1367 Information Provisions, Instruction 002-02-001 (Nov. 7, 2013) | ICE CAR 055-070 |
| 7. | Executive Order, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017) | ICE CAR 071-075 |
| 8. | U.S. Immigration and Customs Enforcement, Enforcement Actions at or near Courthouses (Mar. 19, 2014) | ICE CAR 076 |

| 9. | ICE Gangs Database: Data Entry and Use, Directive 10067.1 (Aug. 4, 2006) | ICE CAR 077-080 |
|---|---|---|
| 10. | U.S. Immigration and Customs Enforcement, Memorandum from John P. Torres, Director of Detention and Removal Operations, Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007) | ICE CAR 081-085 |
| 11. | U.S. Immigration and Customs Enforcement, Memorandum from John P. Torres, Director of Detention and Removal Operations, and Marcy M. Forman, Director of the Office of Investigations, Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007) | ICE CAR 086-090 |
| 12. | Department of Homeland Security, Memorandum from John Kelly, Secretary of Department of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017) | ICE CAR 091-096 |
| 13. | Department of Homeland Security, Memorandum from John Kelly, Secretary of Department of Homeland Security, Implementing the President's Border Security and Immigration Enforcement Improvements Policies (Feb. 20, 2017) | ICE CAR 097-109 |
| 14. | U.S. Immigration and Customs Enforcement, Memorandum from John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011) | ICE CAR 110-112 |
| 15. | U.S. Immigration and Customs Enforcement, Memorandum from Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (Nov. 7, 2007) | ICE CAR 113-126 |
| 16. | U.S. Immigration and Customs Enforcement, Email from Jon Gurule, Assistant Director for Field Operations, Reminder: Enforcement Actions at or Near Courthouses (Oct. 21, 2015) | ICE CAR 127 |
| 17. | Initiation of Removal Proceedings, 8 U.S.C. §1229(e) (Aug. 12, 2006) | ICE CAR 128-130 |
| 18. | Penalties for Disclosure of Information, 8 U.S.C. §1367(a)(2) (Mar. 7, 2013) | ICE CAR 131-133 |
| 19. | Letter from Jefferson B. Sessions, III, Attorney General, John F. Kelly, Secretary of Homeland Security (Mar. 29, 2017) | ICE CAR 134-135 |
| 20. | Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client, New York Daily News (Nov. 28, 2017) | ICE CAR 136 |
| 21. | ICE agents "pounced" on immigrant in Brooklyn courthouse: attorney, NY Post (Nov. 28, 2017) | ICE CAR 137-138 |

| 22. | Latest ICE arrest in Brooklyn courthouse protested by NYC lawyers, Patch (Nov. 28, 2017) | ICE CAR 139-148 |
|---|---|---|
| 23. | San Jose: Arrests made in city's first two homicides of 2017, Mercury News (Nov. 7, 2017) | ICE CAR 149-151 |
| 24. | Email From J.D. Gingrich to M. Albence and B. Hyer, Fwd: Letter from ICE, dated Aug. 9, 2017 (with attachment: 8-2-17 ltr from Thomas Homan, Acting Dir. ICE) | ICE CAR 152-154 |
| 25. | Email from L. Marks to M. Albence, ICE activity in courthouses—proposed language, dated Sept. 15, 2017 (with attachment: ICEPolicyFinal) | ICE CAR 155-156 |
| 26. | Letter from Chief Justice Thomas A. Balmer to Attorney General Jeff Sessions and Secretary John F. Kelly, dated April 6, 2017 | ICE CAR 157-159 |
| 27. | Email Chain from M. Albence to L. Marks, RE: ICE activity in courthouses—proposed language, dated from Sept. 15, 2017 through Jan. 26, 2018 | ICE CAR 160-163 |
| 28. | Email from ERO Tasking to Field Office Directors and Deputy Field Office Directors, Subject: Guidance Update: Enforcement Actions at or Near Courthouses, dated Jan. 26, 2015 | ICE CAR 164-165 |
| 29. | State of New York Office of Court Administration, Policy and Protocol Governing Activities in Courthouses by Law Enforcement Agencies, Memorandum to All Chiefs and Majors from Chief Michael Magliano, dated April 26, 2017 | ICE CAR 166 |
| 30. | Department of Homeland Security, Frequently Asked Questions, release date July 15, 2016 | ICE CAR 167-171 |
| 31. | Newly public guidelines bar ICE from arresting immigrants inside courtrooms, New York Daily News, dated June 30, 2017 | ICE CAR 172-177 |
| 32. | State court memo: ICE agents should ID selves in courts, Newsday, dated June 29, 2017 | ICE CAR 178-180 |
| 33. | Letter from Thomas Homan, Acting Director, to Mary Campbell McQueen, President of the National Center for State Courts, dated June 5, 2017 | ICE CAR 181-182 |
| 34. | U.S. Immigration and Customs Enforcement Response to Policy Guidance Regarding Court Houses vs. Court Rooms to the National Center for State Courts, dated June 5, 2017 | ICE CAR 183 |
| 35. | Email Chain between J.D. Gingrich and M. Albence Re: Updated policy re: courthouse arrest activities, dated Sept. 12, 2017 | ICE CAR 184 |

**Department of Homeland Security**
**DHS Directives System**
**Directive Number: 002-02**
**Revision Number: 00**
**Issue Date: 11/1/2013**

# IMPLEMENTATION OF SECTION 1367
# INFORMATION PROVISIONS

## I.  Purpose

This directive establishes a single Department of Homeland Security (DHS) policy regarding the implementation of Title 8, United States Code (U.S.C.), Section 1367, Violence Against Women Act (VAWA) confidentiality provisions and provides guidance as instructed by 8 U.S.C. 1367(d), as amended by the Violence Against Women Reauthorization Act of 2013, Public Law 113-4, section 810.

## II.  Scope

This directive applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.  Authorities

A.  Public Law 101-649, "Immigration and Nationality Act" (INA) Section 101(a)(51), as codified in 8 U.S.C. Section 1101(a)(51)

B.  Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

C.  Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

D.  Public Law 109-162,  "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure."(VAWA 2005)

E.  Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes." (VAWA 2013)

F.  Section 239(e) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

1

ICE CAR 001

G.    Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Special Rule for Battered Spouse or Child"

H.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

I.    Title 42, U.S.C., Section 13925(a), "Definitions and grant provisions" (as re-designated and amended by Section 3 of VAWA 2013), Public Law 113-4

J.    Delegation 19004, Delegation of Authority to Implement Section 1367 Information

K.    Instruction 002-02-001, Implementation of Section 1367 Information Provisions

L.    DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

# IV.   Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this Directive.

A.    The ***Chief Privacy Officer*** is the senior official within the Department with primary responsibility for privacy compliance and policy.

B.    The ***Officer for Civil Rights and Civil Liberties (CRCL)*** directs and oversees the implementation of the integration of civil rights and civil liberties across the Department and has the delegated authority to issue this Directive and Instruction.

C.    The ***General Counsel*** is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.    The ***Component Heads*** with any Section 1367 information that might be shared will implement and execute all applicable policies and procedures set forth in this directive, and will develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other Instruction, or national or departmental policy.

E.    The ***Council on Combating Violence Against Women*** works to ensure that policies and practices for combating violence against women and

Directive # 002-02
Revision # 00

ICE CAR 002

children are consistent Department-wide. By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children. The Council collects information on a quarterly basis and conduct after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations. The Council is also responsible for assisting in developing all implementing policies that are created by Components.

F.    The ***Federal Law Enforcement Training Center (FLETC)*** ensures the computer-based training module, *VAWA: Confidentiality and Immigration Relief*, is available to all Components for promulgation through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

# V.    Policy and Training Requirements

***Policy:*** The policy is comprised of three confidentiality requirements:

A.    All DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee of DHS, Department of State (DOS), or Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits, including a battered spouse or child hardship waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits. There are certain exceptions to the general nondisclosure requirement, such as information to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information. (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes).

B.    Adverse determinations of admissibility or deportability against an alien are not made using information furnished solely by prohibited sources associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U visa. For a more information on what qualifies as a VAWA benefit, refer to Instruction 002-02-001, Implementation of Section 1367 Provisions. If a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited

3

source, DHS employees should treat the information as inherently suspect and exercise all appropriate prosecutorial discretion with respect to pursuing the adverse information. Further, DHS employees receiving information solely from a prohibited source do not take action on that information unless there is an independent source of corroboration.

C.      DHS employees complete a certification of compliance in cases where enforcement actions leading to a removal proceeding are taken at sensitive locations, as required by INA 239(e) (8 U.S.C. 1229(e)). The certification includes the Notice to Appear, which affirms compliance with the Section 1367 Information and prohibited source provisions.

***Component requirements***: Components with access to Section 1367 Information that might be shared with those outside of the DHS develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy. Components coordinate with the Council in the development of implementing policy. Moreover, any Component with access to Section 1367 information creates ways to identify those individuals protected by Section 1367 confidentiality, such as through a Central Index System (CIS) database check, and develops safeguards to protect this information in the relevant systems.

***Training requirement***: All DHS employees who, through the course of their work may come into contact with victim applicants or have access to information covered by 8 U.S.C. 1367 complete the *VAWA: Confidentiality and Immigration Relief* training, which is currently on Component's Learning Management Systems (LMS). The VAWA Training was developed by FLETC in collaboration with subject-matter experts from several DHS Components, including USCIS, ICE and CBP. No later than 180 days after the enactment of this policy, and on an annual basis thereafter, the Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE and CBP report to the Review Committee the rate of compliance for this training.

# VI.  Questions

Address any questions or concerns regarding this Directive to CRCL.

Chris Cummiskey
Acting Under Secretary for Management

Date

4

**Department of Homeland Security**
**DHS Directives System**
**Directive Number: 215-01**
**Revision Number: 00**
**Issue Date: 11/6/2013**

# DISCLOSURE OF SECTION 1367 INFORMATION TO NATIONAL SECURITY OFFICIALS FOR NATIONAL SECURITY PURPOSES

## I.    Purpose

This Directive serves as the principal reference for disclosing any information related to applicants for or beneficiaries of T Visa, U Visa, or Violence Against Women Act (VAWA) protections ("Section 1367 information") for National Intelligence (including Foreign Intelligence and Counterintelligence) purposes to elements of the Intelligence Community or for counterterrorism purposes to elements of the Intelligence Community, other Federal departments and agencies, and foreign government entities.

## II.    Scope

This Directive applies throughout the Department of Homeland Security (DHS).  It does not affect the disclosure of Section 1367 information in accordance with Title 8, United States Code (U.S.C.), Section 1367(b)(1)-(7).

## III.    Authorities

A.    Title 6, United States Code (U.S.C.), Section 112, "Secretary; functions"

B.    Title 8 U.S.C., Sections 1101(a)(15)(T), (a)(15)(U), (a)(51)

C.    Title 8, U.S.C., Section 1103, "Powers and duties of the Secretary, the Under Secretary, and the Attorney General"

D.    Title 8, U.S.C., Section 1367, "Penalties for Disclosure"

E.    Title 50, U.S.C., Chapter 15, "National Security Act of 1947," as amended

F.    Executive Order (E.O.) 12,333, "U.S. Intelligence Activities," as amended

G.    E.O. 13,388, "Further Strengthening the Sharing of Terrorism Information to Protect Americans"

H.    Privacy Incident Handling Guidance (Jan. 26, 2012)

I.    DHS Directive 002-02, "Implementation of Section 1367 Information Provisions"

J.    DHS Instruction 002-02-001, "Implementation of Section 1367 Information Provisions"

# IV.  Responsibilities

A.    The ***Officer for Civil Rights and Civil Liberties (CRCL)*** directs and oversees the implementation of the integration of civil rights and civil liberties across the Department, serving as the foundational DHS organization through which all Department-wide civil rights and civil liberties activities are overseen, defined, and measured, including the disclosure of Section 1367 Information.  The Officer for CRCL manages the execution of this Directive.

B.    The ***Under Secretary for Intelligence and Analysis (I&A)*** serves as the Chief Intelligence Officer for the Department, exercising leadership and authority over intelligence policy and programs throughout the Department and, acting in conjunction with, and without preempting the authorities of the DHS Chief Information Officer and the DHS Chief Security Officer, exercising leadership over information sharing and safeguarding policy and programs throughout the Department in partnership with the Heads of Components, including with respect to the disclosure of information related to applicants for or beneficiaries of T Visa, U Visa or VAWA protections.

C.    The ***Director of U.S. Citizenship and Immigration Services (USCIS)*** oversees lawful immigration to the United States by establishing national immigration services policies and priorities, including with respect to the maintenance and disclosure of information related to applicants for or beneficiaries of T Visa, U Visa or VAWA protections.

D.    The ***Chief Privacy Officer*** is the senior official within the Department with primary responsibility for privacy compliance and policy, including with respect to the disclosure of information related to applicants for or beneficiaries of T Visa, U Visa or VAWA protections.

E.    The ***Heads of Components*** implement and execute all applicable policies and procedures set forth in this Directive and any implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other directive, or national or departmental

policy.

## V.    Policy and Requirements

A.    Consistent with applicable law, presidential directive, regulation, and national and departmental policy, Component Heads or their designees, in coordination with the Director of USCIS or his designees, disclose Section 1367 information to other Federal departments or agencies and foreign entities solely in furtherance of those entities' authorized counterterrorism functions, or to elements of the Intelligence Community for authorized intelligence functions in support of national missions or counterterrorism functions, and only in accordance with procedures for the Component jointly developed by the Component, I&A, USCIS, and CRCL.

B.    Only Section 1367 information that constitutes terrorism information (or, with respect to elements of the Intelligence Community outside the Department, as information determined to be relevant to the element's authorized intelligence function(s) in support of national missions) is permanently retained by the entity to which the information is disclosed.

## VI.    Questions

Address any questions or concerns regarding this Directive to CRCL.

_____          11/6/13
Chris Cummiskey                                    Date
Acting Under Secretary for Management

- 3 -

**Department of Homeland Security**
**DHS Directives System**
**Directive Number: 034-06**
**Revision Number: 01**
**Issue Date: 10/23/2015**

# DEPARTMENT REPORTING REQUIREMENTS

## I.    Purpose

This Directive establishes the Department Reporting Requirements to enhance information sharing and situational awareness regarding threats, incidents, and operations and associated capabilities for Department of Homeland Security (DHS) senior leadership.  This Directive sets forth requirements and policies for Components and Joint Task Forces (JTFs) to provide senior DHS leadership, and homeland security partners, with time-sensitive information, including but not limited to: suspicious activities and emerging threats, incidents and events, operations and capabilities, and personnel and facilities, affecting the Department or the homeland security enterprise.

## II.    Scope

This Directive applies to all DHS Components (Operational and Support) and JTFs.

Nothing in this Directive requires, or should be interpreted as requiring, the violation of statute, presidential order, directive, delegation, regulation, or policy.

## III.    Authorities

A.    Homeland Security Act of 2002, as amended

B.    DHS Delegation No. 21000, "Delegation to the Director of the Office of Operations Coordination and Planning," (May 29, 2012)

C.    DHS Directive 252-01, " Organization of the Department of Homeland Security" (March 3, 2009)

## IV.    Responsibilities

A.    ___Director, Office of Operations Coordination (OPS)___ in coordination with, and without preempting the authorities of applicable Component(s):

1.    Implements and maintains the Department Reporting Requirements, consisting of policies, procedures, processes, and requirements;

1

2.      Coordinates and promulgates Department-wide guidance for Department Reporting Requirements; and

3.      Advises the Secretary of Homeland Security concerning the Department Reporting Requirements and directs necessary modifications.

B.      ***DHS Component heads and JTF Directors***:

1.      Comply with the Department Reporting Requirements Directive and supporting instructions.

2.      Issue applicable reporting guidance based on requirements for a specific mission/geographic area of responsibility; and

3.      Coordinate supporting guidance with the impacted Components and JTFs for concurrence.

# V.   Policy and Procedures

A.      ***Policy***.  Components and JTFs comply with reporting requirements , including policies, procedures, and processes, further defined in a supporting instruction for reporting on operations and associated capabilities, personnel and facilities, and threats to the homeland.  For the purpose of enhancing the situational awareness of senior Department leadership, and consistent with any applicable department guidance, Components and JTFs provide timely, accurate, and relevant information:

1.      Requested by the Office of the Secretary;

2.      On DHS actions that may result, or have resulted, in White House, Congressional, or media attention;

3.      On DHS actions that are heroic, life-threatening, or involve the use of lethal force;

4.      On incidents/events that threaten, or may threaten, the homeland; or

5.      On actions, incidents, or events that affect or highlight the mission, operations, or functional status of Components or JTFs.

B.      ***Procedures***.  Detailed requirements, including definitions, responsibilities, content, and procedures for implementing the Department Reporting Requirements are detailed in a supporting DHS Instruction.

Directive # 034-06
Revision # 01
ICE CAR 009

# VI.  Questions

Address questions concerning this Directive to the Office of Operations Coordination.


_____     _____
Russell C. Deyo                        10/23/15
Under Secretary for Management          Date

**Department of Homeland Security**
**DHS Directives System**
**Instruction Number: 034-06-001**
**Revision Number: 01**
**Issue Date: 03/28/2017**

# DEPARTMENT REPORTING
# REQUIREMENTS INSTRUCTION

# I.   Purpose

This Instruction implements the Department of Homeland Security (DHS) Directive 034-06, Revision 01, Department Reporting Requirements.  It establishes responsibilities, reporting content, and reporting procedures to ensure the Secretary of DHS and Department leaders have appropriate situational awareness regarding personnel, facilities, suspicious activities, emerging threats, incidents, operations, and operational capabilities affecting the Department or the Homeland Security Enterprise.

# II.   Scope

This Instruction applies to all DHS Components and Joint Task Forces (JTFs) East, West, and Investigations hereinafter identified as JTFs, to the extent consistent with law.

# III.   References

A.    Directive 034-06, Revision 01, Department Reporting Requirements, October 23, 2015

B.    Directive 264-01, Intelligence Integration and Management, June 12, 2013

C.    DHS Office of Intelligence and Analysis Instruction IA-105, Duty To Warn, November 25, 2015

D.    Directives 008-03, Continuity Programs, June 10, 2015

# IV.   Definitions

A.    ***Homeland Security Enterprise***:  The collective efforts and shared responsibilities of federal, state, local, tribal, territorial, non-governmental, private-sector, and international partners—as well as individuals, families, and communities—to maintain critical Homeland Security capabilities.

1

B.    ***Personally Identifiable Information (PII)***:  Information that permits the identity of an individual to be directly or indirectly inferred, including other information that is linked or linkable to an individual.

C.    ***Special interest alien (SIA)***:  Non-U.S. citizens who, based on an analysis of their travel patterns, pose a national security risk to the U.S. and its interests.

# V.    Responsibilities

A.    ***DHS Component Heads and JTF Directors***:

1.    Provide timely and accurate reporting in accordance with this instruction;

2.    Comply with DHS reporting requirements and establish supporting policies and procedures as needed;

3.    Coordinate with affected Components or JTFs to de-conflict reporting responsibilities and minimize duplicative reporting;

4.    Comply with standard records management and PII safeguards;

5.    Provide details and answer requests for information; and

6.    Designate offices or centers to function as the authoritative point of contact (POC) for reporting on items identified in the Content and Procedures Section and to function as the primary ingest point(s) for disseminated reports.

B.    ***Component and JTF POCs***:

1.    Provide timely and accurate reporting, in accordance with this instruction; and

2.    Send and receive reports on behalf of the Component or JTF.

C.    The ***Director, Office of Operations Coordination (OPS)***:

1.    Provides situational awareness, the DHS Common Operating Picture, and Department continuity; and facilitates information fusion, information sharing, executive communications, and operations coordination pertaining to the prevention of terrorist attacks and incident

Instruction # 034-06-001
Revision # 01

ICE CAR 012

management;

2.      Serves as the primary point of contact for reporting, except intelligence-derived threat reporting;

3.      Provides DHS leadership with coordinated and consolidated summaries of operations to include Component and JTF actions;

4.      Collects, consolidates, analyzes, and disseminates reports, except those derived from intelligence information, to provide complete, accurate, and timely information to the Secretary, DHS Senior Leadership, and applicable Homeland Security partners;

5.      Coordinates requests for information and responses to operational requests for information;

6.      Consolidates readiness reporting on mission essential functions from Components and JTFs;

7.      Provides clarification and guidance on reporting; and

8.      Maintains the list of authoritative POCs.

D.      The ***Under Secretary for Intelligence and Analysis (I&A) and Chief Intelligence Officer (CINT)***:

1.      Serves as the primary point of contact for intelligence and counterintelligence reporting from Components and JTFs;

2.      Collects, consolidates, and analyzes threat reporting derived from intelligence information to provide complete, accurate, and timely information to the Secretary and DHS Senior Leadership;

3.      Provides connectivity to other agencies and coordinates responses on intelligence-related requests for information; and

4.      Initiates follow-up actions for reportable threat information.

E.      The ***Under Secretary for Management (USM)***:

1.      Consolidates readiness reporting on assets and property; and

2.      Provides oversight of personnel actions regarding safety, liability, pay, and compensation.

3

Instruction # 034-06-001
Revision # 01

ICE CAR 013

    F.    The ***Chief Medical Officer***:

        1.    Serves as the Department's primary official for health and medical issues related to natural disasters, acts of terrorism, and other man-made disasters; and

        2.    Provides medical, health, and bio-surveillance information to the Secretary; DHS Senior Leadership; state, local, and tribal governments; the medical community, and others within and outside DHS.

# VI.  Content and Procedures

A.    Content for reporting:  Components and JTFs provide timely, accurate, and relevant information on incidents, events, operations, threats, and personnel and readiness issues that:

        1.    Are requested by, or are of interest to, the Office of the Secretary;

        2.    May receive White House, Congressional, or media attention;

        3.    Are heroic in nature, life-threatening, or involve the use of deadly force;

        4.    Threaten, or may threaten, the Homeland Security Enterprise; or

        5.    Affect or highlight the mission, operations, or functional status of Components or JTFs.

B.    It is not desired, nor necessary, to inform Department leadership of every action, situation, or event affecting the Department.  Nor is it possible to provide an all-inclusive, time-tested list of every item that is reported to leadership.  The reporting thresholds in paragraph A above provide Component and JTF leadership guidance and latitude in deciding what to report.  To assist in narrowing reporting requirements, this instruction identifies five general reporting categories of interest to Department leadership (see paragraph D below).

C.    The reporting template is located in Appendix A.  The information elements listed serve as reminders and may not apply to every situation.

D.    The following reporting categories are intentionally broad to ensure a wide array of incidents, operations, threats, personnel issues, and changes in readiness are considered when informing the Secretary and other Department leaders.  The categories are also used in Section E (procedures for reporting) to identify variations in reporting requirements.  The items listed in Appendices B –

ICE CAR 014

D are for reference only.  Each should be assessed using the above thresholds before inclusion in a Component or JTF report.  The broad reporting categories are, but are not limited to:

1.    **Incidents and Events**:  Emergent and ongoing incidents, events, mishaps, or accidents that involve, or may involve, Department and/or other Homeland Security partners' authorities or assets.  See Appendix B for specific examples.  These may include:

a.    Hostile or disruptive acts involving chemical or biological agents, radiological or nuclear material, or explosives (CBRNE); conventional/kinetic weapons; or cyber tools;

b.    Death of an individual in the care or custody of DHS or at a DHS facility;

c.    DHS use of force, or any action, to compel compliance resulting in death or serious injury;

d.    Death of, or serious injury to, a key political leader or cabinet member;

e.    Loss or degradation of any part of U.S. critical infrastructure, to include space-based systems;

f.    Compromise of DHS information networks, systems, or data or the unauthorized release of PII;

g.    Natural or man-made disasters (e.g., destructive weather or release of hazardous material);

h.    Case(s) of diseases of public health concern; and

i.    Any incident that has the potential for escalation or requires resources in excess of the responding organization's capability.

2.    **Operations:**  Significant daily, weekly, or monthly operational actions or mission related successes; significant upcoming operational actions; and operational updates on actions following the execution of a DHS Operational Plan.  Reports focus on the items listed below.  See Appendix C for examples.

Instruction # 034-06-001
Revision # 01

ICE CAR 015

a.    Arrests

b.    Seizures

c.    Interdictions

d.    Investigations

e.    Encounters

f.    Removals

g.    Search and rescue

h.    Heroic acts

i.    Results of exercises or training events

j.    Planned actions

3.    **Threats:**  Information pertaining to potential or actual threats to an individual, Homeland Security partner, the Department, or the Nation.  See Appendix D for specific examples.  Threats may include:

a.    Terrorism and known or suspected terrorist;

b.    Violent extremism;

c.    Domestic and transnational organized crime;

d.    Weather, pandemic, and other natural phenomena;

e.    Threats to high-ranking officials; and

f.    Threats or hazards to critical infrastructure.

4.    **Personnel:**  Information on sensitive personnel issues.  While incident reports may address numbers of individuals and the number of DHS personnel associated with an ongoing incident, Personnel Reporting provides specific details needed by DHS leadership regarding sensitive issues.  Personnel reporting addresses:

6

Instruction # 034-06-001
Revision # 01

ICE CAR 016

    a.      Death of DHS federal personnel;

    b.      Death of DHS contractor personnel and non-DHS students and staff members participating in a DHS program or performing official duties;

    c.      Misconduct by or arrest of a DHS employee; or DHS contractor personnel and non-DHS students and staff members when participating in a DHS program or performing official duties;

    d.      Threats against or malicious targeting of specific individuals as a result of their association with DHS.  This includes disclosure of sensitive personal information; and

    e.      No-notice or unexpected change of an appointed or acting Component Head.

5.    **Readiness**:  Addresses changes (degradation or restoration) in the ability of a DHS Component or JTF to coordinate operations, execute, or sustain their Homeland Security mission, perform essential functions, or provide support to state, local, tribal, territorial, private sector and international partners.  Readiness Reporting addresses the status of people, infrastructure, property, facilities, and assets.  These reports should address:

    a.      Loss/return of a mission critical capability (e.g., closure of a port of entry (POE) or detention facility, grounding a type of aircraft or loss of a Coast Guard Cutter, screening capability at a port, mission critical communications, or computer network);

    b.      Loss, degradation, or return of mission critical infrastructure or any part of U.S. critical infrastructure, to include the Global Positioning System (GPS), and other space-based systems supporting DHS mission essential functions;

    c.      Changes in operational posture (including responding to or preparing for an incident/event and unplanned support to state, local, tribal, territorial, or private sector partners);

    d.      A change to a tracked national, regional, or Component Headquarters alert, security status, or operational status (e.g., maritime security level, continuity of operations or continuity of government condition, or National Terrorism Advisory System and

Instruction # 034-06-001
Revision # 01

ICE CAR 017

        e.      The number of Component personnel assigned to locations outside the United States.

E.      Procedures for Reporting

    1.      The Department has three reporting timelines:  immediate, priority, and routine.

        a.      Immediate:  Information that should be reported as soon as possible.  Initial reports may not include all necessary information and may require additional or follow-up reporting.  Immediate Reporting is limited to select Incident, Threat, and Personnel reporting.

        b.      Priority:  Information that may influence decision making but does not require immediate reporting.  Information should be reported as soon as sufficient details are available within 24 hours of Component Headquarters or leadership being notified.

        c.      Routine:  Subject-specific information provided on a recurring (daily, weekly, or monthly) basis and used to produce recurring reports.  Daily reports are due daily before midnight.  Weekly and monthly reporting timelines are established on a case-by-case basis and are influenced by the needs of senior leaders and data availability.  Routine reporting is almost exclusively used for Operations and Readiness Reporting.

    2.      For all but intelligence reporting, Components submit reports/information to OPS which consolidates and forwards to the lead Component.  The lead Component formats and provides the information to Department Senior Leadership and OPS.  In the absence of a designated lead Component, OPS forwards the information to Senior Leadership.  Intelligence reporting, counterintelligence reporting, and raw intelligence flows to, and through, the Department's CINT or designated representative for analysis and dissemination to Department and Component leadership.

        a.      **Incidents and Events**:  For emergent and ongoing events, issues, mishaps, or accidents:

           i.      Components and JTFs, as applicable, immediately notify the DHS National Operations Center (NOC) via telephone (202-282-8101) and unclassified email (NOC.SWO.Restricted@hq.dhs.gov) with initial details and

<div align="center">8</div>

contact information;

ii.      Components or JTFs provide available information in accordance with the reporting template (Appendix A).  Email unclassified reports to  NOC.SWO.Restricted@hq.dhs.gov. Email classified reports to NOC.SWO@dhs.sgov.gov or NOC.SWO@dhs.ic.gov.  Inform the NOC via unclassified email of any classified reporting.  Reports include:

a)      Brief statement of what occurred;

b)      Location (city, state, address);

c)      Date and time (in local time);

d)      DHS personnel, facilities, assets, or infrastructure involved;

e)      Injuries and/or fatalities;

f)      DHS injuries and/or fatalities;

g)      Name of the facility/facilities;

h)      Type of infrastructure or asset(s);

i)      Who has been notified; and

j)      Actions taken by:

- DHS Components;

- Federal Government partners;

- State, local, tribal, and territorial partners;

- Private sector partners; and

- International partners.

9

Instruction # 034-06-001
Revision # 01

ICE CAR 019

iii.    Components and JTFs provide classified or unclassified update reports - as appropriate.  To assist with version control, assign a version number (e.g., Status Update version 1, Status Update version 2, etc.) to each report and indicate changes to, and deletions from, the last report.  Inform the NOC via unclassified email of any classified update reports.

Update Reports include:

a)    Version number in the title line;

b)    Updates to the information identified in the report details in sub-paragraph VI. E. 2. a. ii.;

c)    Specific names and numbers of DHS personnel, assets, or infrastructure;

d)    Effect on DHS mission; and

e)    Needed capabilities or resources.

iv.    In addition to providing information to the lead Component, OPS uses the information to update the DHS Common Operating Picture and provides the information to specific Components and other Homeland Security partners that may need to take action.  For example, information may be provided to:

a)    The Office of Public Affairs (OPA) immediately if the incident may receive, or is receiving, media or social media attention;

b)    The USM on a priority basis if there is an employee death;

c)    USM on a priority basis if there is loss or contamination of, or damage to, key DHS infrastructure, facilities, or assets; and

d)    The Office of Health Affairs on a priority basis if individuals at a DHS facility or work location are exposed to hazardous material including any chemical, biological, radiological, or nuclear (CBRN)

10

Instruction # 034-06-001
Revision # 01

ICE CAR 020

material or a public health threat.

b.    **Operations**:  Report on a routine and recurring basis: operational successes; Component actions and operational status during contingency operations, following an incident that is tracked on the DHS Common Operating Picture, or the execution of a DHS Operational Plan; and upcoming Component and JTF-coordinated operations.  Daily (including weekends as required) reporting ensures the Secretary and DHS leadership are kept aware of significant Component and JTF-coordinated operations that generally occurred over the past 24-48 hours.  Report on a weekly basis actions or operations scheduled to take place over the next seven days.  Information from Component operations reporting is used to populate multiple reports.

i.    Components and JTFs, as applicable, provide unclassified inputs, using the reporting template at Appendix A, to OPS via email using the following email addresses: DHSOPSReporting@hq.dhs.gov and NOC.SWO.Restricted@hq.dhs.gov.  Send classified reports to OPS using the following email addresses: DHSOPSReporting@dhs.sgov.gov and NOC.SWO@dhs.sgov.gov; or DHSOPSReporting@dhs.ic.gov and NOC.SWO@dhs.ic.gov. Inform OPS, via unclassified email, of any classified reporting.  Unless otherwise directed, daily Component and JTF reports are due by 12:00 a.m. Eastern Time.

ii.    Once a week, a summary of upcoming Component operations, engagements, investigations, training events, and participation in Department-level exercises is provided by OPS to Senior Leadership.  The reporting timeline is coordinated with the Components to account for the variety of internal reporting timelines.

iii.    When requested by the lead Component, through OPS, in preparation for or as a result of an event or incident, Components provide their operational actions and operating status.  The lead Component defines reporting timelines based on the information needs of Department leadership.

iv.    Reports include:

11

a) Description of what occurred or occur;

b) Location (state and nearest city);

c) Date (and time, if appropriate);

d) Name or title of operation/exercise/training (if applicable);

e) Component or JTF actions and associated resources; and

f) Other Components and federal, state, tribal, local, and international partners involved.

v. OPS consolidates and disseminates operational successes to senior leaders and to Homeland Security partners when applicable. All other reporting on operations is consolidated and provided to the lead Component or applicable support staffs.

c. **Threats**: Components immediately report any information or intelligence that suggests an impending threat to an individual, Homeland Security partner, the Department, or the Nation. Report all other threats on a priority basis.

i. Intelligence and counterintelligence threat information, as well as raw intelligence is reported via established intelligence reporting channels and in accordance with DHS Intelligence Enterprise reporting procedures to IA.IWW@hq.dhs.gov, IA.IWW@dhs.sgov.gov, or IA.IWW@dhs.ic.gov. The CINT, per DHS Directive No. 264-01, "Intelligence Integration and Management", issues specific reporting processes, standards, guidelines, and procedures for the DHS Intelligence Enterprise and any activity, including intelligence-driven threat reporting, within the enterprise. Any Duty-To-Warn actions are conducted in accordance with DHS I&A Instruction IA-105, "Duty to Warn."

ii. Non-intelligence-driven threat information is reported using the reporting template (Appendix A) to OPS via email using the following addresses: NOC.SWO.Restricted@hq.dhs.gov and DHSOPSReporting@hq.dhs.gov.

Instruction # 034-06-001
Revision # 01

ICE CAR 022

iii.        Reports include:

        a)        Description of the threat and intended target (if known);

        b)        Expected duration;

        c)        Reporting sources, and level of confidence in the source; and

        d)        Date and time of source information.

iv.        Provide update reports as appropriate.  When providing updates, indicate any changes or deletions to the last published report.  Assign a version number (e.g., Status Update version 1, Status Update version 2, etc.).

v.        The NOC, for non-intelligence threats, or I&A, for intelligence driven threats, compiles the information into a single report and coordinates the dissemination of that information to senior leaders, crisis teams, and support staffs as needed.

vi.        The NOC also forwards specific threat information to Components that may need to take action.  It immediately forwards information to the United States Secret Service (USSS) if there is a threat to the President or Vice President of the United States, the Secretary or Deputy Secretary of Homeland Security, or any other USSS protectee.

d.        **Personnel**:  For deaths, misconduct, and threats against or malicious targeting of specific individuals as a result of their association with DHS, the affected Component(s) notifies the NOC, on a priority basis, via email and provides applicable information based on the reporting template (Appendix A).  Send reports to NOC.SWO.Restricted@hq.dhs.gov.

i.        Reports include:

        a)        Name of individual and status (e.g., employee, contractor, student, or visitor), name of facility, description of infrastructure, affected/assigned Component(s);

13

ICE CAR 023

b)    Date and time of incident;

c)    City and state (and address if reporting misconduct);

d)    Brief statement of what occurred and current status;

e)    Component actions (securing personal effects, counseling for staff, etc.); and

f)    Who has been notified.

ii.    When providing updates, indicate any changes or deletions to the last published report.  Assign a version number (e.g., Status Update version 1, Status Update version 2, etc.).

iii.    The NOC consolidates the information and coordinates its dissemination to the Secretary and Deputy Secretary.  The NOC also provides the information to specific Components that may need to take action.  In those cases, information is provided to:

a)    Management Directorate (MGMT)/Chief Procurement Officer, on a priority basis, regarding the death of a DHS employee, the death of a DHS contractor while at work supporting DHS, non-DHS student or staff participating in a DHS program, and non-DHS personnel at a DHS facility.

b)    MGMT/Chief Information Officer, MGMT/Chief Security Officer, I&A, Civil Rights and Civil Liberties Office, and Privacy Office, as appropriate, on a priority basis for any threat against or malicious targeting (including the disclosure of sensitive PII) of specific individuals as a result of their association with DHS.  The NOC does not provide PII or details on the status of an ongoing investigation.  If this information is needed, the requesting Component works through the reporting or investigating Component.

c)    OPA, on a priority basis, if actions or death are

14

reported by the media or social media.

e.    **Readiness**:  On a priority basis via email, Components inform OPS of any degradation or restoration of national critical infrastructure, DHS mission critical infrastructure, or the ability to execute or sustain Homeland Security operations or essential functions.  Components also report by the tenth day of each month, or as requested by the NOC, the number and location of personnel assigned outside the United States

i.    Affected Components and JTFs notify OPS via email and provide applicable information based on the reporting template at Appendix A.  Send email notifications to NOC.SWO.Restricted@hq.dhs.gov, NOC.MGMT@hq.dhs.gov, and DHSOPSReporting@hq.dhs.gov.

ii.    Readiness reports address changes in the ability of a Component to execute or sustain Homeland Security operations or essential functions as a result of a loss of people, infrastructure, facilities, equipment, or assets.  The magnitude and duration of any degradation is considered before reporting a change in readiness.

iii.    For changes in the ability to perform essential functions or the implementation or termination of continuity plans, also notify the DHS Continuity Coordinator on a priority basis by sending an email to Reporting&Facilites@hq.dhs.gov with the following information:

a)    Reason for implementation or termination of continuity plan;

b)    Where essential functions are being performed;

c)    Contact information for Component Head if not located at primary facility; and

d)    POC information.

15

Instruction # 034-06-001
Revision # 01

ICE CAR 025

    iv.    When reporting on the location of personnel assigned outside the United States, Components update the Overseas Personnel Accountability Listing (OPAL) by accessing Component information at https://hsin.dhs.gov/dhs/FedOps/OPAL.  Components also include updated information in an email to HSIN.OPAL@hq.dhs.gov.  This information along with information from the Department of State electronic country clearance system allows the NOC to provide DHS leaders with a DHS footprint in the vicinity of an overseas event.

    v.    The NOC monitors readiness reporting and notifies additional Components that may need to take action, including but not limited to:

        a)    MGMT/Chief Readiness Support Officer on a priority basis if infrastructure, facilities, equipment, or assets are affected.

        b)    OPS (DHS Continuity Coordinator) immediately if a Component implements or terminates its continuity of operations plan or if mission critical infrastructure is degraded.

f.    **Senior Leadership Reports**:  Reports to Department Senior Leaders, at a minimum, include an overview of the situation or threat, recent developments, known short falls, and Component actions related to, or as a result of, the situation or threat.

# VII.  Questions

Address questions concerning this Instruction to the Office of Operations Coordination.

_(signature)_

Richard Chavez
Director

3/28/17

Date

Instruction # 034-06-001
Revision # 01

ICE CAR 026

Appendix A

Template–DHS Components Incident Status Report:
Status Update Version xxx

| | |
|---|---|
| | Report Title ( Version xxx) |
| | Classification |
| | Reporting Component / JTF |
| | Current as of (date and time) |
| | *If required, include any "special handling instructions" in the front end of the report.* |
| This report covers: | Incident<br><br>Operations<br><br>Threat<br><br>Personnel<br><br>Readiness |
| Date and time of report | Initial Report<br><br>Update, Version # |
| | **INCIDENTS and EVENTS** |
| Description of what has or is occurring | |
| Location: city and state (and address if applicable) | |

17

| | |
|---|---|
| Current Status<br><br>&bull; # Fatalities<br>&bull; # Injuries<br>&bull; Status of facility<br>&bull; Status of infrastructure<br>&bull; Loss of data/PII | |
| Component Actions<br><br>&bull; Security/crowd control<br>&bull; Personnel accountability<br>&bull; Support to Homeland Security partners | |
| | **OPERATIONS** |
| Description of what did or occurred<br><br>&bull; Arrest, seizure, interdiction<br>&bull; Encounters and investigations<br>&bull; Search and Rescue<br>&bull; ICE ERO removals<br>&bull; Exercises | |
| Date and time it occurred | |
| Location: nearest city and state | |
| Name or title of operation, exercise, or training event | |

18

ICE CAR 028

| | |
|---|---|
| Component / JTF actions and results<br><br>• Name and "plus one" data on known or suspected terrorist<br>• Background info on illegal aliens | |
| Other Components and federal, state, and local partners involved | |
| | **THREAT** |
| Description of the threat and intended target (if known) | |
| Expected duration | |
| Source of information and reliability of the source | |
| Date and time of source information | |
| | **PERSONNEL** |
| Name of individual(s) and status (employee, contractor, student, or visitor); affected family members, if appropriate; name of facility or description of infrastructure; affected or assigned Components | |
| Date and time of action | |
| Location: nearest city and state (and address if reporting misconduct) | |
| Description of what occurred | |
| Component actions | |

19

Instruction # 034-06-001<br>Revision # 01

ICE CAR 029

| Notifications | |
|---|---|
| | **READINESS** |
| Description of what occurred and what facility or infrastructure is involved | |
| Effect on Component /JTF and DHS mission | |
| Estimated recovery date | |
| Is continuity plan activated and why | |
| Where essential functions are being performed | |
| Needed resources | |
| Contact information for Component Heads if not located at primary facility | |

20

Instruction # 034-06-001
Revision # 01

ICE CAR 030

Appendix B

**Incidents and Events**:  Emergent and ongoing incidents, events, mishaps, or accidents that involve, or may involve, Department and/or other Homeland Security partners' assets or authorities.  The incidents and events listed below are examples and for reference only.  Each is assessed using the guidelines in paragraph VI. A. before being included in a Component or JTF report.

A.    Hostile or disruptive acts involving CBRNE, cyber tools, disruption technologies, or conventional weapons.
- Terrorist incident or potential terrorist incident.
- Actual or suspected loss, sale, theft, transfer, acquisition, misuse, or release of CBRN material.
- Actual or suspected use of a CBRNE weapon.
- Active shooter.
- Attempted or actual penetration of an airplane's cockpit, locomotive cab, vessel bridge/pilot house/engine room, or tanker-ship pump room.
- Attempted or actual maritime vessel hijacking impacting U.S. citizens or national interests.
- Attack or sabotage at seaport, airport, land port, or federal facility.
- Cybercrime.
- Compromise of, or unauthorized access to, DHS information networks, systems, or data.
- Data breach involving PII or the unauthorized release of PII.

B.    Official requests and notifications.
- Requests for foreign emergency assistance.
- Request for or approval of a Fire Management Assistance Grant.
- Activation of a National or Regional Watch Center above Steady-State operations.
- Major Disaster or Emergency Declaration.
- Temporary Flight Restriction, Special Flight Restricted Area, or Captain of the Port orders.
- Temporary security zones or safety zones imposed by United States Coast Guard Captain of the Port.

C.    Natural or man-made events.
- Intentional breaches of sterile areas, security zones, or controlled seaports.
- Effects of destructive or disruptive weather.
- Volcanic or seismic activity.
- North American wildland fire.

Instruction # 034-06-001
Revision # 01

ICE CAR 031

- Nuclear weapon accident.
- Actual or potential release of oil or hazardous materials in, or affecting, the United States.
  - Spills of 10,000 gallons or more in inland waterways.
  - Spills of 100,000 gallons or more in coastal or offshore waters.
  - Hazardous chemical or radioactive plumes.
- Crash involving commercial or military air or rail assets.
- Collision or allision of commercial or military vessel.
- Space vehicle launch or re-entry.
- Incidents involving weapons discharge across the International Border at DHS personnel, aircraft, vessel, or vehicle.
- A border violence event that results in an arrest, significant damage to property, and/or injury.
- Major marine events that involve:
  - Loss of six or more lives;
  - Vessel over 100 gross tons;
  - Over $500,000 in damages; or
  - Serious threat to life, environment, or property.
- Canadian or Mexican military or law enforcement border incursion.

D.    Public health concern.

- Any biological, chemical, or radiological event that poses a threat to public health or agricultural interests of the United States.
- Infectious diseases:  Diseases manifesting in significant levels of death, illness, or injury in people or animals.
- Actual or suspected animal, pest, or plant disease that may have serious agricultural and economic consequences on the United States.
- Public health incident of international concern or of significant threat to the DHS workforce.

E.    Loss or degradation of any part of the U.S. critical infrastructure including space-based systems.

- Actual or expected closure of an airport, seaport, or waterway for more than 12 hours, significant economic impact, regional/national impact, or high regional/national media interest.
- Any change in operating status of a port, port security passenger checkpoint, international bridge, or POE.
- Any event requiring Nuclear Regulatory Commission reporting involving nuclear power facilities.
- Event or incident affecting electric power grid.
- Event or incident involving petrochemical industry.

22

Instruction # 034-06-001
Revision # 01

ICE CAR 032

- Event or incident affecting physical infrastructure to include bridges, dams, etc.
- Loss of key communications, information technology, or GPS capabilities.
- Event or incident affecting water supply system.

F.    Deaths and Injuries.

- Death of non-DHS individual at a DHS facility/workplace or in the care or custody of DHS.
- DHS use of force, or any action, to compel compliance resulting in death or serious injury.
- Death of, or serious injury to, a key political leader (U.S. or international) or cabinet member.

23

Instruction # 034-06-001
Revision # 01

ICE CAR 033

Appendix C

**Operations**:  Any mission-related successes including such things as seizures, arrests, disruptions, other Department actions related to law enforcement or national security.  The operations listed below are examples and for reference only.  Each are assessed using the guidelines in paragraph VI. A. before being included in a Component or JTF report.

A.    Arrests
- Of a known or suspected terrorist;
- Of high profile alien for removal;
- Involving federal criminal charges;
- For fraud schemes that result in the loss of more than $1 million;
- For Racketeer Influenced and Corrupt Organizations Act charges as part of a DHS-led investigation;
- Arrests or repatriations likely to generate national media interest;
- Component cooperation and/or coordination with foreign governments resulting in arrests or seizures; or
- For interference with flight crew.

B.    Seizures of, or involving:
- Counterfeit currency and items required for producing counterfeit currency;
- Counterfeit, forged, fraudulent, or blank passports that have or may have a nexus to terrorism;
- Counterfeit, forged, fraudulent, or blank identification documents (e.g., university diplomas, birth certificates, professional licenses) that have a nexus to terrorism;
- Smuggled, illegal, or export-controlled weapons and dual use commodities;
- Contraband or counterfeit goods;
- Stolen artwork (e.g., stolen artifacts, antiquities, cultural objects);
- Drugs:
  - 500 kilograms of marijuana,
  - 50 kilograms of cocaine,
  - 50 kilograms of methamphetamine,
  - 200 kilograms of hashish,
  - 2 kilograms of heroin,
  - 2 kilograms of opium, or
  - 2 kilograms of MDMA (Ecstasy).
- $250,000 or more in currency/negotiable instruments;

24

ICE CAR 034

- $1 million in real property or merchandise (using manufacturer's suggested retail price); or
- Outbound stolen cars valued in excess of $250,000.

C.   Interdictions involving:

- The use of force to include warning shots and disabling fire to compel compliance;
- U.S. citizens or lawful permanent residents;
- 20 or more illegal aliens (with or without a smuggling nexus);
- Exigent circumstances (e.g., medical support, evacuation, etc.);
- Human trafficking;
- Special interest aliens;
- Known or suspected terrorists;
- Multi-Component coordination; or
- Foreign fisheries violations exceeding $100,000.

D.   Encounters with:

- Known or suspected terrorist;
- Special interest alien;
- High-level foreign government official, prominent foreign citizen, individual claiming diplomatic immunity, or any other special status if it involves searches, detention, arrest, asylum, or denied entry;
- Tunnels or tunneling activity associated with a U.S. border;
- Immigration Advisory Program events; or
- An individual based on recommendations by Behavior Detection Officers and Ticket Document Checkers.

E.   Investigations results involving:

- Immigration benefit fraud;
- Smuggling or trafficking;
- Known or suspected terrorist;
- An individual suspected of having ordered or engaged in the persecution of others, war crimes, genocide, or torture; or
- Fraudulent passport or visa.
  - SIA use of a fraudulent travel document (e.g., passport, visa, border crossing card) to travel to the United States.
  - Special interest alien fraudulent immigration petitions/applications.
  - Use or suspected use of a fraudulent passport, from a Visa Waiver Program country, to travel to the United States.

F.   ICE/Enforcement Removal Operations removal of:

25

Instruction # 034-06-001
Revision # 01

- Known or suspected terrorist;
- High-profile criminal;
- A member of a transnational criminal organization; or
- Individual requested by foreign governments.

G.     Search and rescue
- Of a kidnap-victim, including an alien held against his/her extorts payment;
- Search and rescue performed under adverse/challenging conditions;
- Disaster survivors;
- Human trafficking victims; or
- Vessels in distress.

H.     Heroic acts by DHS personnel on or off duty.

I.     Results of exercises or training events.

J.     Planned actions including:
- Enforcement operations;
- Training;
- Exercises;
- Maritime Operational Threat Response (MOTR) event; and
- Visible Intermodal Prevention and Response (VIPR) operations.

Instruction # 034-06-001
Revision # 01

ICE CAR 036

Appendix D

**Threats**:  Any information on a potential or actual threat to the Department or Nation. The threats listed below are examples and for reference only.  Each should be assessed using the guidelines in paragraph VI. A. before being included in a Component or JTF report:

A.    Terrorism
- An individual on the terrorist watchlist detained for questioning.
- An individual on the terrorist watchlist identified on an immigration petition or immigration application.
- Activity involving suspected espionage against the United States.
- Activity involving an individual suspected of being involved in terrorism or a direct supporter of a terrorist organization.
- Suspicious activity resulting from data analysis either through field operations or analytic solutions.
- The actual or suspected surveillance of federal buildings, landmarks, or commercial sectors.

B.    Violent extremism
- The detention or arrest of any suspected violent extremist who facilitates or engages in unlawful violence as a method to effect societal or political change.

C.    Organized domestic and transnational crime
- Production or acquisition of fraudulent travel documents to facilitate Illegal immigration.
- Smuggling or facilitating the travel of criminals, known or suspected terrorists, or special interest aliens into the United States.

D.    Weather and other natural phenomena
- Space weather event that has significant potential to affect or is affecting national critical infrastructure, the GPS and/or other space-enabled technologies.
- Forecast for potentially destructive or debilitating weather.
- Wild fires and flooding that may affect critical infrastructure or result in loss of life or property.
- Mass migration.

E.    Threats to high ranking officials
- Threatening statement about a USSS protectee.
- Hostile attempt to meet with/contact a USSS protectee.

ICE CAR 037

- Attempt to meet with a senior government official resulting in federal arrest or federal charges.
- Investigations into threats that result in a federal arrest.

Instruction # 034-06-001
Revision # 01

ICE CAR 038

Department of Homeland Security
DHS Instructions System
Instruction Number: 002-02-001
Revision Number: 00
**Issue date: 11/7/2013**

# IMPLEMENTATION OF SECTION 1367 INFORMATION PROVISIONS

## I.  Purpose

This Instruction implements the Department of Homeland Security (DHS) Directive 002-02, Implementation of Section 1367 Information Provisions.  In Section 810 of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54 (2013). Congress amended Title 8, United States Code (U.S.C.), Section 1367, to require that the Attorney General, the Secretary of State and the Secretary of Homeland Security provide guidance consistent with the amendments it made to subsections (a) and (b) of 8 U.S.C. § 1367. See 8 U.S.C. § 1367(d).  This Instruction provides guidance as instructed by 8 U.S.C. 1367(d), as amended by Section 810 of the Violence Against Women Reauthorization Act of 2013, and DHS Directive 002-02.

## II.  Scope

This instruction applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.  References

A.    Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

B.    Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

C.    Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure." (VAWA 2005)

D.    Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes." (VAWA 2013)

E.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

1

F.     Title 42, U.S.C., Section 13925(a), "Definitions and grant provisions"  (as re-designated and amended by Section 3 of VAWA 2013)

G.     Section 101(a)(51) of the Immigration and Nationality Act (INA) (8 U.S.C. 1101(a)(51))

H.     Section 239(e) of the Immigration and Nationality Act (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

I.     Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Special Rule for Battered Spouse or Child."

J.     DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

K.     Delegation 19004, Delegation of Authority to Implement Section 1367 Information, Date

L.     Directive 002-02, Implementation of Section 1367 Information Provisions, Date

# IV.  Definitions

A.     ***U Nonimmigrant Status***:  U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of being a victim of criminal activity, possess relevant information concerning the crime, and have been helpful, are being helpful, or are likely to be helpful to law enforcement or government officials in the investigation or prosecution of the criminal activity.  U status allows victims to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of a lawful permanent resident (LPR).

B.     ***T Nonimmigrant Status***:  T nonimmigrant status for victims of a severe form of trafficking in persons, as defined in section 103 of the TVPA of 2000, who are physically present in the United States on account of trafficking and who have complied with any reasonable requests for assistance in a law enforcement investigation or prosecution (with limited exceptions).  See INA 101(a)(15)(T).  T status allows victims of human trafficking to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of an LPR.

C.     ***VAWA Self-Petition(er)***:  Under VAWA, as amended, certain persons who have been battered or subjected to extreme cruelty by a qualifying relative may self-petition, allowing them to remain in the United States,

apply for LPR status as an approved VAWA self-petitioner, and eventually apply for naturalization.  VAWA self-petitioners include:  the spouse, child or parent of an abusive U.S. citizen; the spouse or child of an abusive LPR; the conditional resident spouse or child of an abusive U.S. citizen or LPR; the spouse or child of an alien eligible for relief under the Cuban Adjustment Act, the Haitian Refugee Immigration Fairness Act, or the Nicaraguan Adjustment and Central American Relief Act; and the spouse or child eligible for suspension of deportation or cancellation of removal due to abuse by a U.S. citizen or LPR.  See INA 101(a)(51) (defining "VAWA self-petitioner").

D.      ***VAWA Cancellation***:  Victims of domestic violence who are in removal proceedings may be eligible to apply for relief with the immigration court in the form of VAWA cancellation of removal.  See INA 240A(b)(2) (prescribing eligibility requirements).

E.      ***Sensitive Location:***  Locations specified in INA § 239(e)(2), where if an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified below, the Notice to Appear (NTA) includes a statement that the provisions of 8 U.S.C. 1367 have been complied with. The locations specified include: domestic violence shelter, rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

Sensitive locations can also include a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) [8 U.S.C. § 1101(a)(15)].

F.      ***Section 1367 Information***:

1.      Any information relating to aliens who are seeking or have been approved for immigrant status as battered spouses, children and parents under provisions of the Violence Against Women Act (VAWA), as victims of a severe form of human trafficking who generally are cooperating with law enforcement authorities, or as aliens who have suffered substantial physical or mental abuse and are cooperating with law enforcement authorities.  This definition includes records or other information that do not specifically identify the individual as an applicant or beneficiary of the T Visa, U Visa, or VAWA protections.

2.      Section 1367 covers information relating to beneficiaries of applications for a number of immigration benefits, not just the Form

I-360 VAWA self-petition.  For the purpose of this guidance if an alien is the beneficiary of a pending or approved application for one or more of the victim-based benefits described below, the requirements of 8 U.S.C. 1367 will be followed:

    a.    VAWA self-petitioner, which incorporates the following applications or petitions:

        i.    I-360 Self-petition - self-petitioners under INA sec. 204

        ii.    I-751 Hardship waiver - battered spouse or child hardship waiver

        iii.    VAWA CAA - abused Cuban Adjustment Act applicants

        iv.    VAWA HRIFA - abused Haitian Refugee Immigration Fairness Act applicants

        v.    VAWA NACARA - abused Nicaraguan Adjustment and Central American Relief Act applicants

        vi.    VAWA Suspension of Deportation

    b.    VAWA Cancellation of Removal applicants under INA 240A(b)(2).

    c.    I-914 T Nonimmigrant Status - victim of a severe form of trafficking in persons under INA 101(a)(15)(T).

    d.    I-918 U Nonimmigrant Status - victim of qualifying criminal activity under INA 101(a)(15)(U).

# V.   Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this instruction.

    A.    The ***Chief Privacy Officer*** is the senior official within the Department with primary responsibility for privacy compliance and policy.

    B.    The ***Officer for Civil Rights and Civil Liberties*** directs and oversees the implementation of the integration of civil rights and civil liberties across the Department, serving as the foundational DHS organization through which all Department-wide civil rights and civil liberties activities are overseen, defined, and measured.  The Officer for Civil Rights and Civil Liberties has the delegated authority from the Secretary to provide this single DHS

policy on the implementation of Title 8, U.S.C., Section 1367 (VAWA/T/U confidentiality provisions).

C.    The ***General Counsel*** is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.    The ***Component Heads*** with any Section 1367 information that might be shared implement and execute all applicable policies and procedures set forth in this instruction, and develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.

E.    The ***Council on Combating Violence Against Women*** works to ensure that policies and practices for combating violence against women and children are consistent Department-wide.  By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children.  The Council collects information on a quarterly basis and conducts after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations.  The Council is also responsible for assisting in developing all implementing policies that are created by Components.

F.    The ***Federal Law Enforcement Training Centers (FLETC)*** serves as an interagency law enforcement training organization for federal agencies and partner organizations.  It provides training to state, local, rural, tribal, territorial, and international law enforcement agencies.  FLETC ensures the computer-based training module, *VAWA: Confidentiality and Immigration Relief*, is available to all Components for promulgation through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

# VI.    Policy and Requirements

A.    ***Policy***:

1.    **Disclosure of Protected Information Generally Prohibited.**

a.    This guidance serves as a reminder that all DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee

5

of DHS, the Department of State (DOS); or the Department of Justice (DOJ) of <u>any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits</u>. This includes a battered spouse or child hardship waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits.  Information that cannot be disclosed includes information about an individual contained in a DHS database as well as information that has not yet been included in a database, such as the location of a beneficiary.

b.    The nondisclosure requirement does not apply to disclosures of protected information within DHS or to DOJ or DOS for legitimate agency purposes.

c.    The nondisclosure provision provides protection as soon as a DHS employee has reason to believe that the alien may be the beneficiary of a pending or approved victim-based application or petition, and the limitation ends when the application for relief is denied *and* all opportunities for appeal of the denial have been exhausted.

d.    Exceptions:  There are specified exceptions to the general nondisclosure requirement allowing for disclosure of protected information in limited circumstances.

Statutory Exceptions.  The statute prescribes eight (8) exceptions to the general nondisclosure requirement:

i.    For the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under 13 U.S.C. section 8.  This exception allows for the furnishing of tabulations and other statistical material that do not disclose the information reported by, or on behalf of, any particular respondent, and the making of special statistical compilations and surveys, for Federal, State, or local government agencies or "other public and private persons and agencies" – provided that no information furnished is "used to the detriment of any respondent or other person to whom such information relates."

6

ii.     For the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.  However, the authority to exercise this exception is subject to the Secretary's discretion.

iii.    In connection with judicial review of a Federal agency or court determination in a manner that protects the confidentiality of such information. Please note, defense counsel in state cases may sometimes attempt to make the entire A-file discoverable; however, the entire file is not discoverable in its entirety under this exception.

iv.    If all the battered individuals in the case are adults and they have all waived the nondisclosure restrictions.

v.    For the disclosure of information to Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for public benefits under 8 U.S.C. section 1641(c).

vi.    For the disclosure to the Chairmen and Ranking Members of the Senate and House of Representatives Committees on the Judiciary, for the exercise of congressional oversight authority, "information on closed cases under this section in a manner that protects the confidentiality of such information and that omits personally identifying information (including locational information about individuals)."

vii.   For purposes of communicating, with the "prior written consent of the alien involved," with nonprofit, nongovernmental victims' services providers "for the sole purpose of assisting victims in obtaining victim services."  The victim services providers receiving such referrals are bound by the nondisclosure requirements of Section 1367.  Recall that Section 101(i) of the INA (8 U.S.C. section 1101(i)) mandates that DHS provide T nonimmigrants with a referral to an NGO "that would advise the alien regarding

7

the alien's options while in the United States and the resources available to the alien."

viii. The disclosure of information to national security officials to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information.  (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes.

For instances where an official is uncertain whether an exception applies or where questions exist about a particular exception, local counsel's office should be consulted.

e. Nonstatutory Exceptions.  In addition to the enumerated statutory exceptions, there may be instances in which disclosure of protected information is mandated by court order or constitutional requirements.  For example, disclosure may be required in a federal, state, or local criminal proceeding for purposes of complying with constitutional obligations to provide exculpatory and impeachment material that is relevant either to guilt or punishment of a criminal defendant in a federal criminal proceeding ("Brady" material) or that bears upon the credibility of a prosecution witness ("Giglio" material).  If DOJ or a state or local prosecutor requests protected information that is not subject to disclosure under one of the statutory exceptions and that will be disclosed to a court or another agency (other than DOS), please consult DHS counsel. DHS counsel are consulted if a Member of Congress not described in the congressional oversight exception in Section 1367(b)(6) is requesting protected information pursuant to his or her congressional oversight authority.

f. Notification of Unauthorized Disclosures:   In the event that any Component (1) discloses Section 1367 information in a manner inconsistent with the provisions above or (2) is informed by the recipient of Section 1367 information that the recipient has disclosed that information in an unauthorized manner, the Component Head for that Component (1) notifies the Chief Privacy Officer and the Officer for Civil Rights and Civil Liberties as soon as is practicable, but in no event later than twenty-four hours after discovery of the unauthorized disclosure, and (2) satisfies

8

the requirements of the DHS Privacy Incident Handling Guidance.

2. **Use of Information from Prohibited Sources:**

a. Section 1367 also prohibits DHS officers and employees from making an adverse determination of admissibility or deportability against an alien using information furnished solely by a prohibited source associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U nonimmigrant status.

b. Prohibited Sources. The following are prohibited sources for purposes of this guidance:

    i. A spouse or parent who battered the alien or subjected the alien to extreme cruelty,

    ii. A member of the spouse's or parent's family residing in the same household as the abusive spouse or parent,

    iii. A spouse or parent who battered the alien's child or subjected the alien's child to extreme cruelty (unless the alien actively participated in the battery or extreme cruelty),

    iv. A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

    v. In the case of an alien who is applying for a U visa, the perpetrator of the substantial physical or mental abuse and the criminal activity, and

    vi. In the case of an alien who is applying for a T visa, Continued Presence, or immigration relief as a VAWA self-petitioner, the trafficker or perpetrator.

c. This prohibited source restriction does not apply to an alien who has been convicted of a crime listed in INA section 237(a)(2). Such crimes include: crime involving moral

9

turpitude, aggravated felony, human trafficking, failure to register as a sex offender under 18 U.S.C. section 2250, certain controlled substance violations, certain firearms offenses, and certain domestic violence, child abuse, stalking, protection order violation offenses. Consultation with counsel to determine if this exception applies is recommended before making a determination whether this exception applies.

d.  The lack of a pending or approved VAWA self-petition does not necessarily mean that the prohibited source provisions do not apply and that the alien is not a victim of battery or extreme cruelty. Similarly, although the prohibited source prohibition with respect to T or U nonimmigrant status applies only to applicants for such relief, the victim might be in the process of preparing an application. Accordingly, whenever a DHS officer or employee receives adverse information from a spouse, family member of a spouse, or unknown private individual, the employee will check the Central Index System (CIS) for the COA "384" flag. Employees will be sensitive to the fact that the alien at issue may be a victim and that a victim-abuser dynamic may be at play.

e.  <u>Receipt of Information from a Prohibited Source</u>

  i.  There are a number of ways DHS employees might receive "tips" from an abuser or an abuser's family, such as: calling ICE to report the victim as illegal, a "landlord" (who may actually be a human trafficker) calling ICE to report that his "tenants" are undocumented, or providing information to USCIS rebutting the basis for the victim's application. When a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees treat the information as inherently suspect. In deciding whether to pursue an investigation or enforcement action, DHS employees should consider all serious adverse factors. These factors include: national security concerns; evidence the alien has a serious criminal history; is involved in a serious crime; poses a threat to public safety (in fact, if the alien has been convicted of a crime listed in INA 237(a)(2); the prohibited source protections do not apply at all). Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud. In the absence of these or other serious adverse factors,

10

exercising favorable discretion, such as not pursuing allegations of fraud from a prohibited source, is appropriate.

ii. An assertion of fraud by the prohibited source, such as an accusation that the marriage is fraudulent, ordinarily will not serve as the sole basis for adverse action. Abusers often claim their marriage is fraudulent in order to exact revenge or exert further control over the victim.

f. Corroborating Information Furnished Solely By Prohibited Source: If a DHS employee receives information solely from a prohibited source that he or she wishes to corroborate and take action on, the DHS employee finds an independent source for the information and adheres to the following procedures:

i. DHS employee documents in the A-file specifically what information was received, from whom the information was received, and what adverse factors about the alien exist to justify pursuing action in the case;

ii. The above information is presented to the DHS employee's immediate supervisor for review and approval;

iii. If the supervisor determines it is appropriate to pursue action in the case and authorizes such action, the responsible Component shares details about the action with the section 1367 information and Victim Safety Provisions Review Committee (the "Review Committee") on a quarterly basis, but always after such action is taken;

iv. The Review Committee is a subcommittee of the DHS Council for Combating Violence Against Women and Girls and consists of subject matter representatives from DHS Policy, CRCL, CIS OMB, ICE, CBP, USCIS and OGC. The Review Committee reviews the information to help ensure compliance with this policy.

3. **Sensitive Location Certification of Compliance Requirement:**

a. In general, in cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in subparagraph b below, the Notice

11

to Appear includes a statement that the provisions of 8 U.S.C. section 1367 have been complied with.

b.    Locations requiring certification in accordance with INA section 239(e) are:

   i.    A domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services provider, or a community-based organization.

   ii.   A courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the alien has been battered or subject to extreme cruelty, or if the alien may be eligible for T or U nonimmigrant status.

c.    DHS officers and employees comply with the section 239(e) certification requirement even if the alien has not applied for or does not intend to apply for a victim-based application or petition.

d.    Section 239(e) requires the relevant DHS agency to certify that the agency has independently verified the inadmissibility or deportability of an alien who was encountered at these sensitive locations.

   Accordingly, before issuing an Notice to Appear (NTA) (with the requisite section 239(e) certification of compliance with 8 U.S.C. section 1367) to an alien against whom an enforcement action leading to a removal proceeding was taken at a sensitive location, DHS employees record on the Form I-213:  (1) the sensitive location at which the enforcement action was taken; (2) whether information related to the alien's admissibility or deportability was supplied by a prohibited source; (3) whether and to what extent such information was independently verified; and (4) an acknowledgement of compliance with the nondisclosure requirements.

e.    The certification of compliance is completed by an officer or agent authorized to issue NTAs after reviewing the information contained in the I-213 and confirming that all section 1367 provisions and policy were followed.

12

i. If a DHS employee suspects that the provisions and relevant policy were not followed, such employee immediately brings the issue to the attention of his or her immediate supervisor rather than issuing the NTA.

ii. If the provisions and policies appear to have been followed, the DHS officer or agent should type or print the following on the NTA, "I certify that, to the best of my knowledge and belief, I have complied with the provisions of 8 U.S.C. § 1367."

iii. Knowingly making a false certification of compliance may subject the officer or employee to civil penalties and/or disciplinary action under 8 U.S.C. § 1367(c). For more information, see Section VII, Penalties, below.

f. Aliens encountered at sensitive locations may be beneficiaries of pending or approved applications for benefits. DHS officers encountering individuals at such locations and considering an enforcement action verify, to the fullest extent reasonably practicable, whether a particular alien is a victim who falls within the protection of the section 1367 provisions.

a. While INA 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that arrests of aliens at such locations to be handled properly given that they may ultimately benefit from VAWA's provisions.

b. DHS officers and employees are strongly encouraged to exercise prosecutorial discretion favorably in cases of aliens encountered at the sensitive locations, unless other exigent circumstances exist, including terrorism or other extraordinary reasons for arresting aliens at a sensitive location.

g. If a DHS employee is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA section 239(e), the employee consults with his supervisory chain and, if authorized in accordance with the office's or Component's protocols, the relevant counsel's office and/or the Office for Civil Rights and Civil Liberties (CRCL).

**B.** **_Component requirements:_** With regard to the above Section 1 (Disclosure of Protected Information Generally Prohibited), Section 2 (Use of Information from Prohibited Sources), and Section 3 (Sensitive Location

13

Certification of Compliance Requirement), Components will meet the following requirements, when applicable.

1.     Requirement to Create Implementing Policy:  Any Component with access to Section 1367 information that might be shared with those outside of the Department develops any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.  Components coordinate with the Council in the development of implementing policy.

2.     Requirement to Identify Those Protected:  Components establish, to the fullest extent reasonably practicable, means of identifying individuals protected by Section 1367 confidentiality and will take steps to develop safeguards to protect this information in the relevant systems.  One such way to help identify most, though not all, of those protected is through a Central Index System (CIS) database check.

     a.     CIS database check:  For any cases where it is suspected that an alien is an applicant for a benefit protected by section 1367, a DHS employee consults the Central Index System (CIS) database to verify whether an alien has a pending or approved application or petition covered by section 1367.

     b.     CIS contains a class of admission (COA) code "384" (signifying section 384 of IIRIRA) that was created to alert DHS personnel that the individual is protected by section 1367.  Information about the location, status, or other identifying information of any individual with the code "384" may not be released outside of DHS, DOJ, or DOS unless one or more of the exceptions applies or the individual has been denied relief and has exhausted all opportunities for appeal.

          i.     When an individual files a VAWA self-petition (Form I-360), T nonimmigrant application (Form I-914, Form I-914 Supplement A), or U nonimmigrant petition (Form I-918, Form I-918 Supplement A) with USCIS, the COA in CIS will be updated to "384."

          ii.    Aliens granted these victim-based immigration benefits remain protected by Section 1367 and the COA will likely be changed from "384".  Any following COA in CIS is an indication that the individual was granted a form of relief that is covered by Section 1367 and the confidentiality provisions apply:  T-1, T-2, T-3, T-4, T-5, T-6, U-1, U-2, U-3, U-4, U-5, B11,

14

B12, B16, B17, B20, B21, B22, B23, B24, B25, B26, B27, B28, B29, B31, B32, B33, B36, B37, B38, BX1, BX2, BX3, BX6, BX7, BX8, IB0, IB1, IB2, IB3, IB4, IB5, IB6, IB7, IB8, ST0, ST6, ST7, ST8, ST9, SU0, SU6, SU7, SU8, SU9, Z14.

C. ___*Training requirement*___:  All DHS employees who, through the course of their work, may come into contact with victim applicants or have access to information covered by 8 U.S.C. section 1367 are required to complete the computer-based training module, *VAWA: Confidentiality and Immigration Relief*, which is currently on the Component's Learning Management Systems (LMS). The VAWA Training was developed by the Federal Law Enforcement Training Centers (FLETC) in collaboration with subject-matter experts from several DHS components, including USCIS, ICE and CBP.  No later than 180 days after the enactment of this policy, and on an annual basis thereafter, Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE and CBP report to the Review Committee the rate of compliance for this training. FLETC ensures the training module is available to all Components through their LMS and provides assistance to keep the training updated and current, as necessary.

D. ___*Penalties*___:  The law provides for civil penalties and/or disciplinary action for certain violations of 8 U.S.C. section 1367 and INA section 239(e):  "Anyone who willfully uses, publishes, or permits information to be disclosed in violation of [8 U.S.C. section 1367] or who knowingly makes a false certification under section 239(e) of the [INA] is subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation."  8 U.S.C. section 1367(c).

Violations of Section 1367 could give rise to serious, even life-threatening, dangers to victims and their family members.  Violations compromise the trust victims have in the efficacy of services that exist to help them and, importantly, may unwittingly aid perpetrators retaliate against, harm or manipulate victims and their family members, and elude or undermine criminal prosecutions.

# VII.   Questions and Reporting

A. To report any suspected violations of 8 U.S.C. section 1367 or INA section 239(e) or this policy instruction, please contact the Office for Civil Rights and Civil Liberties:

1. ___*E-mail:*___ CRCLCompliance@hq.dhs.gov
2. ___*Telephone:*___ 202-401-1474
3. ___*Fax:*___ 202-401-4708
4. ___*U.S. Postal Mail:*___

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch
245 Murray Lane, SW
Building 410, Mail Stop #0190
Washington, D.C. 20528

B.     Address any questions or concerns regarding this Instruction to CRCL.

_____     11/7/13
Megan Mack                                   Date
Officer for Civil Rights and Civil Liberties

16

**Department of Homeland Security**
**DHS Instructions System**
**Instruction Number: 002-02-001**
**Revision Number: 00**
**Issue date:**

# IMPLEMENTATION OF SECTION 1367 INFORMATION PROVISIONS

## I.  Purpose

This Instruction implements the Department of Homeland Security (DHS) Directive 002-02, Implementation of Section 1367 Information Provisions.  In Section 810 of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54 (2013). Congress amended Title 8, United States Code (U.S.C.), Section 1367, to require that the Attorney General, the Secretary of State and the Secretary of Homeland Security provide guidance consistent with the amendments it made to subsections (a) and (b) of 8 U.S.C. § 1367. See 8 U.S.C. § 1367(d).  This Instruction provides guidance as instructed by 8 U.S.C. 1367(d), as amended by Section 810 of the Violence Against Women Reauthorization Act of 2013, and DHS Directive 002-02.

## II.  Scope

This instruction applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.  References

A.    Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

B.    Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

C.    Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure." (VAWA 2005)

D.    Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes." (VAWA 2013)

E.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

F.     Title 42, U.S.C., Section 13925(a), "Definitions and grant provisions" (as re-designated and amended by Section 3 of VAWA 2013)

G.     Section 101(a)(51) of the Immigration and Nationality Act (INA) (8 U.S.C. 1101(a)(51))

H.     Section 239(e) of the Immigration and Nationality Act (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

I.     Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Special Rule for Battered Spouse or Child."

J.     DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

K.     Delegation 19004, Delegation of Authority to Implement Section 1367 Information, Date

L.     Directive 002-02, Implementation of Section 1367 Information Provisions, Date

# IV.   Definitions

A.     ***U Nonimmigrant Status***:  U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of being a victim of criminal activity, possess relevant information concerning the crime, and have been helpful, are being helpful, or are likely to be helpful to law enforcement or government officials in the investigation or prosecution of the criminal activity.  U status allows victims to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of a lawful permanent resident (LPR).

B.     ***T Nonimmigrant Status***:  T nonimmigrant status for victims of a severe form of trafficking in persons, as defined in section 103 of the TVPA of 2000, who are physically present in the United States on account of trafficking and who have complied with any reasonable requests for assistance in a law enforcement investigation or prosecution (with limited exceptions).  See INA 101(a)(15)(T).  T status allows victims of human trafficking to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of an LPR.

C.     ***VAWA Self-Petition(er)***:  Under VAWA, as amended, certain persons who have been battered or subjected to extreme cruelty by a qualifying relative may self-petition, allowing them to remain in the United States,

2

apply for LPR status as an approved VAWA self-petitioner, and eventually apply for naturalization. VAWA self-petitioners include: the spouse, child or parent of an abusive U.S. citizen; the spouse or child of an abusive LPR; the conditional resident spouse or child of an abusive U.S. citizen or LPR; the spouse or child of an alien eligible for relief under the Cuban Adjustment Act, the Haitian Refugee Immigration Fairness Act, or the Nicaraguan Adjustment and Central American Relief Act; and the spouse or child eligible for suspension of deportation or cancellation of removal due to abuse by a U.S. citizen or LPR. <u>See</u> INA 101(a)(51) (defining "VAWA self-petitioner").

D.    ***<u>VAWA Cancellation</u>***:  Victims of domestic violence who are in removal proceedings may be eligible to apply for relief with the immigration court in the form of VAWA cancellation of removal. <u>See</u> INA 240A(b)(2) (prescribing eligibility requirements).

E.    ***<u>Sensitive Location</u>:***  Locations specified in INA § 239(e)(2), where if an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified below, the Notice to Appear (NTA) includes a statement that the provisions of 8 U.S.C. 1367 have been complied with. The locations specified include: domestic violence shelter, rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

Sensitive locations can also include a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) [8 U.S.C. § 1101(a)(15)].

F.    ***<u>Section 1367 Information</u>***:

1.    Any information relating to aliens who are seeking or have been approved for immigrant status as battered spouses, children and parents under provisions of the Violence Against Women Act (VAWA), as victims of a severe form of human trafficking who generally are cooperating with law enforcement authorities, or as aliens who have suffered substantial physical or mental abuse and are cooperating with law enforcement authorities. This definition includes records or other information that do not specifically identify the individual as an applicant or beneficiary of the T Visa, U Visa, or VAWA protections.

2.    Section 1367 covers information relating to beneficiaries of applications for a number of immigration benefits, not just the Form

<div align="center">3</div>

I-360 VAWA self-petition.  For the purpose of this guidance if an alien is the beneficiary of a pending or approved application for one or more of the victim-based benefits described below, the requirements of 8 U.S.C. 1367 will be followed:

a.      VAWA self-petitioner, which incorporates the following applications or petitions:

     i.      I-360 Self-petition - self-petitioners under INA sec. 204

     ii.     I-751 Hardship waiver - battered spouse or child hardship waiver

     iii.    VAWA CAA - abused Cuban Adjustment Act applicants

     iv.    VAWA HRIFA - abused Haitian Refugee Immigration Fairness Act applicants

     v.     VAWA NACARA - abused Nicaraguan Adjustment and Central American Relief Act applicants

     vi.    VAWA Suspension of Deportation

b.      VAWA Cancellation of Removal applicants under INA 240A(b)(2).

c.      I-914 T Nonimmigrant Status - victim of a severe form of trafficking in persons under INA 101(a)(15)(T).

d.      I-918 U Nonimmigrant Status - victim of qualifying criminal activity under INA 101(a)(15)(U).

# V.   Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this instruction.

A.      The _**Chief Privacy Officer**_ is the senior official within the Department with primary responsibility for privacy compliance and policy.

B.      The _**Officer for Civil Rights and Civil Liberties**_ directs and oversees the implementation of the integration of civil rights and civil liberties across the Department, serving as the foundational DHS organization through which all Department-wide civil rights and civil liberties activities are overseen, defined, and measured.  The Officer for Civil Rights and Civil Liberties has the delegated authority from the Secretary to provide this single DHS

4

policy on the implementation of Title 8, U.S.C., Section 1367 (VAWA/T/U confidentiality provisions).

C.    The *__General Counsel__* is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.    The *__Component Heads__* with any Section 1367 information that might be shared implement and execute all applicable policies and procedures set forth in this instruction, and develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.

E.    The *__Council on Combating Violence Against Women__* works to ensure that policies and practices for combating violence against women and children are consistent Department-wide.  By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children.  The Council collects information on a quarterly basis and conducts after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations.  The Council is also responsible for assisting in developing all implementing policies that are created by Components.

F.    The *__Federal Law Enforcement Training Centers (FLETC)__* serves as an interagency law enforcement training organization for federal agencies and partner organizations.  It provides training to state, local, rural, tribal, territorial, and international law enforcement agencies.  FLETC ensures the computer-based training module, *VAWA: Confidentiality and Immigration Relief*, is available to all Components for promulgation through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

# VI.    Policy and Requirements

A.    *__Policy__*:

1.    **Disclosure of Protected Information Generally Prohibited.**

   a.    This guidance serves as a reminder that all DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee

5

of DHS, the Department of State (DOS); or the Department of Justice (DOJ) of <u>any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits</u>. This includes a battered spouse or child hardship waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits.  Information that cannot be disclosed includes information about an individual contained in a DHS database as well as information that has not yet been included in a database, such as the location of a beneficiary.

b.    The nondisclosure requirement does not apply to disclosures of protected information within DHS or to DOJ or DOS for legitimate agency purposes.

c.    The nondisclosure provision provides protection as soon as a DHS employee has reason to believe that the alien may be the beneficiary of a pending or approved victim-based application or petition, and the limitation ends when the application for relief is denied *and* all opportunities for appeal of the denial have been exhausted.

d.    Exceptions:  There are specified exceptions to the general nondisclosure requirement allowing for disclosure of protected information in limited circumstances.

Statutory Exceptions.  The statute prescribes eight (8) exceptions to the general nondisclosure requirement:

i.    For the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under 13 U.S.C. section 8.  This exception allows for the furnishing of tabulations and other statistical material that do not disclose the information reported by, or on behalf of, any particular respondent, and the making of special statistical compilations and surveys, for Federal, State, or local government agencies or "other public and private persons and agencies" – provided that no information furnished is "used to the detriment of any respondent or other person to whom such information relates."

6

ii.     For the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.  However, the authority to exercise this exception is subject to the Secretary's discretion.

iii.    In connection with judicial review of a Federal agency or court determination in a manner that protects the confidentiality of such information.  Please note, defense counsel in state cases may sometimes attempt to make the entire A-file discoverable; however, the entire file is <u>not discoverable in its entirety under this exception.</u>

iv.     If all the battered individuals in the case are adults and they have all waived the nondisclosure restrictions.

v.      For the disclosure of information to Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for public benefits under 8 U.S.C. section 1641(c).

vi.     For the disclosure to the Chairmen and Ranking Members of the Senate and House of Representatives Committees on the Judiciary, for the exercise of congressional oversight authority, "information on closed cases under this section in a manner that protects the confidentiality of such information and that omits personally identifying information (including locational information about individuals)."

vii.    For purposes of communicating, with the "prior written consent of the alien involved," with nonprofit, nongovernmental victims' services providers "for the sole purpose of assisting victims in obtaining victim services."  The victim services providers receiving such referrals are bound by the nondisclosure requirements of Section 1367.  Recall that Section 101(i) of the INA (8 U.S.C. section 1101(i)) mandates that DHS provide T nonimmigrants with a referral to an NGO "that would advise the alien regarding

7

the alien's options while in the United States and the resources available to the alien."

    viii.  The disclosure of information to national security officials to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information.  (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes.

For instances where an official is uncertain whether an exception applies or where questions exist about a particular exception, local counsel's office should be consulted.

e.    Nonstatutory Exceptions.  In addition to the enumerated statutory exceptions, there may be instances in which disclosure of protected information is mandated by court order or constitutional requirements.  For example, disclosure may be required in a federal, state, or local criminal proceeding for purposes of complying with constitutional obligations to provide exculpatory and impeachment material that is relevant either to guilt or punishment of a criminal defendant in a federal criminal proceeding ("Brady" material) or that bears upon the credibility of a prosecution witness ("Giglio" material).  If DOJ or a state or local prosecutor requests protected information that is not subject to disclosure under one of the statutory exceptions and that will be disclosed to a court or another agency (other than DOS), please consult DHS counsel.  DHS counsel are consulted if a Member of Congress not described in the congressional oversight exception in Section 1367(b)(6) is requesting protected information pursuant to his or her congressional oversight authority.

f.    Notification of Unauthorized Disclosures:   In the event that any Component (1) discloses Section 1367 information in a manner inconsistent with the provisions above or (2) is informed by the recipient of Section 1367 information that the recipient has disclosed that information in an unauthorized manner, the Component Head for that Component (1) notifies the Chief Privacy Officer and the Officer for Civil Rights and Civil Liberties as soon as is practicable, but in no event later than twenty-four hours after discovery of the unauthorized disclosure, and (2) satisfies

8

the requirements of the DHS Privacy Incident Handling Guidance.

2. **Use of Information from Prohibited Sources:**

a. Section 1367 also prohibits DHS officers and employees from making an adverse determination of admissibility or deportability against an alien using information furnished solely by a prohibited source associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U nonimmigrant status.

b. Prohibited Sources.  The following are prohibited sources for purposes of this guidance:

    i. A spouse or parent who battered the alien or subjected the alien to extreme cruelty,

    ii. A member of the spouse's or parent's family residing in the same household as the abusive spouse or parent,

    iii. A spouse or parent who battered the alien's child or subjected the alien's child to extreme cruelty (unless the alien actively participated in the battery or extreme cruelty),

    iv. A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

    v. In the case of an alien who is applying for a U visa, the perpetrator of the substantial physical or mental abuse and the criminal activity, and

    vi. In the case of an alien who is applying for a T visa, Continued Presence, or immigration relief as a VAWA self-petitioner, the trafficker or perpetrator.

c. This prohibited source restriction does not apply to an alien who has been convicted of a crime listed in INA section 237(a)(2).  Such crimes include:  crime involving moral

9

turpitude, aggravated felony, human trafficking, failure to register as a sex offender under 18 U.S.C. section 2250, certain controlled substance violations, certain firearms offenses, and certain domestic violence, child abuse, stalking, protection order violation offenses.  Consultation with counsel to determine if this exception applies is recommended before making a determination whether this exception applies.

d.    The lack of a pending or approved VAWA self-petition does not necessarily mean that the prohibited source provisions do not apply and that the alien is not a victim of battery or extreme cruelty.  Similarly, although the prohibited source prohibition with respect to T or U nonimmigrant status applies only to applicants for such relief, the victim might be in the process of preparing an application.  Accordingly, whenever a DHS officer or employee receives adverse information from a spouse, family member of a spouse, or unknown private individual, the employee will check the Central Index System (CIS) for the COA "384" flag.  Employees will be sensitive to the fact that the alien at issue may be a victim and that a victim-abuser dynamic may be at play.

e.    <u>Receipt of Information from a Prohibited Source</u>

i.    There are a number of ways DHS employees might receive "tips" from an abuser or an abuser's family, such as:  calling ICE to report the victim as illegal, a "landlord" (who may actually be a human trafficker) calling ICE to report that his "tenants" are undocumented, or providing information to USCIS rebutting the basis for the victim's application.  When a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees treat the information as inherently suspect.  In deciding whether to pursue an investigation or enforcement action, DHS employees should consider all serious adverse factors.  These factors include: national security concerns; evidence the alien has a serious criminal history; is involved in a serious crime; poses a threat to public safety (in fact, if the alien has been convicted of a crime listed in INA 237(a)(2); the prohibited source protections do not apply at all).  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors,

10

exercising favorable discretion, such as not pursuing allegations of fraud from a prohibited source, is appropriate.

ii. An assertion of fraud by the prohibited source, such as an accusation that the marriage is fraudulent, ordinarily will not serve as the sole basis for adverse action. Abusers often claim their marriage is fraudulent in order to exact revenge or exert further control over the victim.

f. Corroborating Information Furnished Solely By Prohibited Source: If a DHS employee receives information solely from a prohibited source that he or she wishes to corroborate and take action on, the DHS employee finds an independent source for the information and adheres to the following procedures:

i. DHS employee documents in the A-file specifically what information was received, from whom the information was received, and what adverse factors about the alien exist to justify pursuing action in the case;

ii. The above information is presented to the DHS employee's immediate supervisor for review and approval;

iii. If the supervisor determines it is appropriate to pursue action in the case and authorizes such action, the responsible Component shares details about the action with the section 1367 information and Victim Safety Provisions Review Committee (the "Review Committee") on a quarterly basis, but always after such action is taken;

iv. The Review Committee is a subcommittee of the DHS Council for Combating Violence Against Women and Girls and consists of subject matter representatives from DHS Policy, CRCL, CIS OMB, ICE, CBP, USCIS and OGC. The Review Committee reviews the information to help ensure compliance with this policy.

3. **Sensitive Location Certification of Compliance Requirement:**

a. In general, in cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in subparagraph b below, the Notice

11

to Appear includes a statement that the provisions of 8 U.S.C. section 1367 have been complied with.

b.    Locations requiring certification in accordance with INA section 239(e) are:

    i.    A domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services provider, or a community-based organization.

    ii.    A courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the alien has been battered or subject to extreme cruelty, or if the alien may be eligible for T or U nonimmigrant status.

c.    DHS officers and employees comply with the section 239(e) certification requirement even if the alien has not applied for or does not intend to apply for a victim-based application or petition.

d.    Section 239(e) requires the relevant DHS agency to certify that the agency has independently verified the inadmissibility or deportability of an alien who was encountered at these sensitive locations.

Accordingly, before issuing an Notice to Appear (NTA) (with the requisite section 239(e) certification of compliance with 8 U.S.C. section 1367) to an alien against whom an enforcement action leading to a removal proceeding was taken at a sensitive location, DHS employees record on the Form I-213:  (1) the sensitive location at which the enforcement action was taken; (2) whether information related to the alien's admissibility or deportability was supplied by a prohibited source; (3) whether and to what extent such information was independently verified; and (4) an acknowledgement of compliance with the nondisclosure requirements.

e.    The certification of compliance is completed by an officer or agent authorized to issue NTAs after reviewing the information contained in the I-213 and confirming that all section 1367 provisions and policy were followed.

i.      If a DHS employee suspects that the provisions and relevant policy were not followed, such employee immediately brings the issue to the attention of his or her immediate supervisor rather than issuing the NTA.

ii.      If the provisions and policies appear to have been followed, the DHS officer or agent should type or print the following on the NTA, "I certify that, to the best of my knowledge and belief, I have complied with the provisions of 8 U.S.C. § 1367."

iii.      Knowingly making a false certification of compliance may subject the officer or employee to civil penalties and/or disciplinary action under 8 U.S.C. § 1367(c). For more information, see Section VII, Penalties, below.

f.      Aliens encountered at sensitive locations may be beneficiaries of pending or approved applications for benefits. DHS officers encountering individuals at such locations and considering an enforcement action verify, to the fullest extent reasonably practicable, whether a particular alien is a victim who falls within the protection of the section 1367 provisions.

a.      While INA 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that arrests of aliens at such locations to be handled properly given that they may ultimately benefit from VAWA's provisions.

b.      DHS officers and employees are strongly encouraged to exercise prosecutorial discretion favorably in cases of aliens encountered at the sensitive locations, unless other exigent circumstances exist, including terrorism or other extraordinary reasons for arresting aliens at a sensitive location.

g.      If a DHS employee is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA section 239(e), the employee consults with his supervisory chain and, if authorized in accordance with the office's or Component's protocols, the relevant counsel's office and/or the Office for Civil Rights and Civil Liberties (CRCL).

B.      ***Component requirements:*** With regard to the above Section 1 (Disclosure of Protected Information Generally Prohibited), Section 2 (Use of Information from Prohibited Sources), and Section 3 (Sensitive Location

13

Certification of Compliance Requirement), Components will meet the following requirements, when applicable.

1.    Requirement to Create Implementing Policy:  Any Component with access to Section 1367 information that might be shared with those outside of the Department develops any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.  Components coordinate with the Council in the development of implementing policy.

2.    Requirement to Identify Those Protected:  Components establish, to the fullest extent reasonably practicable, means of identifying individuals protected by Section 1367 confidentiality and will take steps to develop safeguards to protect this information in the relevant systems.  One such way to help identify most, though not all, of those protected is through a Central Index System (CIS) database check.

a.    CIS database check:  For any cases where it is suspected that an alien is an applicant for a benefit protected by section 1367, a DHS employee consults the Central Index System (CIS) database to verify whether an alien has a pending or approved application or petition covered by section 1367.

b.    CIS contains a class of admission (COA) code "384" (signifying section 384 of IIRIRA) that was created to alert DHS personnel that the individual is protected by section 1367.  Information about the location, status, or other identifying information of any individual with the code "384" may not be released outside of DHS, DOJ, or DOS unless one or more of the exceptions applies or the individual has been denied relief and has exhausted all opportunities for appeal.

i.    When an individual files a VAWA self-petition (Form I-360), T nonimmigrant application (Form I-914, Form I-914 Supplement A), or U nonimmigrant petition (Form I-918, Form I-918 Supplement A) with USCIS, the COA in CIS will be updated to "384."

ii.    Aliens granted these victim-based immigration benefits remain protected by Section 1367 and the COA will likely be changed from "384".  Any following COA in CIS is an indication that the individual was granted a form of relief that is covered by Section 1367 and the confidentiality provisions apply:  T-1, T-2, T-3, T-4, T-5, T-6, U-1, U-2, U-3, U-4, U-5, B11,

14

B12, B16, B17, B20, B21, B22, B23, B24, B25, B26, B27, B28, B29, B31, B32, B33, B36, B37, B38, BX1, BX2, BX3, BX6, BX7, BX8, IB0, IB1, IB2, IB3, IB4, IB5, IB6, IB7, IB8, ST0, ST6, ST7, ST8, ST9, SU0, SU6, SU7, SU8, SU9, Z14.

C.   _**Training requirement**_:  All DHS employees who, through the course of their work, may come into contact with victim applicants or have access to information covered by 8 U.S.C. section 1367 are required to complete the computer-based training module, *VAWA: Confidentiality and Immigration Relief*, which is currently on the Component's Learning Management Systems (LMS). The VAWA Training was developed by the Federal Law Enforcement Training Centers (FLETC) in collaboration with subject-matter experts from several DHS components, including USCIS, ICE and CBP.  No later than 180 days after the enactment of this policy, and on an annual basis thereafter, Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE and CBP report to the Review Committee the rate of compliance for this training. FLETC ensures the training module is available to all Components through their LMS and provides assistance to keep the training updated and current, as necessary.

D.   _**Penalties**_:  The law provides for civil penalties and/or disciplinary action for certain violations of 8 U.S.C. section 1367 and INA section 239(e): "Anyone who willfully uses, publishes, or permits information to be disclosed in violation of [8 U.S.C. section 1367] or who knowingly makes a false certification under section 239(e) of the [INA] is subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation."  8 U.S.C. section 1367(c).

Violations of Section 1367 could give rise to serious, even life-threatening, dangers to victims and their family members.  Violations compromise the trust victims have in the efficacy of services that exist to help them and, importantly, may unwittingly aid perpetrators retaliate against, harm or manipulate victims and their family members, and elude or undermine criminal prosecutions.

# VII.   Questions and Reporting

A.   To report any suspected violations of 8 U.S.C. section 1367 or INA section 239(e) or this policy instruction, please contact the Office for Civil Rights and Civil Liberties:

1.   ***E-mail:*** CRCLCompliance@hq.dhs.gov
2.   ***Telephone:*** 202-401-1474
3.   ***Fax:*** 202-401-4708
4.   ***U.S. Postal Mail:***

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch
245 Murray Lane, SW
Building 410, Mail Stop #0190
Washington, D.C. 20528

B.      Address any questions or concerns regarding this Instruction to CRCL.


_____          _____
                Megan H. Mack                                          Date
       Officer for Civil Rights and Civil Liberties

11/7/13

16

Instruction # 002-02-001
Revision # 00
ICE CAR 070

The White House

Office of the Press Secretary
For Immediate Release
January 25, 2017

Executive Order: Enhancing Public Safety in the Interior of the United States

EXECUTIVE ORDER

- - - - - - -

ENHANCING PUBLIC SAFETY IN THE INTERIOR OF THE UNITED STATES

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 et seq.), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

Section 1. Purpose. Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

1

Sec. 2. Policy. It is the policy of the executive branch to:

(a) Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

(b) Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

(c) Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

(d) Ensure that aliens ordered removed from the United States are promptly removed; and

(e) Support victims, and the families of victims, of crimes committed by removable aliens.

Sec. 3. Definitions. The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

Sec. 4. Enforcement of the Immigration Laws in the Interior of the United States. In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

Sec. 5. Enforcement Priorities. In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Sec. 6. Civil Fines and Penalties. As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under

ICE CAR 072

the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

Sec. 7. Additional Enforcement and Removal Officers. The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

Sec. 8. Federal-State Agreements. It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary.  Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

Sec. 9. Sanctuary Jurisdictions. It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

(a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a

ICE CAR 073

weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

Sec. 10. Review of Previous Immigration Actions and Policies. (a) The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as "Secure Communities" referenced in that memorandum.

(b) The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

(c) To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

Sec. 11. Department of Justice Prosecutions of Immigration Violators. The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

Sec. 12. Recalcitrant Countries. The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

Sec. 13. Office for Victims of Crimes Committed by Removable Aliens. The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

Sec. 14. Privacy Act. Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

ICE CAR 074

Sec. 15. Reporting. Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

Sec. 16. Transparency. To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

(a) the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

(b) the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

(c) the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

Sec. 17. Personnel Actions. The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

Sec. 18. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
January 25, 2017.

ICE CAR 075

**From:**  ERO Taskings
**Subject:**  Enforcement Actions at or Near Courthouses
**Date:**  Wednesday, March 19, 2014 11:11:09 AM

*This message is sent on behalf of Philip T. Miller, Assistant Director for Field Operations:*

**To:**        **Field Office Directors and Deputy Field Office Directors**

**Subject:**        **Enforcement Actions at or Near Courthouses**

This message provides important guidance concerning ERO enforcement actions at courthouses.  Please ensure immediate distribution to all ERO officers within your AOR.

- Enforcement actions at or near courthouses will only be undertaken against Priority 1 aliens, as described in ICE Policy Number 10072.1, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011). These aliens include, but are not limited to:

    - aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;
    - aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders;
    - aliens not younger than 16 years of age who participated in organized criminal gangs;
    - aliens subject to outstanding criminal warrants; and
    - aliens who otherwise pose a serious risk to public safety.

- Enforcement actions at or near courthouses will only take place against specific, targeted aliens, rather than individuals who may be "collaterally" present, such as family members or friends who may accompany the target alien to court appearances or functions.

- Enforcement actions at or near courthouses will, wherever practicable:  (1) take place outside public areas of the courthouse; (2) be conducted in collaboration with court security staff; and (3) utilize the court building's non-public entrances and exits.

Questions regarding this guidance may be directed to the Field Operations Staff Officer assigned to your AOR.

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**Please Reference This Directive As Directive Number 10067.1**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**ICE Policy System**

**OFFICE OF PRIMARY INTEREST:** <u>OFFICE OF INVESTIGATIONS</u>

| | |
|---|---|
| **DISTRIBUTION:** | OI, DRO, FPS, INTELLIGENCE |
| **DIRECTIVE NO.:** | 7-2.0 |
| **ISSUE DATE:** | August 4, 2006 |
| **EFFECTIVE DATE:** | August 4, 2006 |
| **REVIEW DATE:** | August 4, 2009 |
| **SUPERSEDES:** | None |

**DIRECTIVE TITLE: ICE GANGS DATABASE: DATA ENTRY AND USE**

1.   **PURPOSE and SCOPE.** This Directive establishes policy for the entry of suspected gang members and/or their associates into the ICE Gangs database by U.S. Immigration and Customs Enforcement (ICE) Office of Investigations (OI) Special Agents, Office of Detention and Removal Operations (DRO) Officers and Immigration Enforcement Agents (IEAs), Office of Intelligence (INTEL) Special Agents and Analysts, and Federal Protective Service (FPS) Special Agents and Police Officers. The ICEGangs database will enable information sharing between participating federal, state, and local police agencies.

2.   **AUTHORITIES/REFERENCES.**

2.1   <u>Authority</u>

2.1.1   18 U.S.C. § 521, Criminal Street Gangs

2.2   <u>References</u>

2.2.1   "Memorandum of Understanding between the Department of Homeland Security, Immigration and Customs Enforcement and California Department of Justice, Criminal Intelligence Bureau Regarding the Sharing of Information Relating to Criminal Street Gangs" (January 3, 2006).

2.2.2   Department of Homeland Security Management Directive 11042.1, "Safeguarding Sensitive but Unclassified (For Official Use Only) Information," January 6, 2005.

3.   **SUPERSEDED/CANCELLED POLICY/SUMMARY OF CHANGES.**
None.

4.   **BACKGROUND.**

4.1   In the first federal initiative of its kind, ICE Headquarters has deployed a comprehensive street gang-tracking software program through the existing ICE Law Enforcement Analysis Data System (NETLEADS) Intelligence Fusion Intranet Web site and OI Proprietary Intranet Web site.

---

ICE GANGS DATABASE: DATA ENTRY AND USE
*Law Enforcement Sensitive*

2

4.2    The gang-tracking software application is known as ICEGangs and is based on the commercially developed GangNet software utilized by numerous federal, state, and local police agencies across the United States and Canada.

4.3    ICE will use ICEGangs to provide connectivity to the California Department of Justice CalGang© network and other GangNet users. Connectivity with California alone will give ICE access to information on approximately 200,000 documented gang members.

4.4    The ICEGangs database will also enhance each Principal Field Officer's capability to identify and arrest gang members within their areas of responsibility (AORs) by using existing ICE communications and software tools.

4.5    ICEGangs will complement the Treasury Enforcement Communications System (TECS)-II with the capability to incorporate biometric identifiers associated with gangs, such as fingerprints, photographs, tattoos, and gang symbols, each with its own search capability.

5.    **DEFINITIONS.**  The following definitions are provided for the purposes of this Directive.

5.1    **CalGang©** is a browser-based investigative, analytical, and statistical software program based on the commercially available GangNet software developed for recording and tracking suspected gang members and their associates. It was originally developed for the California Department of Justice and is known outside of California as GangNet.

5.2    **Gang,** as used in this Directive, is a formal or informal group, club, organization, or association of three or more persons that has as one of its purposes the commission of criminal activity either in the United States or outside the United States has committed two or more criminal acts on separate and distinct occasions, and the members of which may share a common identifying sign, symbol, or name.

5.3    **GangNet** is the name by which CalGang© is known outside of California.

5.4    **ICEGangs** is a browser-based investigative, analytical, and statistical software program based on the commercially available GangNet software developed for recording and tracking suspected gang members and their associates. The ICEGangs database will enable information-sharing between participating agencies.

5.5    **ICE Principal Field Officers** are OI Special Agents in Charge, DRO Field Office Directors, FPS Regional Directors, and INTEL Field Intelligence Unit Directors.

6.    **POLICY.**

6.1    OI Special Agents, DRO Officers and IEAs, FPS Special Agents and Police Officers, and INTEL Special Agents and Analysts who encounter, obtain information about, or become aware of suspected gang members and/or associates are required to place information about those individuals into ICEGangs within 72 hours.

6.2　　Individuals convicted of violations associated with 18 U.S.C. § 521 or any other Federal or state law punishing or imposing civil consequences for gang-related activity or association or who, during any questioning by law enforcement officers, have admitted their gang membership qualify as suspected gang members for the purposes of entry into ICEGangs.

6.3　　Individuals also qualify for entry into ICEGangs as suspected gang members if two or more of the criteria set forth in Sections 6.3.1 – 6.3.10 apply, one of which having occurred within the previous 5 years. (Note: This information must be documented in the appropriate TECS-II, ENFORCE, or other reporting system record.)

6.3.1　Subject has tattoos identifying a specific gang.

6.3.2　Subject frequents an area notorious for gangs and/or associates with known gang members.

6.3.3　Subject has been seen displaying gang signs/symbols.

6.3.4　Subject has been identified as a gang member through a reliable source.

6.3.5　Subject has been identified as a gang member through an untested informant.

6.3.6　Subject has been arrested with other gang members on two or more occasions.

6.3.7　Subject has been identified as a gang member by a jail or prison.

6.3.8　Subject has been identified as a gang member through seized or otherwise obtained written or electronic correspondence.

6.3.9　Subject has been seen wearing distinctive gang style clothing or has been found in possession of other gang indicia.

6.3.10　Subject has been identified as a gang member through documented reasonable suspicion.

6.4　　The entry of suspected gang members into ICEGangs does not eliminate the requirement to create an appropriate TECS-II record.

6.5　　All information accessed through ICEGangs (ICE or third agency) is to be treated as law enforcement intelligence and not to be disclosed or used as evidence in any criminal, civil, or administrative proceeding, nor is it to be used independently as probable cause to support arrests, searches, seizures, or other law enforcement actions. Only original source (TECS-II, ENFORCE, etc.) documentation may be used to support legal proceedings.

6.5.1　The use and release of any non-ICE information contained in or accessed through ICEGangs must be approved by the source agency to support any law enforcement action.

6.6　　Pursuant to 8 C.F.R. § 208.6, asylum information is generally protected from disclosure to third parties. As such, it should not be accessible by non-DHS law enforcement agencies accessing ICEGangs, unless it is provided on a

4

case-by-case basis to a federal law enforcement agency when it is necessary to disclose such information for investigative purposes pursuant to 8 C.F.R. § 208.6(c)(1)(v).

6.7    ICEGangs data should be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS MD 11042.1.  (See Section 2.3.)

**7.    RESPONSIBILITIES.**

7.1    The Assistant Secretary has overall responsibility for the ICEGangs database.

7.2    The Directors of OI, DRO, FPS, and INTEL have the responsibility of implementing this Directive within their respective Program Offices.

7.3    The Director of OI has management oversight of the ICEGangs database.

7.4    The Principal Field Officers of OI, DRO, FPS, and INTEL will ensure compliance with the provisions of this Directive within their respective AORs.

**8.    PROCEDURES.**  Procedures for entering and accessing records in the ICEGangs database are included in the training provided to the users.

**9.    ATTACHMENTS.**  None.

**10.    NO PRIVATE RIGHT STATEMENT.**  This Directive is an internal policy statement of ICE.  It is not intended to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States; its departments, agencies, or other entities; its officers or employees; or any other person.

Approved: _Julie Myers_
            Julie L. Myers
            Assistant Secretary for
            Immigration and Customs Enforcement

*Office of Detention and Removal Operations*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



### JAN 2 2 2007

MEMORANDUM FOR          Field Office Directors and Special Agents


FROM:                   John P. Torres
                        Director


SUBJECT:                <u>Interim Guidance Relating to Officer Procedure Following
                        Enactment of VAWA 2005</u>

<u>Purpose</u>

The Violence Against Women and Department of Justice Reauthorization Act of 2005
(VAWA 2005), which became effective on January 5, 2006, expanded various protections for
aliens seeking immigration benefits as crime victims and amended various sections of the
Immigration and Nationality Act (INA). As a result, operational units of U.S. Immigration and
Customs Enforcement (ICE) will be required to follow new procedures when taking certain
actions in cases involving aliens eligible to apply for VAWA benefits or T or U nonimmigrant
status. This interim guidance explains how VAWA 2005 affects the current operating
procedures of the Office of Investigations (OI) and the Office of Detention and Removal
Operations (DRO).

<u>Background</u>

Congress passed the Violence Against Women Act (VAWA) of 1994 as a response to growing
concerns over gender-related violence. VAWA provides that abused spouses, children, and
parents of U.S. citizens or lawful permanent residents can "self-petition" to obtain lawful
permanent residence. These provisions allow certain battered aliens to file for an immigrant
visa in order to seek safety and independence from the abuser without the abuser's permission.

Congress subsequently passed the Victims of Trafficking and Violence Protection Act of 2000,
which reauthorized the VAWA provisions of 1994 and created two new nonimmigrant
categories: T status and U status. T nonimmigrant status is available to victims of "severe
forms of trafficking" who are physically present in the United States or a port of entry as a
result of that trafficking. U nonimmigrant status is available to aliens who have "suffered
substantial physical or mental abuse" as a result of certain criminal acts. Victims eligible for
VAWA benefits or T or U nonimmigrant status may seek benefits through separate
applications submitted to the Vermont Service Center of U.S. Citizenship and Immigration

**FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE**

http://www.ice.gov

ICE CAR 081

SUBJECT- VAWA GUIDANCE
Page 2

Services (USCIS). This memorandum provides interim guidance concerning the expanded confidentiality protections of the VAWA 2005 and the legislation's requirement that ICE issue a certificate of compliance in certain circumstances.

<u>Discussion</u>

A.  <u>Definition of "VAWA Self-Petitioner"</u>

VAWA 2005 added INA § 101(a)(51), which defines "VAWA self-petitioner" as an alien, or a child of the alien, who qualifies for relief under several provisions of the Act and generally requires that the victim be abused, battered, or subjected to human trafficking or severe mental or physical abuse. A self-petition allows the victim the opportunity to adjust status without the abuser's assistance. ICE employees should become familiar with the categories of VAWA self-petitioners and the many ways in which battered victims may adjust their status. For purposes of this interim guidance, if an officer believes there is any credible evidence that the alien may be eligible for VAWA benefits or T or U nonimmigrant status, the requirements of 8 U.S.C. § 1367, described below, must be followed along with standard operating procedure.

B.  <u>Use of Information from Prohibited Sources and Confidentiality</u>

Section 1367(a) of Title 8 of the United States Code, as amended by VAWA 2005, prevents ICE employees from making an adverse determination of admissibility or deportability of an alien using information furnished *solely* by certain people associated with the battery or extreme cruelty, such as the abuser or a member of the abuser's family living in the same household as the victim. For purposes of this interim guidance, an adverse determination of admissibility or deportability would include placing an alien in removal proceedings or making civil arrests relating to an alien's violation of the immigration laws. Section 1367(a) also generally prohibits ICE employees from disclosing any information about a VAWA, T, or U beneficiary to anyone, especially those who might use the information to the alien's detriment, *i.e.* an abuser who may wish to have the victim removed from the United States.

Information provided *solely* by prohibited sources must be independently corroborated. Examples of prohibited sources include: the abuser in the case of a VAWA petitioner, the human trafficker in the case of a T status applicant, or the perpetrator of substantial physical or mental abuse in the case of a U status applicant. In such cases, ICE employees cannot rely solely on these sources when making an adverse determination of admissibility or deportability. This prohibition is important to note because ICE officers sometimes receive information from upset or disgruntled spouses, abusers, traffickers, or family members. An arrest based on such information would not violate § 1367 if, according to existing standard operating procedures, the ICE officer independently verifies the information *{e.g.,* through an immigration database) prior to making the arrest. To avoid a possible violation of § 1367, ICE officers must verify the information provided from these prohibited sources. For example, if the abuser husband calls ICE and states that his alien wife is in the United States after being ordered removed, ICE must independently verify the prior removal and note such corroboration on Form 1-213 (Record of Inadmissible/Deportable Alien).

FOR OFFICIAL USE ONLY LAW
ENFORCEMENT SENSITIVE

SUBJECT: VAWA GUIDANCE
Page 3

Section 1367 does not prevent ICE officers from making arrests of aliens believed to be in the United States illegally if the information provided by a prohibited source is independently verified. Likewise, § 1367 does not prevent ICE officers from arresting aliens who have applied for benefits under VAWA or the T or U nonimmigrant categories. Instead, § 1367 prevents ICE officers from making adverse determinations of admissibility or deportability based on information provided "solely" by a prohibited source. Simply stated, ICE officers must independently verify information and check databases at their disposal to determine the existence of any pending victim-based applications for immigration benefits. ICE officers are also reminded to consider the sources of their information and be aware that there is a possibility that the caller may be involved in an abusive or violent relationship with the alien who is the subject of the call. Accordingly, if the source of the independently verifiable information is likely an abuser or someone acting in the abuser's capacity, the ICE officer should consider using prosecutorial discretion.

This interim guidance also reminds ICE employees that they are generally prohibited from "permitting] use by or disclosure to anyone (other than a sworn officer or employee of [DHS])" of any information which relates to an alien who is the beneficiary of an application for relief under victim based benefits (VAWA, T or U nonimmigrant status).[1] If ICE employees know that an alien has sought such victim-based benefits, they are generally prohibited from disclosing any information to a third party. In enacting this nondisclosure provision, Congress sought to prevent, with limited exceptions, disclosure of *any information* relating to beneficiaries of applications for VAWA benefits (battered spouses or children) or for T or U nonimmigrant status, including the fact that they have applied for benefits. The disclosure of certain information is permitted in limited circumstances. Those circumstances include disclosure for legitimate law enforcement purposes, statistical purposes, and benefit granting or public benefit purposes. *See* 8 U.S.C § 1367(b) (listing exceptions to general nondisclosure rule). In short, ICE employees must not reveal any information concerning an alien's T, U, or VAWA application unless an exception to the general nondisclosure requirement applies. The nondisclosure limitation ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

C. Sensitive Location Certificate of Compliance Requirement

VAWA 2005 added new INA § 239(e), which requires the completion of a certificate of compliance in certain cases. INA § 239(e) states, in relevant part:

(1) In general
In cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 384 of the IIRIRA of 1996 (8 U.S.C § 1367) have been complied with.

(2) Locations

---

[1] For additional information concerning the non-disclosure of information relating to VAWA beneficiaries, please see *Memorandum of Paul W. Virtue, INS Acting Executive Associate Commissioner, Non-Disclosure and Other Prohibitions Relating to Battered Aliens. IIRIRA § 384,* May 5, 1997.

FOR OFFICIAL USE ONLY LAW
ENFORCEMENT SENSITIVE

SUBJECT- VAWA GUIDANCE
Page 4

The locations specified in this paragraph are as follows:
(A) At a domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.[2]
(B) At a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101 (a)( 15) of this title [8 U.S.C. § 1101(a)(15)]

This provision applies to all apprehensions occurring on or after February 5, 2006.

Section 239(e) requires ICE to certify that the agency has independently verified the inadmissibility or deportability of an alien that was encountered at these specified sensitive locations. In practical terms, when ICE officers encounter aliens at these sensitive locations and ultimately issue a Notice To Appear, the officers must ensure that they have independently verified the inadmissibility or deportability of that alien and must not permit any unauthorized disclosure of information about the alien.

The file must bear information adequately alerting the officer or agent who is preparing the NTA that the INA 239(e) certification requirement could be implicated. Moreover, in complying with 8 U.S.C § 1367, the file must bear sufficient information to permit the issuing officer or agent to make a reliable assessment that, in fact, the prohibited source and nondisclosure provisions of § 1367 have been complied with. Accordingly, ICE officers or agents must record on the Form 1-213 whether the alien was encountered at a sensitive location, whether information related to the alien's admissibility or deportability was supplied by a prohibited source, whether and how such information was independently verified, and an acknowledgement that, if applicable, the nondisclosure requirements have been complied with.

The certificate of compliance requirements reflects congressional intent that ICE proceed cautiously when making an arrest or otherwise physically encountering an alien at one of the sensitive locations without objective evidence that the alien is in the United States in violation of the immigration laws and that victims of battery, abuse, trafficking, and extreme cruelty be protected. In this regard, ICE officers encountering such individuals are to verify information through use of all databases at their disposal, including CLAIMS. For INA § 239(e) purposes,

---

[2]  A community based organization means an organization that:
(A) focuses primarily on domestic violence, dating violence, sexual assault, or stalking;
(B) has established a specialized culturally specific program that addresses domestic violence, dating violence, sexual assault, or stalking;
(C) has a primary focus on underserved populations (and includes representatives of these populations) and domestic violence, dating violence, sexual assault, or stalking; or
(D) obtains expertise, or shows demonstrated capacity to work effectively, on domestic violence, dating violence, sexual assault, and stalking through collaboration.
See 42 U.S.C. § 13925(a)(3) (2006).

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

SUBJECT- VAWA GUIDANCE
Page 5

ICE officers must then issue a certificate of compliance if the alien was encountered at a sensitive location and ICE issued a Notice To Appear. The certificate of compliance must be completed by an officer or agent authorized to issue Notices To Appear after reviewing the information contained on the 1-213 and confirming the prohibited source information was independently verified. *See* 8 C.F.R. § 239.1 (2006). The certificate may simply state "I certify that, to the best of my knowledge and belief, section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1367) has been complied with." The certificate of compliance language may be typed or printed on the NTA. Failure to complete a certificate of compliance may subject the officer and ICE to civil penalties and disciplinary action for violating 8 U.S.C. § 1367.

ICE officers are discouraged from making arrests at these sensitive locations absent clear evidence that the alien is not entitled to victim-based benefits. Aliens encountered at rape crisis centers, domestic violence centers, or any of the sensitive locations noted in INA § 239(e) are likely to be genuine VAWA self-petitioners. While INA § 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that cases of aliens arrested at such locations be handled properly given that they may ultimately benefit from VAWA's provisions. ICE officers should consider prosecutorial discretion in cases of aliens encountered at sensitive locations unless exigent circumstances exist. Examples of exigent circumstances include criminal activity, fraud, terrorism, or where there are extraordinary reasons for arresting aliens at sensitive locations.

If an officer is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA § 239(e), the officer should consult the local Office of Chief Counsel (OCC). If time does not permit, the officer should consult his or her immediate supervisor for assistance.

Questions about the information provided in this memorandum may be directed to the local OCC or to the Enforcement Law Division (202-514-2895). Specific victim assistance questions may be directed to Susan Shriner, ICE Victim-Witness Coordinator, at 202-616-8737.

FOR OFFICIAL USE ONLY LAW
ENFORCEMENT SENSITIVE



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

JAN 2 2 2007

MEMORANDUM FOR:    Field Office Directors and Special Agents in Charge

FROM:    Director John P. Torres
    Office of Detention and Removal Operations

    Director Marcy M. Forman
    Office of Investigations

SUBJECT:    Interim Guidance Relating to Officer Procedure Following
    Enactment of VAWA 2005.

Purpose

The Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), which became effective on January 5, 2006, expanded various protections for aliens seeking immigration benefits as crime victims and amended various sections of the Immigration and Nationality Act (INA). As a result, operational units of U.S. Immigration and Customs Enforcement (ICE) will be required to follow new procedures when taking certain actions in cases involving aliens eligible to apply for VAWA benefits or T or U nonimmigrant status. This interim guidance explains how VAWA 2005 affects the current operating procedures of the Office of Investigations (OI) and the Office of Detention and Removal Operations (DRO).

Background

Congress passed the Violence Against Women Act (VAWA) of 1994 as a response to growing concerns over gender-related violence. VAWA provides that abused spouses, children, and parents of U.S. citizens or lawful permanent residents can "self-petition" to obtain lawful permanent residence. These provisions allow certain battered aliens to file for an immigrant visa in order to seek safety and independence from the abuser without the abuser's permission.

Congress subsequently passed the Victims of Trafficking and Violence Protection Act of 2000, which reauthorized the VAWA provisions of 1994 and created two new nonimmigrant categories: T status and U status. T nonimmigrant status is available to victims of "severe forms of trafficking" who are physically present in the United States or a port of entry as a result of that trafficking. U nonimmigrant status is available to aliens who have "suffered substantial physical or mental abuse" as a result of certain criminal acts. Victims eligible for VAWA benefits or T or U nonimmigrant status may seek benefits through separate applications submitted to the Vermont Service Center of U.S. Citizenship and Immigration

ICE CAR 086

SUBJECT: VAWA GUIDANCE
Page 2

Services (USCIS). This memorandum provides interim guidance concerning the expanded confidentiality protections of the VAWA 2005 and the legislation's requirement that ICE issue a certificate of compliance in certain circumstances.

Discussion

A. Definition of "VAWA Self-Petitioner"

VAWA 2005 added INA § 101(a)(51), which defines "VAWA self-petitioner" as an alien, or a child of the alien, who qualifies for relief under several provisions of the Act and generally requires that the victim be abused, battered, or subjected to human trafficking or severe mental or physical abuse. A self-petition allows the victim the opportunity to adjust status without the abuser's assistance. ICE employees should become familiar with the categories of VAWA self-petitioners and the many ways in which battered victims may adjust their status. For purposes of this interim guidance, if an officer believes there is any credible evidence that the alien may be eligible for VAWA benefits or T or U nonimmigrant status, the requirements of 8 U.S.C. § 1367, described below, must be followed along with standard operating procedure.

B. Use of Information from Prohibited Sources and Confidentiality

Section 1367(a) of Title 8 of the United States Code, as amended by VAWA 2005, prevents ICE employees from making an adverse determination of admissibility or deportability of an alien using information furnished *solely* by certain people associated with the battery or extreme cruelty, such as the abuser or a member of the abuser's family living in the same household as the victim. For purposes of this interim guidance, an adverse determination of admissibility or deportability would include placing an alien in removal proceedings or making civil arrests relating to an alien's violation of the immigration laws. Section 1367(a) also generally prohibits ICE employees from disclosing any information about a VAWA, T, or U beneficiary to anyone, especially those who might use the information to the alien's detriment, *i.e.,* an abuser who may wish to have the victim removed from the United States.

Information provided *solely* by prohibited sources must be independently corroborated. Examples of prohibited sources include: the abuser in the case of a VAWA petitioner, the human trafficker in the case of a T status applicant, or the perpetrator of substantial physical or mental abuse in the case of a U status applicant. In such cases, ICE employees cannot rely solely on these sources when making an adverse determination of admissibility or deportability. This prohibition is important to note because ICE officers sometimes receive information from upset or disgruntled spouses, abusers, traffickers, or family members. An arrest based on such information would not violate § 1367 if, according to existing standard operating procedures, the ICE officer independently verifies the information (*e.g.,* through an immigration database) prior to making the arrest. To avoid a possible violation of § 1367, ICE officers must verify the information provided from these prohibited sources. For example, if the abuser husband calls ICE and states that his alien wife is in the United States after being ordered removed, ICE must independently verify the prior removal and note such corroboration on Form I-213 (Record of Inadmissible/Deportable Alien).

SUBJECT: VAWA GUIDANCE
Page 3

Section 1367 does not prevent ICE officers from making arrests of aliens believed to be in the United States illegally if the information provided by a prohibited source is independently verified. Likewise, § 1367 does not prevent ICE officers from arresting aliens who have applied for benefits under VAWA or the T or U nonimmigrant categories. Instead, § 1367 prevents ICE officers from making adverse determinations of admissibility or deportability based on information provided "solely" by a prohibited source. Simply stated, ICE officers *must* independently verify information and check databases at their disposal to determine the existence of any pending victim-based applications for immigration benefits. ICE officers are also reminded to consider the sources of their information and be aware that there is a possibility that the caller may be involved in an abusive or violent relationship with the alien who is the subject of the call. Accordingly, if the source of the independently verifiable information is likely an abuser or someone acting in the abuser's capacity, the ICE officer should consider using prosecutorial discretion.

This interim guidance also reminds ICE employees that they are generally prohibited from "permit[ing] use by or disclosure to anyone (other than a sworn officer or employee of [DHS])" of any information which relates to an alien who is the beneficiary of an application for relief under victim based benefits (VAWA, T or U nonimmigrant status).[1]  If ICE employees know that an alien has sought such victim-based benefits, they are generally prohibited from disclosing any information to a third party. In enacting this nondisclosure provision, Congress sought to prevent, with limited exceptions, disclosure of *any information* relating to beneficiaries of applications for VAWA benefits (battered spouses or children) or for T or U nonimmigrant status, including the fact that they have applied for benefits. The disclosure of certain information is permitted in limited circumstances. Those circumstances include disclosure for legitimate law enforcement purposes, statistical purposes, and benefit granting or public benefit purposes. *See* 8 U.S.C. § 1367(b) (listing exceptions to general nondisclosure rule). In short, ICE employees must not reveal any information concerning an alien's T, U, or VAWA application unless an exception to the general nondisclosure requirement applies. The nondisclosure limitation ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

C. Sensitive Location Certificate of Compliance Requirement

VAWA 2005 added new INA § 239(e), which requires the completion of a certificate of compliance in certain cases. INA § 239(e) states, in relevant part:

> (1) In general
> In cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 384 of the IIRIRA of 1996 (8 U.S.C. § 1367) have been complied with.

> (2) Locations

---

[1] For additional information concerning the non-disclosure of information relating to VAWA beneficiaries, please see *Memorandum of Paul W. Virtue, INS Acting Executive Associate Commissioner, Non-Disclosure and Other Prohibitions Relating to Battered Aliens: IIRIRA § 384,* May 5, 1997.

SUBJECT: VAWA GUIDANCE
Page 4

The locations specified in this paragraph are as follows:

(A) At a domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.[2]

(B) At a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) of this title [8 U.S.C. § 1101(a)(15)].

This provision applies to all apprehensions occurring on or after February 5, 2006.

Section 239(e) requires ICE to certify that the agency has independently verified the inadmissibility or deportability of an alien that was encountered at these specified sensitive locations. In practical terms, when ICE officers encounter aliens at these sensitive locations and ultimately issue a Notice To Appear, the officers must ensure that they have independently verified the inadmissibility or deportability of that alien and must not permit any unauthorized disclosure of information about the alien.

The file must bear information adequately alerting the officer or agent who is preparing the NTA that the INA 239(e) certification requirement could be implicated. Moreover, in complying with 8 U.S.C. § 1367, the file must bear sufficient information to permit the issuing officer or agent to make a reliable assessment that, in fact, the prohibited source and nondisclosure provisions of § 1367 have been complied with. Accordingly, ICE officers or agents must record on the Form I-213 whether the alien was encountered at a sensitive location, whether information related to the alien's admissibility or deportability was supplied by a prohibited source, whether and how such information was independently verified, and an acknowledgement that, if applicable, the nondisclosure requirements have been complied with.

The certificate of compliance requirements reflects congressional intent that ICE proceed cautiously when making an arrest or otherwise physically encountering an alien at one of the sensitive locations without objective evidence that the alien is in the United States in violation of the immigration laws and that victims of battery, abuse, trafficking, and extreme cruelty be protected. In this regard, ICE officers encountering such individuals are to verify information through use of all databases at their disposal, including CLAIMS. For INA § 239(e) purposes,

---

[2] A community based organization means an organization that:

(A) focuses primarily on domestic violence, dating violence, sexual assault, or stalking;

(B) has established a specialized culturally specific program that addresses domestic violence, dating violence, sexual assault, or stalking;

(C) has a primary focus on underserved populations (and includes representatives of these populations) and domestic violence, dating violence, sexual assault, or stalking; or

(D) obtains expertise, or shows demonstrated capacity to work effectively, on domestic violence, dating violence, sexual assault, and stalking through collaboration.

*See* 42 U.S.C. § 13925(a)(3) (2006).

SUBJECT: VAWA GUIDANCE
Page 5

ICE officers must then issue a certificate of compliance if the alien was encountered at a sensitive location and ICE issued a Notice To Appear. The certificate of compliance must be completed by an officer or agent authorized to issue Notices To Appear after reviewing the information contained on the I-213 and confirming the prohibited source information was independently verified. *See* 8 C.F.R. § 239.1 (2006). The certificate may simply state: "I certify that, to the best of my knowledge and belief, section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1367) has been complied with." The certificate of compliance language may be typed or printed on the NTA. Failure to complete a certificate of compliance may subject the officer and ICE to civil penalties and disciplinary action for violating 8 U.S.C. § 1367.

ICE officers are discouraged from making arrests at these sensitive locations absent clear evidence that the alien is not entitled to victim-based benefits. Aliens encountered at rape crisis centers, domestic violence centers, or any of the sensitive locations noted in INA § 239(e) are likely to be genuine VAWA self-petitioners. While INA § 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that cases of aliens arrested at such locations be handled properly given that they may ultimately benefit from VAWA's provisions. ICE officers should consider prosecutorial discretion in cases of aliens encountered at sensitive locations unless exigent circumstances exist. Examples of exigent circumstances include criminal activity, fraud, terrorism, or where there are extraordinary reasons for arresting aliens at sensitive locations.

If an officer is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA § 239(e), the officer should consult the local Office of Chief Counsel (OCC). If time does not permit, the officer should consult his or her immediate supervisor for assistance.

Questions about the information provided in this memorandum may be directed to the local OCC or to the Enforcement Law Division (202-514-2895). Specific victim assistance questions may be directed to Susan Shriner, ICE Victim-Witness Coordinator, at 202-616-8737.

ICE CAR 090



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Thomas D. Homan
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Lori Scialabba
                   Acting Director
                   U.S. Citizenship and Immigration Services

                   Joseph B. Maher
                   Acting General Counsel

                   Dimple Shah
                   Acting Assistant Secretary for International Affairs

                   Chip Fulghum
                   Acting Undersecretary for Management

FROM:              John Kelly
                   Secretary

SUBJECT:           **Enforcement of the Immigration Laws to Serve the National
                   Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

**B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

ICE CAR 095

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

### H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

### I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

ICE CAR 096



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:    John Kelly
Secretary

SUBJECT:    **Implementing the President's Border Security and
Immigration Enforcement Improvements Policies**

This memorandum implements the Executive Order entitled "Border Security and
Immigration Enforcement Improvements," issued by the President on January 25, 2017, which
establishes the President's policy regarding effective border security and immigration
enforcement through faithful execution of the laws of the United States. It implements new
policies designed to stem illegal immigration and facilitate the detection, apprehension, detention,
and removal of aliens who have no lawful basis to enter or remain in the United States. It
constitutes guidance to all Department personnel, and supersedes all existing conflicting policy,
directives, memoranda, and other guidance regarding this subject matter—to the extent of the
conflict—except as otherwise expressly stated in this memorandum.

A. **Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.**

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1.  When removing the alien from the United States pursuant to statute or regulation;

2.  When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (DHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3.  When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4.  When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

ICE CAR 098

5.    When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6.    When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

**B. Hiring More CBP Agents/Officers**

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall—while ensuring consistency in training and standards—immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

3

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

## C. Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

## D. Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

4

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

## E. Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

## F. Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise—and using materials originating in the United States to the maximum extent permitted by law—shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

## G. Expanding Expedited Removal Pursuant to Section 235(b)(1)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

5

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).
[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.
[3] *Id.*

6

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

## H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

## I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

7

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

## J. Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] *See* INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] *See* INA § 235(b)(1)(B)(v).
[6] *See id.*
[7] *Id.*

8

ICE CAR 104

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

### K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

9

ICE CAR 105

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

## L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

[9] *See* 8 U.S.C. § 1232(b)(3).

[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

10

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

## M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

## N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

11

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border— including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

## O. Public Reporting of Border Apprehensions Data

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

ICE CAR 108

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

## P. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

ICE CAR 109

Policy Number: 10076.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

JUN 17 2011



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs

Purpose:

This memorandum sets forth agency policy regarding the exercise of prosecutorial discretion in removal cases involving the victims and witnesses of crime, including domestic violence, and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties. In these cases, ICE officers, special agents, and attorneys should exercise all appropriate prosecutorial discretion to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice. This memorandum builds on prior guidance on the handling of cases involving T and U visas and the exercise of prosecutorial discretion.[1]

Discussion:

Absent special circumstances or aggravating factors, it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime. In practice, the vast majority of state and local law enforcement agencies do not generally arrest victims or witnesses of crime as part of an investigation. However, ICE regularly hears concerns that in some instances a state or local law enforcement officer may arrest and book multiple people at the scene of alleged domestic violence. In these cases, an arrested victim or witness of domestic violence may be booked and fingerprinted and, through the operation of the Secure

---

[1] For a thorough explanation of prosecutorial discretion, see the following: Memorandum from Peter S. Vincent, Principal Legal Advisor, Guidance Regarding U Nonimmigrant Status (U visa) Applicants in Removal Proceedings or with Final Orders of Deportation or Removal (Sept. 25, 2009); Memorandum from William J. Howard, Principal Legal Advisor, VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367 (Feb. 1, 2007); Memorandum from Julie L. Myers, Assistant Secretary of ICE, Prosecutorial and Custody Discretion (Nov. 7, 2007); Memorandum from William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (Oct. 24, 2005); Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, Exercising Prosecutorial Discretion (Nov. 17, 2000).

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 2

Communities program or another ICE enforcement program, may come to the attention of ICE. Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties.

To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints. Particular attention should be paid to:

- victims of domestic violence, human trafficking, or other serious crimes;
- witnesses involved in pending criminal investigations or prosecutions;
- plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and
- individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

In deciding whether or not to exercise discretion, ICE officers, agents, and attorneys should consider all serious adverse factors. Those factors include national security concerns or evidence the alien has a serious criminal history, is involved in a serious crime, or poses a threat to public safety. Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud. In the absence of these or other serious adverse factors, exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate. Discretion may also take different forms and extend to decisions to place or withdraw a detainer, to issue a Notice to Appear, to detain or release an alien, to grant a stay or deferral of removal, to seek termination of proceedings, or to join a motion to administratively close a case.

In addition to exercising prosecutorial discretion on a case-by-case basis in these scenarios, ICE officers, agents, and attorneys are reminded of the existing provisions of the Trafficking Victims Protection Act (TVPA),[2] its subsequent reauthorization,[3] and the Violence Against Women Act (VAWA).[4] These provide several protections for the victims of crime and include specific provisions for victims of domestic violence, victims of certain other crimes,[5] and victims of human trafficking.

Victims of domestic violence who are the child, parent, or current/former spouse of a U.S. citizen or permanent resident may be able to self-petition for permanent residency.[6] A U nonimmigrant visa provides legal status for the victims of substantial mental or physical abuse as

---

[2] Pub. L. No. 106-386, §§101-113, 114 Stat. 1464, 1466 (codified as amended in scattered sections of the U.S.C.).
[3] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[4] Pub. L. No. 106-386, §§1001-1603, 114 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[5] For a list of the qualifying crimes, see INA §101(a)(15)(U)(iii).
[6] *See* INA §101(a)(51).

ICE CAR 111

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 3

a result of domestic violence, sexual assault, trafficking, and other certain crimes.[7]  A T
nonimmigrant visa provides legal status to victims of severe forms of trafficking who assist law
enforcement in the investigation and/or prosecution of human trafficking cases.[8]  ICE has
important existing guidance regarding the exercise of discretion in these cases that remains in
effect.  Please review it and apply as appropriate.[9]

Please also be advised that a flag now exists in the Central Index System (CIS) to identify those
victims of domestic violence, trafficking, or other crimes who already have filed for, or have
been granted, victim-based immigration relief.  These cases are reflected with a Class of
Admission Code "384."  When officers or agents see this flag, they are encouraged to contact the
local ICE Office of Chief Counsel, especially in light of the confidentiality provisions set forth at
8 U.S.C. § 1367.

No Private Right of Action

These guidelines and priorities are not intended to, do not, and may not be relied upon to create
any right or benefit, substantive or procedural, enforceable at law by any party in any
administrative, civil, or criminal matter.

---

[7] *See* INA §101(a)(15)(U).
[8] *See* INA §101(a)(15)(T).
[9] *See* Memorandum from John P. Torres, Director, Office of Detention and Removal Operations and Marcy M.
Forman, Director, Office of Investigations, Interim Guidance Relating to Officers Procedure Following Enactment
of VAWA 2005 (Jan. 22, 2007).

ICE CAR 112

Office of the Assistant Secretary

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

NOV - 7 2007

MEMORANDUM FOR       All Field Office Directors
                    All Special Agents in Charge

FROM:               Julie L. Myers
                    Assistant Secretary

SUBJECT             Prosecutorial and Custody Discretion

This memorandum serves to highlight the importance of exercising prosecutorial discretion
when making administrative arrest and custody determinations for aliens who are nursing
mothers. The commitment by ICE to facilitate an end to the "catch and release" procedure for
illegal aliens does not diminish the responsibility of ICE agents and officers to use discretion in
identifying and responding to meritorious health related cases and caregiver issues.

The process for making discretionary decisions is outlined in the attached memorandum of
November 7, 2000, entitled "Exercising Prosecutorial Discretion." Field agents and officers
are not only authorized by law to exercise discretion within the authority of the agency, but are
expected to do so in a judicious manner at all stages of the enforcement process.

For example, in situations where officers are considering taking a nursing mother into custody,
the senior ICE field managers should consider:

- Absent any statutory detention requirement or concerns such as national security,
  threats to public safety or other investigative interests, the nursing mother should be
  released on an Order of Recognizance or Order of Supervision and the Alternatives to
  Detention programs should be considered as an additional enforcement tool;
- In situations where ICE has determined, due to one of the above listed concerns or a
  statutory detention requirement to take a nursing mother into custody, the field
  personnel should consider placing a mother with her non-U.S. citizen child in the T.
  Don Hutto or Berks family residential center, provided there are no medical or legal
  issues that preclude their removal and they meet the placement factors of the facility.
  For a nursing mother with a U.S. citizen child, the pertinent state social service agencies
  should be contacted to identify and address any caregiver issues the alien mother might
  have in order to maintain the unity of the mother and child if the above listed release
  condition can be met;
- The decision to detain nursing mothers shall be reported through the programs'
  operational chain of command.

Requests for Headquarters assistance to address arrests and custody determinations as they
relate to this issue may be addressed to the appropriate Assistant Director for Operations within
OI or DRO.

Attachment

ICE CAR 113



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
                  DISTRICT DIRECTORS
                  CHIEF PATROL AGENTS
                  REGIONAL AND DISTRICT COUNSEL

FROM:    Doris Meissner
              Commissioner
              Immigration and Naturalization Service

SUBJECT:   Exercising Prosecutorial Discretion

      Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion.  This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions.  Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position.  In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.

      More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating Procedures), Part X.  This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997.  This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate.  If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

ICE CAR 114

Memorandum for Regional Directors, et al.                                           Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

## Legal and Policy Background

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Memorandum for Regional Directors, et al.                                    Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings. INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

ICE CAR 116

Memorandum for Regional Directors, et al.                                         Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or
officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive
any legal requirements that apply to the action itself.  For example, an enforcement decision to
focus on certain types of immigration violators for arrest and removal does not mean that the INS
may arrest any person without probable cause to do so for an offense within its jurisdiction.
Service officers who are in doubt whether a particular action complies with applicable
constitutional, statutory, or case law requirements should consult with their supervisor and obtain
advice from the district or sector counsel or representative of the Office of General Counsel to
the extent necessary.

    Finally, exercising prosecutorial discretion does not lessen the INS' commitment to
enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore
the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our
mission of administering and enforcing the immigration laws of the United States.

## Principles of Prosecutorial Discretion

    Like all law enforcement agencies, the INS has finite resources, and it is not possible to
investigate and prosecute all immigration violations.  The INS historically has responded to this
limitation by setting priorities in order to achieve a variety of goals.  These goals include
protecting public safety, promoting the integrity of the legal immigration system, and deterring
violations of the immigration law.

    It is an appropriate exercise of prosecutorial discretion to give priority to investigating,
charging, and prosecuting those immigration violations that will have the greatest impact on
achieving these goals.  The INS has used this principle in the design and execution of its border
enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing
benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under
appropriate principles, rather than devoting resources to cases that will do less to advance these
overall interests, is a crucial element in effective law enforcement management.

    The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the
concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution
if "*no substantial Federal interest would be served by prosecution.*"  This principle provides a
useful frame of reference for the INS, although applying it presents challenges that differ from
those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal
responsibility, the option of an adequate alternative remedy under state law is not available.  In
an immigration case, the interest at stake will always be Federal.  Therefore, we must place
particular emphasis on the element of substantiality.  How important is the Federal interest in the
case, as compared to other cases and priorities?  That is the overriding question, and answering it
requires examining a number of factors that may differ according to the stage of the case.

ICE CAR 117

Memorandum for Regional Directors, et al.                                    Page 5
Subject:  Exercising Prosecutorial Discretion

As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4]  The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

### Investigations

Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious offenders will be identified.  Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention.  Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.
[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.
[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                    Page 6
Subject: Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion. Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources. As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens. Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

### *Initiating and Pursuing Proceedings*

Aliens who are subject to removal may come to the Service's attention in a variety of ways. For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry. While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case. This is true even when an alien is removable based on his or her criminal history and when the alien--if served with an NTA--would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process. Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law. As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings. However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service. Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

Memorandum for Regional Directors, et al.                                   Page 7
Subject: Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible. Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel. It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis. Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion. Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration. However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States: The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation. It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court. Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns: Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history: Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history. The seriousness of any such violations should also be taken into account.

Memorandum for Regional Directors, et al.                                    Page 8
Subject: Exercising Prosecutorial Discretion

- **Likelihood of ultimately removing the alien**: Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- **Likelihood of achieving enforcement goal by other means**: In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- **Whether the alien is eligible or is likely to become eligible for other relief**: Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States. The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- **Effect of action on future admissibility**: The effect an action such as removal may have on an alien can vary--for example, a time-limited as opposed to an indefinite bar to future admissibility--and these effects may be considered.
- **Current or past cooperation with law enforcement authorities**: Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- **Honorable U.S. military service**: Military service with an honorable discharge should be considered as a favorable factor. See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- **Community attention**: Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS. Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds. Public and professional responsibility will sometimes require the choice of an unpopular course.
- **Resources available to the INS**: As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative. For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case. There may be other factors, not on the list above, that are appropriate to consider. The decision should be based on the totality of the circumstances, not on any one factor considered in isolation. General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case. In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer. Choosing a course of action in difficult

Memorandum for Regional Directors, et al.                                    Page 9
Subject: Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may not be considered. Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion. For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time. For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here. For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit. For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief. Political activities may be relevant to a ground of removal on national security or terrorism grounds. An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

ICE CAR 122

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later.  It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways.  For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum).  In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly, the fact that an alien has not requested prosecutorial discretion should not influence the analysis of the case.  Whether, and to what extent, any request should be considered is also a matter of discretion.  Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

**Process for Decisions**

### Identification of Suitable Cases

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise.  Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law.  Different offices face different conditions and have different requirements.  Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8]  In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                    Page 11
Subject: Exercising Prosecutorial Discretion

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the favorable exercise of discretion to their attention for appropriate resolution. To assist in exercising their authority, DDs and CPAs may wish to convene a group to provide advice on difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion. These cases should then be reviewed at a supervisory level where a decision can be made as to whether to proceed in the ordinary course of business, to develop additional facts, or to recommend a favorable exercise of discretion. Such triggers could include the following facts (whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly both within and between INS offices, this list of possible trigger factors for supervisory review is intended neither to be comprehensive nor mandatory in all situations. Nor is it intended to suggest that the presence or absence of "trigger" facts should itself determine whether prosecutorial discretion should be exercised, as compared to review of all the relevant factors as discussed elsewhere in these guidelines. Rather, development of trigger criteria is intended solely as a suggested means of facilitating identification of potential cases that may be suitable for prosecutorial review as early as possible in the process.

### Documenting Decisions

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision should be clearly documented in the alien file, including the specific decision taken and its factual and legal basis. DDs and CPAs may also document decisions based on a specific set of facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial discretion favorably, such as not placing him or her in removal proceedings or not pursuing a case. This normally should be done by letter to the alien and/or his or her attorney of record, briefly stating the decision made and its consequences. It is not necessary to recite the facts of the case or the INS' evaluation of the facts in such letters. Although the specifics of the letter

will vary depending on the circumstances of the case and the action taken, it must make it clear
to the alien that exercising prosecutorial discretion does not confer any immigration status,
ability to travel to the United States (unless the alien applies for and receives advance parole),
immunity from future removal proceedings, or any enforceable right or benefit upon the alien.
If, however, there is a potential benefit that is linked to the action (for example, the availability
of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

        The obligation to notify an individual is limited to situations in which a specific,
identifiable decision to refrain from action is taken in a situation in which the alien normally
would expect enforcement action to proceed.  For example, it is not necessary to notify aliens
that the INS has refrained from focusing investigative resources on them, but a specific decision
not to proceed with removal proceedings against an alien who has come into INS custody should
be communicated to the alien in writing.  This guideline is not intended to replace existing
standard procedures or forms for deferred action, voluntary return, voluntary departure, or other
currently existing and standardized processes involving prosecutorial discretion.

        *Future Impact*

        An issue of particular complexity is the future effect of prosecutorial discretion decisions
in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and
venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that
another office has declined, immigration violations are continuing offenses that, as a general
principle of immigration law, continue to make an alien legally removable regardless of
a decision not to pursue removal on a previous occasion.  An alien may come to the attention of
the INS in the future through seeking admission or in other ways.  An INS office should abide by
a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new
facts or changed circumstances.  However, if a removal proceeding is transferred from one INS
district to another, the district assuming responsibility for the case is not bound by the charging
district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest
that a favorable exercise of prosecutorial discretion is appropriate.

        Service offices should review alien files for information on previous exercises of
prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any
such information into account.  In particular, the office encountering the alien must carefully
assess to what extent the relevant facts and circumstances are the same or have changed either
procedurally or substantively (either with respect to later developments, or more detailed
knowledge of past circumstances) from the basis for the original exercise of discretion. A
decision by an INS office to take enforcement action against the subject of a previous
documented exercise of favorable prosecutorial discretion should be memorialized with a
memorandum to the file explaining the basis for the decision, unless the charging documents on
their face show a material difference in facts and circumstances (such as a different ground of
deportability).

Memorandum for Regional Directors, et al.                                    Page 13
Subject:  Exercising Prosecutorial Discretion

## Legal Liability and Enforceability

The question of liability may arise in the implementation of this memorandum.  Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision.  We cannot promise INS officers that they will never be sued.  However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

## Training and Implementation

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level.  This training will include discussion of accountability and periodic feedback on implementation issues.  In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated.  The regions will report to the Office of Field Operations when this training has been completed.

ICE CAR 126

*This message is sent on behalf of Jon Gurule, Assistant Director for Field Operations:*

**To:**            **Field Office Directors and Deputy Field Office Directors**

**Subject:**       **Reminder: Enforcement Actions at or Near Courthouses**

This message serves as a reminder for important guidance concerning ERO enforcement actions at courthouses. _**Please ensure immediate distribution to all ERO officers within your AOR.**_

- Enforcement actions at or near courthouses will only be undertaken against:

    - Priority #1(a): aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;
    - Priority #1(c): aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in the November 20, 2014 Johnson memorandum;
    - Priority #1(d): aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration history;
    - Priority #1(e): aliens convicted of an "aggravated felon," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

- Enforcement actions at or near courthouses will only take place against specific, targeted aliens, rather than individuals who may be "collaterally" present, such as family members or friends who may accompany the target alien to court appearances or functions.

- Enforcement actions at or near courthouses will, wherever practicable: (1) take place outside public areas of the courthouse; (2) be conducted in collaboration with court security staff; and (3) utilize the court building's non-public entrances and exits.

Questions regarding this guidance may be directed to the Field Operations Staff Officer assigned to your AOR.

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated

Title 8. Aliens and Nationality (Refs & Annos)

Chapter 12. Immigration and Nationality (Refs & Annos)

Subchapter II. Immigration

Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1229

§ 1229. Initiation of removal proceedings

Effective: August 12, 2006

**(a) Notice to appear**

**(1) In general**

In removal proceedings under section 1229a of this title, written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

**(A)** The nature of the proceedings against the alien.

**(B)** The legal authority under which the proceedings are conducted.

**(C)** The acts or conduct alleged to be in violation of law.

**(D)** The charges against the alien and the statutory provisions alleged to have been violated.

**(E)** The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

**(F)(i)** The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 1229a of this title.

**(ii)** The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

**(iii)** The consequences under section 1229a(b)(5) of this title of failure to provide address and telephone information pursuant to this subparagraph.

**(G)(i)** The time and place at which the proceedings will be held.

(ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional circumstances, to appear at such proceedings.

**(2) Notice of change in time or place of proceedings**

**(A) In general**

In removal proceedings under section 1229a of this title, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying--

(i) the new time or place of the proceedings, and

(ii) the consequences under section 1229a(b)(5) of this title of failing, except under exceptional circumstances, to attend such proceedings.

**(B) Exception**

In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

**(3) Central address files**

The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

**(b) Securing of counsel**

**(1) In general**

In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 1229a of this title, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

**(2) Current lists of counsel**

The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 1229a of this title. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

**(3) Rule of construction**

Nothing in this subsection may be construed to prevent the Attorney General from proceeding against an alien pursuant to

section 1229a of this title if the time period described in paragraph (1) has elapsed and the alien has failed to secure counsel.

**(c) Service by mail**

Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

**(d) Prompt initiation of removal**

**(1)** In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

**(2)** Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

**(e) Certification of compliance with restrictions on disclosure**

**(1) In general**

In cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 1367 of this title have been complied with.

**(2) Locations**

The locations specified in this paragraph are as follows:

**(A)** At a domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

**(B)** At a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, § 239, as added Pub.L. 104-208, Div. C, Title III, § 304(a)(3), Sept. 30, 1996, 110 Stat. 3009-587; amended Pub.L. 109-162, Title VIII, § 825(c)(1), Jan. 5, 2006, 119 Stat. 3065; Pub.L. 109-271, § 6(d), Aug. 12, 2006, 120 Stat. 763.)

Notes of Decisions (69)
8 U.S.C.A. § 1229, 8 USCA § 1229
Current through P.L. 115-43.

ICE CAR 130

| United States Code Annotated |
| --- |
| Title 8. Aliens and Nationality (Refs & Annos) |
| Chapter 12. Immigration and Nationality (Refs & Annos) |
| Subchapter II. Immigration |
| Part IX. Miscellaneous |

8 U.S.C.A. § 1367

§ 1367. Penalties for disclosure of information

Effective: March 7, 2013

**(a) In general**

Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official or employee of the Department of Homeland Security or Department of State (including any bureau or agency of either of such Departments)--

**(1)** make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.] using information furnished solely by--

**(A)** a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

**(B)** a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

**(C)** a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty),

**(D)** a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

**(E)** in the case of an alien applying for status under section 101(a)(15)(U) of the Immigration and Nationality Act [8 U.S.C.A. § 1101(a)(15)(U)], the perpetrator of the substantial physical or mental abuse and the criminal activity,[1]

**(F)** in the case of an alien applying for status under section 101(a)(15) (T) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(T)), under section 7105(b)(1)(E)(i)(II)(bb) of Title 22, under section 244(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1254a(a)(3)), as in effect prior to March 31, 1999, or as a VAWA self-petitioner (as defined in section 101(a)(51) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(51)),[2] the trafficker or perpetrator,

unless the alien has been convicted of a crime or crimes listed in section 237(a)(2) of the Immigration and Nationality Act [8 U.S.C.A. § 1227(a)(2)]; or

**(2)** permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency

ICE CAR 131

thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under paragraph (15)(T), (15)(U), or (51) of section 101(a) of the Immigration and Nationality Act [8 U.S.C.A. § 1101(a)(15)(T), (U), (51)] or section 240A(b)(2) of such Act [8 U.S.C.A. § 1229b(b)(2)].

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

**(b) Exceptions**

**(1)** The Secretary of Homeland Security or the Attorney General may provide, in the Secretary's or the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of Title 13.

**(2)** The Secretary of Homeland Security or the Attorney General may provide in the discretion of the Secretary or the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose in a manner that protects the confidentiality of such information.

**(3)** Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

**(4)** Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

**(5)** The Secretary of Homeland Security and the Attorney General are authorized to disclose information, to Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for benefits pursuant to section 1641(c) of this title.

**(6)** Subsection (a) may not be construed to prevent the Attorney General and the Secretary of Homeland Security from disclosing to the chairmen and ranking members of the Committee on the Judiciary of the Senate or the Committee on the Judiciary of the House of Representatives, for the exercise of congressional oversight authority, information on closed cases under this section in a manner that protects the confidentiality of such information and that omits personally identifying information (including locational information about individuals).

**(7)** Government entities adjudicating applications for relief under subsection (a)(2), and government personnel carrying out mandated duties under section 101(i)(1) of the Immigration and Nationality Act [8 U.S.C.A. § 1101(i)(1)], may, with the prior written consent of the alien involved, communicate with nonprofit, nongovernmental victims' service providers for the sole purpose of assisting victims in obtaining victim services from programs with expertise working with immigrant victims. Agencies receiving referrals are bound by the provisions of this section. Nothing in this paragraph shall be construed as affecting the ability of an applicant to designate a safe organization through whom governmental agencies may communicate with the applicant.

**(8)** Notwithstanding subsection (a)(2), the Secretary of Homeland Security, the Secretary of State, or the Attorney General may provide in the discretion of either such Secretary or the Attorney General for the disclosure of information to national security officials to be used solely for a national security purpose in a manner that protects the confidentiality of such information.

ICE CAR 132

**(c) Penalties for violations**

Anyone who willfully uses, publishes, or permits information to be disclosed in violation of this section or who knowingly makes a false certification under section 239(e) of the Immigration and Nationality Act [8 U.S.C.A. § 1229(e)] shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation.

**(d) Guidance**

The Attorney General, Secretary of State, and the Secretary of Homeland Security shall provide guidance to officers and employees of the Department of Justice, Department of State, or the Department of Homeland Security who have access to information covered by this section regarding the provisions of this section, including the provisions to protect victims of domestic violence and severe forms of trafficking in persons or criminal activity listed in section 1101(a)(15)(U) of this title from harm that could result from the inappropriate disclosure of covered information.

**CREDIT(S)**

(Pub.L. 104-208, Div. C, Title III, §§ 308(g)(8)(D), 384, Sept. 30, 1996, 110 Stat. 3009-624, 3009-652; Pub.L. 105-33, Title V, § 5572(b), Aug. 5, 1997, 111 Stat. 641; Pub.L. 106-386, Div. B, Title V, § 1513(d), Oct. 28, 2000, 114 Stat. 1536; Pub.L. 109-162, Title VIII, § 817, Jan. 5, 2006, 119 Stat. 3060; Pub.L. 109-271, § 6(h), Aug. 12, 2006, 120 Stat. 763; Pub.L. 113-4, Title VIII, § 810(a), (b), (d), Mar. 7, 2013, 127 Stat. 117, 118.)

Footnotes

[1]    So in original. Probably should be followed by "or".

[2]    So in original. Probably should be followed by a closing parenthesis.

8 U.S.C.A. § 1367, 8 USCA § 1367
Current through P.L. 115-43.

**End of Document**                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

ICE CAR 133

 

March 29, 2017


The Honorable Tani G. Cantil-Sakauye
Chief Justice
Supreme Court of California
350 McAllister Street
San Francisco, California 94102

Dear Chief Justice Cantil-Sakauye:

  Thank you for your March 16, 2017 letter regarding concern about reports from some California trial courts that suggest law enforcement officers, engaged in the performance of their duties with U.S. Immigration and Customs Enforcement (ICE), are "stalking" individuals at courthouses to make arrests.

  As the chief judicial officer of the State of California, your characterization of federal law enforcement officers is particularly troubling. As you are aware, stalking has a specific legal meaning in American law, which describes criminal activity involving repetitive following or harassment of the victim with the intent to produce fear of harm. The arrest of persons in a public place based upon probable cause has long been held by the United States Supreme Court as constitutionally permissible. *See U.S. v. Watson*, 432 U.S. 411 (1976). Further, ICE officers and agents are authorized by federal statute to make arrests of aliens where probable cause exists to believe that such aliens are in violation of immigration laws. *See* 8 U.S.C. § 1357.

  To be clear, the arrest of individuals by ICE officers and agents is predicated on investigation and targeting of specific persons who have been identified by ICE and other law enforcement agencies as subject to arrest for violations of federal law. ICE does not engage in "sweeps" or other indiscriminate arrest practices.

ICE CAR 134

The Honorable Tani G. Cantil-Sakauye
Page 2

Some jurisdictions, including the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests. Such policies threaten public safety, rather than enhance it. As a result, ICE officers and agents are required to locate and arrest these aliens in public places, rather than in secure jail facilities where the risk of injury to the public, the alien, and the officer is significantly increased because the alien can more readily access a weapon, resist arrest, or flee. Because courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting officers and persons being arrested are substantially decreased.

We agree with you that the enforcement of our country's immigration laws is necessary, and that we should strive to ensure public safety and the efficient administration of justice. Therefore, we would encourage you to express your concerns to the Governor of California and local officials who have enacted policies that occasionally necessitate ICE officers and agents to make arrests at courthouses and other public places.

The men and women of federal law enforcement perform their duties with the highest degree of professionalism and public service. As ICE undertakes the necessary enforcement of our country's immigration laws, its officers and agents will continually improve their operations to meet the challenges to effective enforcement, including state and local policies that hinder their efforts. While these law enforcement personnel will remain mindful of concerns by the public and governmental stakeholders regarding enforcement activities, they will continue to take prudent and reasonable actions within their lawful authority to achieve their mission.

Sincerely,

Jefferson B. Sessions III
Attorney General

John F. Kelly
Secretary of Homeland Security

SECTIONS

ADVERTISEMENT

BROOKLYN

# Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client

By CHRISTINA CARREGA
NEW YORK DAILY NEWS   |   NOV 28, 2017

  



Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 2 of 8

SECTIONS

Nearly 100 defense attorneys staged an impromptu protest ouside a Brooklyn courthouse Tuesday after a lawyer's client was arrested by federal authorities on an immigration charge.

When Rebecca Kavanagh walled into Judge Rosemarie Montalbano's courtroom, she was warned to speak to her client immediately because U.S. Immigration and Customs Enforcement agents were present and prepared to detain him.

ADVERTISEMENT

Moments later, ICE agents detained Genaro Rojas-Hernandez, 30, who was in court for a misdemeanor domestic violence charge.

It was not immediately clear what the immigration issue was or what country Rojas-Hernandez was from.

But what was clear is that many defense attorneys view the courthouse as a safe haven that is off limits on issues involving immigration, and were banding together to voice their displeasure.

ICE CAR 137

Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 3 of 8

"Stay out ICE," and "Shame on you," the lawyers chanted, while others held makeshift signs that read "F--k ICE," and "Go away."

Defense attorneys from the Legal Aid Society and Brooklyn Defender Services rally outside Brooklyn Criminal Court Tuesday to demand ICE agents stay away from court proceedings. (Jesse Ward/for New York Daily News)

"They arrested him and put him into a restricted area. The courtroom' s sergeant pushed me and the court officers kept me away," said Kavanagh, who asked the judge to set bail for her client to keep him out of ICE custody.

The judge declined to set bail but instructed the court officers to allow Kavanagh to speak to her client.

"The sergeant ignored the judge's directive," Kavanagh said. "It was totally inappropriate."

When Kavanagh finally caught up with her client, who doesn't speak English, he told her the men who detained him didn't identify themselves.

ICE CAR 138

Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 4 of 8

SECTIONS

A statement from the Office of Court Administration said several legal aid attorneys escalated the situation by "purposely interfering in an arrest situation."

MOST READ

Rapper Lexii Alijai has died at age 21

Perv caught naked in room with toddlers, gets beaten by kids' dad: cops

EXCLUSIVE: Bronx Subway snatcher insists he's a do-gooder, wants rematch with haters who beat him on the street

"Only for the professionalism and restraint of the court officers involved, there were no injuries and the attorneys were not arrested for obstructing governmental administration," the statement said.

ICE CAR 139

Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 5 of 8

SECTIONS

Defense attorneys line the sidewalk outside the courthouse Tuesday after the arrest. (Jesse Ward/for New York Daily News)

According to OCA, ICE agents "made the proper notifications upon arrival, and the presiding judge not only was notified but the defense attorney made her record when the case was called."

"We do not facilitate or impede ICE agents when they effect an arrest inside New York State Courthouses, the OCA statement said.

Brooklyn DA Eric Gonzalez was also unhappy with the ICE intervention.

ICE CAR 140

"Today's ICE arrest during a hearing on a serious domestic violence case denied due process for both victim and defendant," Gonzalez said in a statement. "Such actions deter victims from reporting abuse and threaten public safety. I join our public defenders in calling on ICE to reconsider their misguided policy and stop conducting enforcement raids in courthouses."

Many defense attorneys view the courthouse as a safe haven that is off limits on issues involving immigration. (Jesse Ward/for New York Daily News)

Topics: protests, immigration, homeland security

Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 7 of 8

SECTIONS

ADVERTISEMENT

RECOMMENDED

ADVERTISEMENT

**Download our mobile app**

**Subscribe for unlimited access**

| | |
|---|---|
| About Us | Contact Us |
| Careers | Frequently Asked |
| Site Map | Questions |
| Media Kit | Place an Ad |
| Special Sections | Contests |
| Manage Subscription | BestReviews |
| Privacy Policy | The Daily Meal |
| Do Not Sell My Info | The Active Times |
| TAG disclosure | Terms of Service |

ICE CAR 142

Defense attorneys protest outside Brooklyn courthouse after ICE cuffs one lawyer's client...   Page 8 of 8

SECTIONS

Copyright © 2020, New York Daily News

**Skip to main content**

METRO

# ICE agents 'pounced' on immigrant in Brooklyn courthouse: attorney

By Jennifer Bain and Emily Saul                    November 28, 2017  |  3:21pm  |  Updated



Lawyers rally for Genaro Rojas Hernandez outside Brooklyn Criminal Court Tuesday.
Gregory P. Mango

Federal agents dragged an illegal immigrant out of a Brooklyn courthouse Tuesday, prompting a wild scuffle between his Legal Aid lawyer and court officers.

The plainclothes US Immigration and Customs Enforcement agents pounced on Genaro Rojas Hernandez as he sat on the bench, speaking to his lawyer, Rebecca Kavanaugh, outside a criminal courtroom awaiting a hearing in his misdemeanor assault case.

Hernandez, a 30-year-old father of two originally from Mexico, is facing charges for allegedly assaulting his wife. He has lived in the states illegally for 15 years but has no prior arrests.

He was cuffed and dragged off by the ICE agents — but not before court officers pushed Kavanagh out of the way, she said.

The agents "suddenly pounced on him" before shoving her, Kavanagh told The Post. It was not immediately clear where the detained man was taken or if the agents had a warrant.

"They were pushing and shoving me out the door," the lawyer said. "It was a silly misdemeanor case … on track to be dismissed."

ICE agents 'pounced' on immigrant in Brooklyn courthouse: attorney                    Page 2 of 2

"I couldn't believe what was going on because court officers are not permitted to, should not be assisting ice agents in making arrests," she said.

As of Monday, ICE agents have entered courthouses across the city 79 times since January, according to data provided by the state Office of Court Administration. Thirty-nine arrests have been made so far.

Across the state, there has been a 900 percent increase in ICE arrests at courthouses since the Trump administration ramped up enforcement against illegals, according to the advocacy group the Immigrant Defense Project.

State courts spokesman Lucien Chalfen refuted Kavanaugh's account of the incident.

"Today's incident in Brooklyn Criminal Court was predicated on four Legal Aid attorneys purposely interfering in an arrest situation, and only for the professionalism and restraint of the court officers involved, there were no injuries and the attorneys were not arrested for obstructing governmental administration," Chalfen said.

"We do not facilitate or impede ICE agents when they effect an arrest inside New York State Courthouses."

Court officers said Kavanagh yelled for Hernandez to "run,'' but she adamantly denied this.

"The idea that I was attempting to interfere with an arrest is crazy. I'm an officer of the court. I'm a lawyer. I would never attempt to interfere on an arrest," she said.

Public Defenders quickly gathered outside the downtown Brooklyn courthouse to protest.

"What do we want? ICE out! When do we want it? Now!" the group chanted.

An ICE spokeswoman did not return a message.

FILED UNDER    **BROOKLYN**, **ICE**, **IMMIGRATION**, **LAWYERS**

Real Estate (Https://Patch.com/New-York/Heights-Dumbo/Real-Estate)

# Latest ICE Arrest In Brooklyn Courthouse Protested By NYC Lawyers

**Legal Aid attorneys walked out of the criminal court after immigration officers arrested a misdemeanor defendant.**

By Noah Manskar, Patch Staff (https://patch.com/users/noah-manskar)
Nov 28, 2017 2:05 pm ET | Updated Nov 28, 2017 5:29 pm ET

Like 126    Share    (https://patch.com/new-york/heights-dumbo/amp/27371495/latest-ice-arrest-in-brooklyn-courthouse-protested-by-nyc-lawyers)    Reply



BROOKLYN HEIGHTS — Brooklyn defense attorneys protested after the latest immigration arrest at the borough's criminal court on Tuesday. Legal Aid Society lawyers staged a walk out after Immigration and Customs Enforcement officers arrested Genaro Rojas-Hernandez inside, according to attorneys and court officials.

Latest ICE Arrest In Brooklyn Courthouse Protested By NYC Lawyers | Brooklyn Height... Page 2 of 10

Plainclothes ICE officers arrested Rojas-Hernandez after he appeared before a judge in a misdemeanor domestic violence court, lawyers and a court official said. The NYPD had arrested Rojas-Hernandez, a Mexican immigrant, on Nov. 6.

Court records show he was charged with 10 crimes, including misdemeanor assault, but four had been dismissed. He was previously arrested in August but has no prior criminal convictions.

Protesters marched outside the courthouse Tuesday afternoon chanting "ICE-free NYC" and "Hell no, ICE must go." About 100 people, including attorneys from Brooklyn Defender Services, joined Legal Aid in a march to the Brooklyn district attorney's office.

Legal Aid attorneys said court officers helped ICE with the arrest, even shoving away Rojas-Hernandez's attorney, Rebecca Kavanagh, as she tried to brief her client on his rights. ICE arrested another client of Kavanagh's in court two weeks ago.

The judge told Kavanagh ICE agents were there to arrest Rojas-Hernandez and told her to speak with him privately outside the courtroom, she said in a series of tweets (https://twitter.com/DrRJKavanaghEsq/status/935611053437784066) describing her account of the arrest.

Rojas-Hernandez "was encountered by" immigration officers outside the courtroom, ICE spokeswoman Rachael Yong Yow said. It was there that the officers "pounced" on Rojas-Hernandez before Kavanagh could advise him of his rights, Kavanagh said.

A court officer pushed her to keep her from following the ICE agents into a restricted area, she said.

"I was caught up in middle & kept saying I am trying to speak to my client, judge told me to speak to my client," Kavanagh said on Twitter.

Kavanagh went back in the courtroom and told the judge ICE had taken her client, she said. She got to talk with Rojas-Hernandez — with ICE agents and another lawyer present — after the judge told officers to hold him, she said.

"He told me they already asked him questions and did not tell him they were from ICE," Kavanagh tweeted. "He was terrified."

Yong Yow denied that, saying the ICE officers properly identified themselves to court staff and Rojas-Hernandez. They let Rojas-Hernandez finish his court hearing before arresting him, Yong Yow said. He is currently in ICE custody waiting to appear before an immigration judge.

ICE CAR 140

Rojas-Hernandez was arrested on an ICE administrative warrant, which the agency issues for immigrants that could be deported. Judges do not sign such warrants.

Defense attorneys want court officers to stop helping with ICE arrests, which they say make defendants fearful to show up in court. ICE arrests in New York City's courthouses have skyrocketed this year under President Donald Trump.

"This court should be a safe place for them to exercise their due process rights to respond to the allegations against them," Adrienne Wells, a Legal Aid defense attorney who attended Tuesday's protest, said in a phone interview.

The Office of Court Administration, the state agency that oversees the courthouses, allows ICE agents to arrest immigrants inside courts so long as they tell court officers why they're there. Officers don't try to help or hinder ICE arrests, the agency says.

Defense attorneys are often kept in the dark (https://patch.com/new-york/new-york-city/nyc-defense-attorneys-kept-dark-ice-arrests-lawyers-say) about ICE arrests, lawyers say, as the OCA policy doesn't require anyone to tell attorneys when their clients are about to be arrested. The state's chief judge, Janet DiFiore, controls court policy.

Lucian Chalfen, an OCA spokesman, said ICE officers properly notified court officers when they came to court Tuesday. He blamed the Legal Aid attorneys for causing a scene by "purposely interfering in an arrest situation."

"When law enforcement is in the process of making an arrest – interfering endangers all involved," Chalfen said in an email.

Kavanagh said neither she nor her fellow lawyers interfered with the arrest. "I was trying to speak to my client, protect his legal rights & follow the judge's direction," she tweeted.

ICE only arrests people in courthouses when officers have "exhausted other options," Yong Yow said. It's easier to track down immigration fugitives at courthouses and safer to arrest them there because they're screened before entering, ICE says.

"The agency complies fully with all prevailing jurisdictional court policies and makes efforts to exhaust all other avenues before effecting a courthouse arrest," Yong Yow said in a statement.

Police arrested Rojas-Hernandez earlier this month after he allegedly assaulted a woman at a Midwood restaurant, violating a previous order of protection, according to a criminal complaint in his case.

ICE CAR 141

Rojas-Hernandez is fighting the charges and refuses to take a plea deal, Kavanagh said on Twitter.

Acting Brooklyn District Attorney Eric Gonzalez said ICE arresting Rojas-Hernandez in court "denied due process for both victim and defendant" in the case.

"Such actions deter victims from reporting abuse and threaten public safety," Gonzalez said in a statement. "I join our public defenders in calling on ICE to reconsider their misguided policy and stop conducting enforcement raids in courthouses."

Defense attorneys say Gonzalez should have prosecutors support defense lawyers when they ask judges to set bail for immigrant defendants. That would put them in local custody, preventing ICE from arresting them and ensuring they can show up for court dates without fear of arrest, Wells said.

*(Lead image: Protesters march outside the Kings County Criminal Court building after an immigration arrest Monday. Photo courtesy of Brooklyn Defender Services via Twitter)*

**Subscribe** (/)

**More from Brooklyn Heights-DUMBO**

klyn-
rt)

### Iconic Businesses New York City Lost In 2019

(https://patch.com/new-york/heights-dumbo/s/gyshx/iconic-businesses-new-york-city-lost-2019)

16h

### Brooklyn Year In Review: The Borough's Best Stories Of 2019

(https://patch.com/new-york/heights-dumbo/s/gyrb2/brooklyn-year-review-boroughs-best-stories-2019)

2d

### 10 Office Upgrades To Make You

Happier & More Productive At Work (https://patch.com/new-york/heights-dumbo/s/gv7ia/10-office-upgrades-make-you-happier-more-productive-work)

5h

**Read more local news from Brooklyn Heights-DUMBO**   (https://patch.com/new-york/heights-dumbo)

ICE CAR 143

Mortgage Rates: DC Metro, DC Advertising Disclosure

30 year fixed $200,000

DC Metro, DC Update

| | | | |
|---|---|---|---|
| ally bank NMLS #181005 | Payment: $926 Fees: $2,329 Rate: 3.750% Points: 0.1 | 3.854% APR Jan 2 | Next |
| ally bank NMLS #181005 | Payment: $954 Fees: $319 Rate: 4.000% Points: 0 | 4.013% APR Jan 2 | Next |
| CIT Bank NMLS #541760 | Payment: $946 Fees: $4,021 Rate: 3.925% Points: 1.1 | 4.188% APR Jan 2 | Next |
| CIT Bank NMLS #541760 | Payment: $978 Fees: $3,165 Rate: 4.200% Points: 0.1 | 4.343% APR Jan 2 | Next |

30 year fixed mtg, All points, 20% down, FICO: 740+

See more rates > Disclaimer | Bankrate.com

**Featured Events** (/#what-is-featured-event)

**Jan 5**
**PlaceChase ChristmasWindows (https://patch.com/new-york/heights-dumbo/calendar/event/20200105/731244/placechase-christmaswindows)**

**Jan 6**
**Mindfulness-Based Stress Reduction (MBSR) Free Orientation Class (https://patch.com/new-york/heights-dumbo/calendar/event/20200106/534357/mindfulness-based-stress-**

**+ Add your event**

JAN 2 **See More Events Near You > (https://patch.com/new-york/heights-dumbo/calendar)**





**Featured Classifieds**    (/#what-is-featured-classified)



(/new-york/heights-dumbo/classifieds/other/117857/winter-sale-50-75-off-rugs)

Winter Sale 50-75% Off Rugs (https://patch.com/new-york/heights-dumbo/classifieds/other/117857/winter-sale-50-75-off-rugs)
Added by Katelyn Berk

Clerical (https://patch.com/new-york/heights-dumbo/classifieds/jobs/118414/clerical)
Added by Marilyn attia

+ Add your classified

**Brooklyn Heights-DUMBO Community Calendar**

**Real Estate Nearby**    realtor.com (https://www.realtor.com?cid=prt_patch_home)



Newly Listed

(https://www.realtor.com/realestateandhomes-detail/100-Jay-St-Apt-14E_Brooklyn_NY_11201_M46267-11436?cid=prt_patch_listings_web_forSale)

100 Jay St Apt 14E
Brooklyn, New York 11201 (https://www.realtor.com/realestateandhomes-detail/100-Jay-St-Apt-14E_Brooklyn_NY_11201_M46267-11436?cid=prt_patch_listings_web_forSale)
For Sale: $995,000
1 bd/1 full ba

More Info (https://www.realtor.com/realestateandhomes-detail/100-Jay-St-Apt-14E_Brooklyn_NY_11201_M46267-11436?cid=prt_patch_listings_web_forSale)

(https://www.realtor.com/realestateandhomes-detail/98-Front-St-4A_Brooklyn_NY_11201_M90464-06346?cid=prt_patch_listings_web_forSale)

98 Front St Unit 4A
Brooklyn, New York 11201 (https://www.realtor.com/realestateandhomes-detail/98-Front-St-4A_Brooklyn_NY_11201_M90464-06346?cid=prt_patch_listings_web_forSale)
For Sale: $775,000
0 bd/1 full ba, 478 sqft

More Info (https://www.realtor.com/realestateandhomes-detail/98-Front-St-4A_Brooklyn_NY_11201_M90464-06346?cid=prt_patch_listings_web_forSale)

(https://www.realtor.com/realestateandhomes-detail/2-Grace-Ct-3CD_Brooklyn_NY_11201_M97461-12496?cid=prt_patch_listings_web_forSale)

2 Grace Ct Unit 3CD
Brooklyn, New York 11201 (https://www.realtor.com/realestateandhomes-detail/2-Grace-Ct-3CD_Brooklyn_NY_11201_M97461-12496?cid=prt_patch_listings_web_forSale)
For Sale: $1,800,000
3 bd/2 full ba

More Info (https://www.realtor.com/realestateandhomes-detail/2-Grace-Ct-3CD_Brooklyn_NY_11201_M97461-

(https://www.realtor.com/realestateandhomes-detail/265-State-St-1111_Brooklyn_NY_11201_M45069-84184?cid=prt_patch_listings_web_forSale)

265 State St Apt 1111
Brooklyn, New York 11201 (https://www.realtor.com/realestateandhomes-detail/265-State-St-1111_Brooklyn_NY_11201_M45069-84184?cid=prt_patch_listings_web_forSale)
For Sale: $1,900,000
2 bd/2 full ba, 1,257 sqft

More Info (https://www.realtor.com/realestateandhomes-detail/265-State-St-1111_Brooklyn_NY_11201_M45069-

ICE CAR 145

12496?
cid=prt_patch_listings_web_forSale)

84184?
cid=prt_patch_listings_web_forSale)

30 Clinton St Apt 4E
Brooklyn, New York 11201
(https://www.realtor.com/realestateandhomes-
detail/30-Clinton-St-Apt-
(https://www.realtor.com/realestateandhomes-
4E_Brooklyn_NY_11201_M37699-
detail/30-
62343?
Clinton-St-Apt-
cid=prt_patch_listings_web_forSale)
4E_Brooklyn_NY
For Sale: $599,000
_11201_M37699-
1 bd/1 full ba
62343?
cid=prt_patch_listings_web_forSale)
More Info
(https://www.realtor.com/realestateandhomes-
detail/30-Clinton-St-Apt-
4E_Brooklyn_NY_11201_M37699-
62343?
cid=prt_patch_listings_web_forSale)

## Get Tickets Nearby

**Mames Babegenush (https://patch.com/new-york/heights-dumbo/tickets/event/4344091)**
Saturday, Jan 11 at 8:30pm

**Hadestown (https://patch.com/new-york/heights-dumbo/tickets/event/2664126)**
Sunday, Jan 12 at 3:00pm

**Yuja Wang (https://patch.com/new-york/heights-dumbo/tickets/event/3901585)**
Friday, Feb 28 at 8:00pm

Get Tickets Near You (https://patch.com/new-york/heights-dumbo/tickets/)



Find out what's happening in your
community on the Patch app

 

(https://apps.apple.com/us/app/patch-local-
news/id430049632)
(https://play.google.com/store/apps/details?
id=com.patchmedia.android&hl=en_US)



ICE CAR 146

## Stay up to date on crime and safety
## with the Neighbors app by Ring

Sponsored by ring

 (https://go.onelink.me/v1xd?pid=Patch&c=Mobile%20Footer&af_web_dp=https%3A%2F%2Fring.com%2Fneighbors)      (https://go.onelink.me/v1xd?pid=Patch&c=Mobile%20Footer&af_web_dp=https%3A%2F%2Fring.com%2Fneighbors)

### Nearby Patches

Brooklyn (https://patch.com/new-york/brooklyn)

Lower East Side-Chinatown (https://patch.com/new-york/lower-east-side-chinatown)

Fort Greene-Clinton Hill (https://patch.com/new-york/fortgreene)

Tribeca-FiDi (https://patch.com/new-york/downtown-nyc)

Carroll Gardens-Cobble Hill (https://patch.com/new-york/carrollgardens)

SoHo-Little Italy (https://patch.com/new-york/soho-little-italy)

View All Patches (https://patch.com/map)

### Topics

Arts & Entertainment (https://patch.com/new-york/heights-dumbo/arts-entertainment)

Business (https://patch.com/new-york/heights-dumbo/business)

Classifieds (https://patch.com/new-york/heights-dumbo/classifieds)

Community Corner (https://patch.com/new-york/heights-dumbo/around-town)

Crime & Safety (https://patch.com/new-york/heights-dumbo/police-fire)

Health & Fitness (https://patch.com/new-

york/heights-dumbo/lifestyle)

Home & Garden (https://patch.com/new-york/heights-dumbo/going-green)

Kids & Family (https://patch.com/new-york/heights-dumbo/kids-family)

Local Voices (https://patch.com/new-york/heights-dumbo/small-business-voices)

Neighbor Posts (https://patch.com/new-york/heights-dumbo/posts)

Obituaries (https://patch.com/new-york/heights-dumbo/obituaries)

Personal Finance (https://patch.com/new-york/heights-dumbo/personal-finance)

Pets (https://patch.com/new-york/heights-dumbo/pets)

Politics & Government (https://patch.com/new-york/heights-dumbo/politics)

Real Estate (https://patch.com/new-york/heights-dumbo/real-estate)

Restaurants & Bars (https://patch.com/new-york/heights-dumbo/restaurants-bars)

Schools (https://patch.com/new-

york/heights-dumbo/schools)

Seasonal & Holidays (https://patch.com/new-york/heights-dumbo/holidays)

Sports (https://patch.com/new-york/heights-dumbo/sports)

Traffic & Transit (https://patch.com/new-york/heights-dumbo/traffic-transit)

Travel (https://patch.com/new-york/heights-dumbo/travel)

Weather (https://patch.com/new-york/heights-dumbo/weather)

### Corporate Info

About Patch (https://patch.com/about)

Careers (https://www.linkedin.com/company/patch-com)

### Partnerships

Advertise on Patch (https://patch.com/new-york/heights-dumbo/advertise-with-us)

### Support

FAQs (https://support.patch.com)

Contact Patch (https://patch.com/contact-us)

Community Guidelines
(https://my.patch.com/info/community-
guidelines)

(mailto:brooklynheights-dumbo@patch.com)

(https://facebook.com/Brooklyn-Heights-DUMBO-Patch-1705629613048725)

(https://twitter.com/BKHtsPatch)          (https://www.linkedin.com/company/patch-com)

(https://www.instagram.com/patch)

Patch Network (https://aol.com)     Terms of Use (https://patch.com/terms)
Privacy Policy (https://patch.com/privacy)

© 2020 Patch (https://patch.com) Media. All Rights Reserved.

ICE CAR 148

News    **Crime & Courts**

# San Jose: Arrests made in city's first two homicides of 2017

**51**

## Authorities nab one suspect at home in Florida, another after court appearance in Santa Clara County



San Jose Police Department

From left, Raul Madriz, 27, of San Jose, and Edgar Sanchez, 29, of Sunnyvale, were arrested Friday in connection with the shooting deaths of Hugo Sanchez, 31, of Sunnyvale, and Daniel Maldonado, 21, of San Jose, the night of Jan. 5 at La Mejor Taqueria in San Jose.

By **JASON GREEN** | jason.green@bayareanewsgroup.com | Bay Area News Group

PUBLISHED: November 7, 2017 at 7:25 pm | UPDATED: November 8, 2017 at 2:22 pm

ICE CAR 149

San Jose: Arrests made in city's first two homicides of 2017                                   Page 2 of 3

SAN JOSE — Police on Tuesday announced the arrests of two men in connection with San Jose's first and second homicides of the year.

Raul Madriz, 27, of San Jose, and Edgar Sanchez, 29, of Sunnyvale, are suspected of gunning down Hugo Sanchez, 31, of Sunnyvale, and Daniel Maldonado, 21, of San Jose, the night of Jan. 5 at La Mejor Taqueria on the 2300 block of Story Road in San Jose.

Both victims were pronounced dead at the scene. A third person was injured by the gunfire but survived.

On Friday, the U.S. Marshals Service, with help from the Pasco County Sheriff's Office, arrested Edgar Sanchez at a home in Dade, Florida, said San Jose police Sgt. Enrique Garcia.

*Reading this on your phone? Stay up to date with our free mobile app. Get it from the Apple app store or the Google Play store.*

Madriz was arrested the same day at a Santa Clara County courthouse after appearing on an unrelated charge, Garcia said.

Both suspects were booked into jail — Edgar Sanchez into Pasco County Jail and Madriz into Santa Clara County Jail — on homicide charges.

*Reading this on your iPhone or iPad? Check out our new Apple News app channel here and click the + at the top of the page to save to your Apple News favorites.*

Police on Tuesday did not disclose what sparked the shooting, but the deaths of Hugo Sanchez and Maldonado marked the first and second homicides of the year in San Jose.

The case remains under investigation, and anyone with information can contact San Jose police Detective Sgt. Mike Montonye or Detective Jason Tanner at 408-277-5283, or leave a tip with Silicon Valley Crime Stoppers at 408-947-STOP (7867) or svcrimestoppers.org.

*Like our Facebook page for more conversation and news coverage from San Jose, the Bay Area and beyond.*

Report an error
Policies and Standards
Contact Us

The Trust Project

ICE CAR 150

Tags: **South Bay Crime**

**Jason Green** Jason Green is a breaking news reporter for the Bay Area News Group. He works week nights and spends most of his time covering crime and public safety. A graduate of UC Santa Barbara and the University of Southern California, he cut his teeth at the Inland Valley Daily Bulletin and the Palo Alto Daily News, and has been with the Bay Area News Group since its inception.

Follow Jason Green **@Jason_T_Green**

SUBSCRIBE TODAY!
ALL ACCESS DIGITAL OFFER FOR JUST 99 CENTS!

ICE CAR 151

| From: | J. Gingerich |
|---|---|
| To: | Albence, Matthew |
| Cc: | Hyer, Brian |
| Subject: | Fwd: Letter from ICE |
| Date: | Wednesday, August 9, 2017 10:58:14 AM |
| Attachments: | 8-2-17 ltr from Thomas Homan, Acting Dir. ICE.pdf |

Matt,

Chief Justice Fairhurst from Washington was in the meeting during your presentation this week. She was one of several Chief Justices who was grateful for your presence and your willingness to listen to their concerns. They are also hopeful that some of those concerns will be considered in the development of your anticipated policy directives regarding courthouse locations and procedures. You may recall that there was also some discussion of the fact that she had requested a meeting with your regional FOD but had never had a response.

Today CJ Fairhurst, who is still at the meeting in Philadelphia, received the attached letter. She is assuming that the timing of the response is coincidental and that this is merely a delayed response to her earlier letter to Secretary Kelly rather than a result of your visit this week and is not intended to negate the good will which was created by your visit. If you could let me know I will pass along the information.

Thanks.

JD



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

AUG 0 2 2017

**RECEIVED**

AUG 0 8 2017

WASHINGTON STATE
SUPREME COURT

The Honorable Mary E. Fairhurst
Chief Justice
Supreme Court of the State of Washington
P.O. Box 40929
Olympia, WA  98504

Dear Chief Justice Fairhurst:

Thank you for your March 22, 2017 letter.  Acting Secretary Duke asked that I respond on her behalf.

On October 24, 2011, U.S. Immigration and Customs Enforcement (ICE) implemented ICE Policy No. 10029.2:  *Enforcement Actions at or Focused on Sensitive Locations*.  This policy remains in effect and provides that enforcement actions at or focused on sensitive locations such as schools, hospitals, and places of worship should generally be avoided.  The policy explains that such actions may only take place when prior approval is obtained from an appropriate supervisory official or there are exigent circumstances necessitating immediate action without supervisor approval.

Courthouses are not sensitive locations under ICE policy; however, they are often an option of last resort to apprehend a targeted alien.  To be clear, immigration enforcement actions are initiated at or near courthouses to apprehend targeted aliens when ICE has specific information indicating those individuals are present at the location.  With any planned enforcement action, ICE officers exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public and every effort to limit the time spent at arrest locations.  To do this, ICE prioritizes its efforts on targeting significant public safety and national security threats, and whenever possible, makes all efforts to arrest such individuals out of the public eye.  An arrest within a courthouse — an environment where visitors are typically screened upon entry for weapons and other contraband — may be the safest and most appropriate option for ICE to pursue.  For these reasons, ICE will continue conducting targeted enforcement actions at courthouses.

Generally speaking, ICE asks that local law enforcement transfer aliens into ICE custody within the controlled environment of a jail.  Across the country, some jurisdictions have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from facilitating such custodial transfers and to shield criminal aliens from detection.  As a result, ICE has been required to more frequently locate and arrest these aliens in public places, rather than in secure jail facilities where the risk of injury to the public, the alien, and the officer is significantly

ICE CAR 153

The Honorable Mary E. Fairhurst
Page 2

increased.  Conducting enforcement operations at courthouses helps to mitigate many of these risks.

The men and women of federal law enforcement perform their duties with the highest degree of professionalism and public service.  As ICE undertakes the necessary enforcement of our country's immigration laws, ICE officers and special agents will continue to take prudent and reasonable actions within their lawful authority to achieve their mission.

Thank you again for your letter and your interest in this important matter.

Sincerely,

Thomas D. Homan
Acting Director

| | |
|---|---|
| **From:** | Lawrence Marks |
| **To:** | Albence, Matthew |
| **Subject:** | ICE activity in courthouses -- proposed language |
| **Date:** | Friday, September 15, 2017 12:04:46 PM |
| **Attachments:** | ICEPolicyFinal.docx |

Matt,

Following up on your offer during our telephone conversation the other day, attached is proposed language addressing ICE activity in courthouses.  This language was drafted and approved by the working group of state chief justices and chief court administrators that you met with in Philadelphia.  Please let me know if you have any questions or we can provide you with additional information.  My number is 212-428-2100.  I also left you a voice message.

We greatly appreciate your cooperation and assistance.

Best regards,

Larry Marks


Lawrence K. Marks

Chief Administrative Judge

New York State Unified Court System

25 Beaver Street, 11th Floor

New York, New York 10004

212-428-2100/

State and local courthouses are not deemed to be "sensitive locations" under ICE Policy Number 10029.2.  However, agents should undertake enforcement activities in and around court facilities only as a last resort.  In addition, absent exigent circumstances, agents should avoid enforcement actions in court facilities and/or during scheduled proceedings which are dedicated to non-criminal matters.  For situations in which enforcement activities are undertaken, agents should attempt to coordinate with local court officials and, to the extent possible, conduct those activities away from public areas of the court facility and outside of public view.

Thomas A. Balmer
Chief Justice



RECEIVED

2017 APR 19  AM 10: 32

1163 State Street
Salem, OR 97301-2563
Phone: 503.986.5717
Fax: 503.986.5730
Oregon Relay Service: 711
Thomas.Balmer@ojd.state.or.us

## OREGON SUPREME COURT

April 6, 2017

Attorney General Jeff Sessions
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

The Honorable John F. Kelly
Secretary of Homeland Security
Washington, DC  20528

Dear Attorney General Sessions and Secretary Kelly:

On behalf of the Oregon Judicial Department, I write to urge you to direct federal law enforcement agencies, including Immigration and Customs Enforcement (ICE), not to arrest individuals inside or in the immediate vicinity of Oregon's county courthouses. If you are unwilling to adopt that policy, then at a minimum, I request that you formally expand the definition of "sensitive locations" in the Homeland Security Policy to include these areas.

Let me explain.  Our courthouses are open to the public, as a matter of tradition and as required by the Oregon Constitution, which provides that "justice shall be administered openly."  ICE agents and other law enforcement officers have the same access to the public areas of our courthouses as all members of the public.

I fully recognize the scope of the statutory authority of ICE and other federal law enforcement agencies. OJD's policy is scrupulous neutrality -- just as we will not hinder federal, state, or local law enforcement agencies, including ICE, in the exercise of their enforcement authority, neither can we assist federal (or other) law enforcement in apprehending those who may have violated the law.  As you know, the courts strive to be -- and must be -- impartial and neutral forums for the resolution of criminal and other cases.

To help the Oregon courts preserve their mandated impartial and neutral role, I respectfully request that you exercise your broad discretion in enforcing federal immigration and criminal laws, and *not* detain or arrest individuals in or in the immediate vicinity of the Oregon courthouses.

ICE CAR 157

Letter to Attorney General Sessions
and Secretary Kelly
April 6, 2017
Page 2

As I am sure you appreciate, the Oregon courts must be accessible to all members of the public. The safety of individuals and families, the protection of economic and other rights, and the integrity of the criminal justice system all depend on individuals being willing and able to attend court proceedings: a witness who is subpoenaed to testify in a criminal case; a victim seeking a restraining order against an abusive former spouse; a driver paying a traffic fine; a landlord seeking an eviction or a tenant defending against one; or a small claims court plaintiff in a dispute with a neighbor.

The State of Oregon needs to encourage, not discourage, court appearances by parties and witnesses, regardless of their immigration status. However, ICE's increasingly visible practice of arresting or detaining individuals in or near courthouses for possible violations of immigration laws is developing into a strong deterrent to access to the courts for many Oregon residents. A number of our trial courts report that even attendance at scheduled hearings has been adversely affected because parties or witnesses fear the presence of ICE agents. The chilling effect of ICE's actions deters not only undocumented residents, but also those who are uncertain about the implications of their immigration or residency status or are close family, friends, or neighbors of undocumented residents. ICE's actions also deter appearances in court by those who are legal residents or citizens, but who do not want to face the prospect of what they see as hostile questioning based on perceived ethnicity, cases of misidentification, or other intrusive interactions with ICE agents.

I understand and appreciate the difficulty of the law enforcement work that you do. I trust that you understand as well the central role that the Oregon courts play in our state's criminal justice system, our efforts to protect children and families, and our daily work to ensure the rule of law for all Oregon residents. ICE's detention or arrest of undocumented residents in and near Oregon's courthouses seriously impedes those efforts. It deters individuals, some undocumented and some not, from coming to court when they should. For that reason, I urge you to adopt a policy of *not* arresting individuals for alleged immigration violations in or near Oregon's courthouses, or, at a minimum, to formally include courthouses in your definition of "sensitive locations" where ICE will thoroughly review the implications of and alternatives to making such arrests.

Letter to Attorney General Sessions
and Secretary Kelly
April 6, 2017
Page 3


        We appreciate the discussions that our judges and staff have had with ICE officials
in Oregon about their policies and practices, but believe this current and prospective
interference with the administration of justice in Oregon calls for policy changes that
only you can direct.

        Thank you for your attention to this serious problem for the Oregon courts.

                                        Sincerely,

                                        Thomas A. Balmer
                                        Chief Justice


cc: Governor Kate Brown
    Attorney General Ellen Rosenblum
    Senator Ron Wyden
    Senator Jeff Merkley
    Oregon Congressional Delegation
    Oregon Presiding Judges

| | |
|---|---|
| **From:** | Lawrence Marks |
| **To:** | Albence, Matthew |
| **Subject:** | RE: ICE activity in courthouses -- proposed language |
| **Date:** | Friday, January 26, 2018 4:49:25 PM |

Matt,

I left you a voice message the other day.  Anything to report here? The Chief Justices' mid-year conference begins this weekend. Not surprisingly, they are asking.

LM

**From:** Albence, Matthew [mailto:Matthew.Albence@ice.dhs.gov]
**Sent:** Thursday, January 11, 2018 2:25 PM
**To:** Lawrence Marks <lmarks@nycourts.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Good Afternoon Judge:

Just wanted to let you know that the policy has been signed. We are working now on getting it publicly released-I will share as soon as I am cleared to do so. Thanks!

Matt

**From:** Lawrence Marks [mailto:lmarks@nycourts.gov]
**Sent:** Friday, December 22, 2017 5:14 PM
**To:** Albence, Matthew
**Subject:** RE: ICE activity in courthouses -- proposed language

Matt,

Thank you for the update.  Very much looking forward to a signed document!  Best wishes to you and your family for the holiday and the new year.

Larry Marks

**From:** Albence, Matthew [mailto:Matthew.Albence@ice.dhs.gov]
**Sent:** Friday, December 22, 2017 4:31 PM
**To:** Lawrence Marks <lmarks@nycourts.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Good Afternoon Judge:

I just wanted to keep you apprised. I finally was able to get a chance to discuss w/Mr. Homan, and we are in a good place. Still hoping for a signed document within the next week or two. Thanks for your patience.

Best,

ICE CAR 160

Matt

---

**From:** Lawrence Marks [mailto:lmarks@nycourts.gov]
**Sent:** Monday, December 4, 2017 10:24 AM
**To:** Albence, Matthew
**Subject:** RE: ICE activity in courthouses -- proposed language

Matt,

I left you a voice message this morning.  The Conference of Chief Justices working group on this issue has a conference call scheduled for this afternoon. I very much wanted to speak with you before then to learn if there's been progress on the proposed language we submitted.  Please give me a call if you have a moment at 212-428-2100.  Thanks.

Larry Marks

---

**From:** Albence, Matthew [mailto:Matthew.Albence@ice.dhs.gov]
**Sent:** Friday, October 27, 2017 5:21 PM
**To:** Lawrence Marks <lmarks@nycourts.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Hi Judge:

Unfortunately, I have been on the road for the past couple weeks on other matters, but I will do my best to push this through ASAP. I will keep you apprised. Thanks, and have a great weekend!

Matt

---

**From:** Lawrence Marks [mailto:lmarks@nycourts.gov]
**Sent:** Friday, October 27, 2017 4:58 PM
**To:** Albence, Matthew <Matthew.Albence@ice.dhs.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Hi Matt,

I left you a voice message yesterday.  Any progress on this?  We have been getting inquiries.

Larry Marks

---

**From:** Albence, Matthew [mailto:Matthew.Albence@ice.dhs.gov]
**Sent:** Friday, October 6, 2017 3:27 PM
**To:** Lawrence Marks <lmarks@nycourts.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Hey Judge:

Sorry for the delay. The policy is still working its way through the review and approval process (to include our attorneys). I did incorporate the language that you sent me last week.  I will keep you

updated throughout the process, which hopefully doesn't take too much longer. Have a great weekend!

Best,

Matt

---

**From:** Lawrence Marks [mailto:lmarks@nycourts.gov]
**Sent:** Friday, October 06, 2017 3:11 PM
**To:** Albence, Matthew <Matthew.Albence@ice.dhs.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Matt,
I've been asked if there have been any developments on this subject.  Have you been able to give this some more thought, and if so is there anything I can report at this time?
Regards,
Larry Marks

---

**From:** Albence, Matthew [mailto:Matthew.Albence@ice.dhs.gov]
**Sent:** Friday, September 15, 2017 12:55 PM
**To:** Lawrence Marks <lmarks@nycourts.gov>
**Subject:** RE: ICE activity in courthouses -- proposed language

Judge Marks:

Thanks very much! I think I should be able to work with this. I doubt I'll have the opportunity today, but I will circle up with you early next week. Have a great weekend and thanks again.

Best,

Matt

---

**From:** Lawrence Marks [mailto:lmarks@nycourts.gov]
**Sent:** Friday, September 15, 2017 12:05 PM
**To:** Albence, Matthew <Matthew.Albence@ice.dhs.gov>
**Subject:** ICE activity in courthouses -- proposed language

Matt,
Following up on your offer during our telephone conversation the other day, attached is proposed language addressing ICE activity in courthouses.  This language was drafted and approved by the working group of state chief justices and chief court administrators that you met with in Philadelphia.  Please let me know if you have any questions or we can provide you with additional information.  My number is 212-428-2100.  I also left you a voice message.
We greatly appreciate your cooperation and assistance.

Best regards,
Larry Marks


Lawrence K. Marks

Chief Administrative Judge

New York State Unified Court System

25 Beaver Street, 11th Floor

New York, New York 10004

212-428-2100/

From: ERO Taskings
Sent: Monday, January 26, 2015 11:43:33 AM
Subject: Guidance Update: Enforcement Actions at or Near Courthouses

This message is sent on behalf of Philip T. Miller, Assistant Director for Field Operations:

To:         Field Office Directors and Deputy Field Office Directors

Subject:    Guidance Update: Enforcement Actions at or Near Courthouses

This message provides important guidance concerning ERO enforcement actions at courthouses, and has been updated to incorporate the enforcement priorities as set forth in Secretary Johnson's November 20, 2014 memorandum, Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants." Please ensure immediate distribution to all ERO officers within your AOR.

Enforcement actions at or near courthouses will only be undertaken against:

- Priority #1(a): aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;
- Priority #1(c): aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in the November 20, 2014 Johnson memorandum;
- Priority #1(d): aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration history;
- Priority #1(e): aliens convicted of an "aggravated felon," as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of the conviction.

Enforcement actions at or near courthouses will only take place against specific, targeted aliens, rather than individuals who may be "collaterally" present, such as family members or friends who may accompany the target alien to court appearances or functions.

Enforcement actions at or near courthouses will, wherever practicable: (1) take place outside public areas of the courthouse; (2) be conducted in collaboration with court security staff; and (3) utilize the court building's non-public entrances and exits.

Questions regarding this guidance may be directed to the Field Operations Staff Officer assigned to your AOR.

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information. Please inform the sender that you

received this message in error and delete the message from your system.

STATE OF NEW YORK
OFFICE OF
COURT ADMINISTRATION



## *MEMORANDUM*

TO: All Chiefs and Majors

FROM: Chief Michael Magliano

DATE: April 26, 2017

---

### Office of the Chief Administrative Judge
### New York State Unified Court System

#### Policy and Protocol Governing
#### Activities in Courthouses by Law Enforcement Agencies

It continues to be the policy of the Unified Court System to permit law enforcement agencies to act in the pursuit of their official legal duties in New York State courthouses, provided that the conduct in no way disrupts or delays court operations, or compromises public safety or court decorum.

The following protocol shall apply to representatives of law enforcement agencies who enter a New York State courthouse to take a person into custody but do not have a warrant issued by a judge of the Unified Court System authorizing them to do so:

- Upon entry to a courthouse, law enforcement officials covered by this protocol shall identify themselves to UCS uniformed personnel, and state their specific law enforcement purpose and the proposed enforcement action to be taken. The UCS officer shall immediately transmit this information to an appropriate supervisor.

- The supervisor shall inform the judge if a law enforcement agent covered by this protocol is present in the courthouse with the intent of arresting or otherwise taking into custody a party or other participant in a case before the judge.

- Absent leave of the court under extraordinary circumstances (e.g., extradition orders), no law enforcement action may be taken by a law enforcement agency in a courtroom.

- UCS uniformed personnel shall file an Unusual Occurrence Report for each law enforcement action taken in a New York State courthouse by a law enforcement agency covered by this protocol.

- UCS uniformed personnel remain responsible for ensuring public safety and decorum in the courthouse at all times.

This policy and protocol is subject to modification based on changed circumstances.


Official website of the Department of Homeland Security


U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Fact Sheet: Frequently Asked Questions – Existing Guidance on Enforcement Actions at or Focused on Sensitive Locations

**Release Date:**  July 15, 2016

(en Español (/news/2016/07/15/preguntas-frecuentes-sobre-zonaslocalidades-sensibles) )

U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have made available Frequently Asked Questions (FAQs) to supplement existing guidance concerning enforcement actions at or focused on sensitive locations and clarify what types of locations are covered by these policies.  ICE and CBP conduct their enforcement actions consistent with the Department of Homeland Security's November 2014 memorandum prioritizing the removal of national security, border security, and public safety threats.

The ICE and CBP sensitive locations policies, which remain in effect, provide that enforcement actions at sensitive locations should generally be avoided, and require either prior approval from an appropriate supervisory official or exigent circumstances necessitating immediate action.  DHS is committed to ensuring that people seeking to participate in activities or utilize services provided at any sensitive location are free to do so without fear or hesitation.

ICE CAR 167

# Q: Do the Department of Homeland Security's policies concerning enforcement actions at or focused on sensitive locations remain in effect?

**A:** U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have each issued and implemented policies concerning enforcement actions at or focused on sensitive locations.  The ICE Sensitive Locations Policy (https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf) and the CBP Sensitive Locations Policy (http://foiarr.cbp.gov/streamingWord.asp?i=1251 (http://foiarr.cbp.gov/streamingWord.asp?i=1251) – please cut and paste) remain in effect, and these FAQs are intended to clarify what types of locations are covered by those policies.  ICE and CBP conduct their enforcement actions consistent with the Department of Homeland Security's November 2014 memorandum (/publication/exercising-prosecutorial-discretion-respect-individuals-who-came-united-states-children), which prioritizes the removal of national security, border security, and public safety threats.

# Q: What do the Department of Homeland Security policies require for enforcement actions to be carried out at sensitive locations?

**A:** The policies provide that enforcement actions at or focused on sensitive locations such as schools, places of worship, and hospitals should generally be avoided, and that such actions may only take place when (a) prior approval is obtained from an appropriate supervisory official, or (b) there are exigent circumstances necessitating immediate action without supervisor approval.  The policies are meant to ensure that ICE and CBP officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations, to enhance the public understanding and trust, and to ensure that people seeking to participate in activities or utilize services provided at any sensitive location are free to do so, without fear or hesitation.

# Q: What does the Department of Homeland Security mean by the term "sensitive location"?

**A:** Locations covered by these policies would include, but not be limited to:

ICE CAR 168

- Schools, such as known and licensed daycares, pre-schools and other early learning programs; primary schools; secondary schools; post-secondary schools up to and including colleges and universities; as well as scholastic or education-related activities or events, and school bus stops that are marked and/or known to the officer, during periods when school children are present at the stop;
- Medical treatment and health care facilities, such as hospitals, doctors' offices, accredited health clinics, and emergent or urgent care facilities;
- Places of worship, such as churches, synagogues, mosques, and temples;
- Religious or civil ceremonies or observances, such as funerals and weddings; and
- During public demonstration, such as a march, rally, or parade.

## Q: What is an enforcement action?

**A:** An enforcement action covered by this policy is any action taken by ICE or CBP to apprehend, arrest, interview, or search an individual, or to surveil an individual for enforcement purposes.

Actions not covered by this policy include activities such as obtaining records, documents, and similar materials from officials or employees, providing notice to officials or employees, serving subpoenas, engaging in Student and Exchange Visitor Program (SEVP) compliance and certification visits, guarding or securing detainees, or participating in official functions or community meetings.

## Q: Will enforcement actions ever occur at sensitive locations?

**A:** Enforcement actions may occur at sensitive locations in limited circumstances, but will generally be avoided.  ICE or CBP officers and agents may conduct an enforcement action at a sensitive location with prior approval from an appropriate supervisory official, or if the enforcement action involves exigent circumstances.

## Q: When may an enforcement action be carried out at a sensitive location without prior approval?

ICE CAR 169

**A:** ICE and CBP officers may carry out an enforcement action at a sensitive location without prior approval from a supervisor in exigent circumstances related to national security, terrorism, or public safety, or where there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under exigent circumstances, officers and agents must conduct themselves as discreetly as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

# Q: Are sensitive locations located along the international border also protected?

**A:** The sensitive locations policy does not apply to operations that are conducted within the immediate vicinity of the international border, including the functional equivalent of the border.  However, when situations arise that call for enforcement actions at or near a sensitive location within the immediate vicinity of the international border, including its functional equivalent, agents and officers are expected to exercise sound judgment and common sense while taking appropriate action, consistent with the goals of this policy.

Examples of operations within the immediate vicinity of the border are, but are not limited to, searches at ports of entry, activities undertaken where there is reasonable certainty that an individual just crossed the border, circumstances where DHS has maintained surveillance of a subject since crossing the border, and circumstances where DHS is operating in a location that is geographically further from the border but separated from the border by rugged and remote terrain.

# Q: Are courthouses sensitive locations?

**A:** Courthouses do not fall under ICE or CBP's policies concerning enforcement actions at or focused on sensitive locations.  However, enforcement actions at courthouses will only be executed against individuals falling within the public safety priorities of DHS's immigration enforcement priorities set forth in the November 20, 2014, memorandum from Secretary Johnson entitled Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants.  Such enforcement actions will, absent exigent circumstances, not lead to arrest of non-targeted individuals and will, wherever practicable, take place outside of public areas of the courthouse.

ICE CAR 170

# Q: Where should I report a DHS enforcement action that I believe may be inconsistent with these policies?

**A:** There are a number of locations where an individual may lodge a complaint about a particular DHS enforcement action that may have taken place in violation of the sensitive locations policy.  You may find information about these locations, and information about how to file a complaint, on the DHS, CBP, or ICE websites.

You may contact ICE Enforcement and Removal Operations (ERO) through the Detention Reporting and Information Line at (888)351-4024 or through the ERO information email address at ERO.INFO@ice.dhs.gov (mailto:ERO.INFO@ice.dhs.gov) , also available at https://www.ice.gov/webform/ero-contact-form (https://www.ice.gov/webform/ero-contact-form) .  The Civil Liberties Division of the ICE Office of Diversity and Civil Rights may be contacted at (202) 732-0092 or ICE.Civil.Liberties@ice.dhs.gov (mailto:ICE.Civil.Liberties@ice.dhs.gov) .

You may contact the CBP Information Center to file a complaint or compliment via phone at 1-877-227-5511, or submit an email through the website at https://help.cbp.gov (https://help.cbp.gov) .

<div align="center">###</div>

Topics:  Immigration and Customs Enforcement (/topics/immigration-enforcement)

Last Published Date: July 15, 2016

ICE CAR 171

2/10/2020                    Newly public guidelines bar ICE from arresting immigrants inside courtrooms - New York Daily News

SECTIONS

**PHOTOS**  **Oscars 2020: Best and worst red carpet looks at th...**     **Texas teen who refused to cut dreadlocks attends Oscars with 'Hair Love' team**   **SEE IT: Parolee sho lieutenant 1 wounding a** ⟩

ADVERTISEMENT

NEW YORK

# Newly public guidelines bar ICE from arresting immigrants inside courtrooms

By **ERIN DURKIN**
NEW YORK DAILY NEWS    |    JUN 30, 2017

  

ICE CAR 172



Court officials previously allowed the controversial policy. (Charles Reed/AP)

The state courts have issued new guidelines governing what immigration agents can do when they show up at city courthouses looking nab immigrants for deportation.

The rules bar immigration agents from making arrests inside courtrooms — though arrests are allowed elsewhere in the courthouse — and require that judges be notified about planned arrests of people involved in their cases.

ICE CAR 173

ADVERTISEMENT

In a memo quietly issued in April, the Office of Court Administration says that it's the court system's policy to "permit law enforcement agencies to act in the pursuit of their official legal duties in New York state courthouses," as long as they don't disrupt court business or endanger public safety.

The protocols went out amid an uproar over Immigrations and Customs Enforcement agents showing up at city courthouses arrest immigrants who are there to deal with criminal or civil cases.

The memo, sent out by court public safety Chief Michael Magliano to court officers' chiefs and majors, applies to law enforcement agents who don't have a warrant from a judge.

Guidelines say that when a law enforcement officer enters a courthouse, they must identify themselves to court officers and tell them what enforcement action they plan to take while inside.

The court officer must inform a supervisor, and the supervisor must tell the judge if the agent is at court to arrest a participant in a case before the judge.

ICE CAR 174

No arrests or other law enforcement actions may happen inside a courtroom except under "extraordinary circumstances," like when someone is being handed over under an order of extradition, Magliano wrote.

Court officers are also required to file an incident report for arrests and law enforcement actions done by outside agencies in courthouses.

Council Speaker Melissa Mark-Viverito, who has decried ICE arrests at courthouses, called the guidelines a good first step.

"Allowing ICE to roam free in New York City courts has needlessly put vulnerable immigrant communities at risk, disrupted our justice system and made our City less safe," she said.

"The guidelines recently put in place by OCA that restrict ICE and other law enforcement activities in the state's courthouses are commonsense policies that reflect the importance of access to justice for all New Yorkers," she said, adding the Council would "closely monitor ICE's activities in the courts to determine whether further restrictions are needed."

But legal aid groups said the rules aren't enough — charging court staffers have gone beyond letting ICE operating freely and actually assisted them on several occasions.

Office of Court Administration staff have helped identify people ICE agents are targeting but don't recognize, called out their names in hallways so they'll respond, or adjusted the timing of arraignments and court appearances to make it easier for ICE to make arrests, defenders said at a City Council oversight hearing on ICE presence in courts.

ICE CAR 175

They have also blocked lawyers and bystanders from entering courtroom vestibules while ICE attempts to take a person into custody inside the vestibule.

"We could make it as hard as possible for ICE to do their job," said Stan German of New York County Defender Services, charging courts are instead "aiding and abetting" ICE.

ADVERTISEMENT

"There's a disconnect between what is on this memo and what is actually happening everyday in courthouses," he said, adding agents who flash a badge are allowed in without identifying themselves and explaining what they're there for.

In an incident that sparked outrage earlier this month, ICE agents showed up at a human trafficking court in Queens — where they wanted to arrest a woman who had been arrested at a Queens massage parlor and was having charges dismissed after going through a court-mandated program, said Councilman Rory Lancman (D-Queens). ICE was looking for her for overstaying a tourist visa.

The woman asked for bail to be set so she would be sent to jail and protected from ICE, though she was later released after the agents left. ICE arrested three other people outside the Queens criminal courthouse.

**MOST READ**

PHOTOS

"Let me repeat that — she asked to be sent to Rikers to protect herself," Lancman said. "This is the choice too

ICE CAR 176

**Oscars 2020: Best and worst red carpet looks at this year's Academy Awards**

**Texas teen who refused to cut dreadlocks attends Oscars with 'Hair Love' team**

**SEE IT: Parolee shoots NYPD lieutenant 12 hours after wounding an officer**

many immigrant New Yorkers are being forced to confront — show up at court or get deported."

The push to impose restrictions on ICE is legally complicated because courthouse buildings are open to the public. To pass legal muster, any restrictions imposed on ICE might also have to be imposed on other law enforcement agencies like the NYPD.

But Tina Luongo, head of the criminal practice at the Legal Aid Society, said courts do have the authority to restrict behavior in their hallways — such as by barring protests there — and could at a minimum require that lawyers be informed if their clients are ICE targets.

"Sometimes you just have to do it," she said. "We cannot have inaction because we think we may get stopped."

OCA turned down invitations to testify on its policies at the hearing.

Topics: homeland security, immigration, melissa mark viverito

---

**Erin Durkin**                                              

Erin Durkin is a reporter in the Daily News City Hall bureau, covering city government and politics, the de Blasio administration and the City Council. She previously covered urban development and local issues in the paper's Brooklyn bureau.

ICE CAR 177

ADVERTISEMENT

**RECOMMENDED**

ADVERTISEMENT

# Sign up for our newsletters

# Subscribe for unlimited access

About Us

Careers

Site Map

Media Kit

Special Sections

Manage Subscription

Privacy Policy

Do Not Sell My Info

TAG disclosure

Contact Us

Frequently Asked

Questions

Place an Ad

Contests

BestReviews

The Daily Meal

The Active Times

Terms of Service

Copyright © 2020, New York Daily News

ICE CAR 178

State court memo: ICE agents should ID selves in courts | Newsday

**NEWS / NEW YORK**
# State court memo: ICE agents should ID selves in courts

**By Matthew Chayes**

matthew.chayes@newsday.com  🐦 @chayesmatthew

*Updated June 29, 2017 8:56 PM*

Law enforcement officers, including federal immigration agents, are prohibited from entering state courthouses without identifying themselves and declaring their intentions, according to a memo issued by the state courts' security chief.

## Sign up for the Newsday Update newsletter.

✕

Enter your email address

Sign up

By signing up, you agree to our privacy policy.

Newsday subscriber? Log in

New York County Defender Services executive director Stanislao A. Germán told the council that in practice, the Magliano protocol is routinely disregarded: Anyone entering the courthouse who flashes a shield is admitted without necessarily being required to obey the protocol.

Tina Luongo of the Legal Aid Society testified that advocates want the state OCA to bar immigration agents from the building, or at least require defense counsel be told whenever the agents are there to detain a person in a case. Currently, it's at each judge's discretion.

"Do something, somebody, and let the federal government try to sue us," she urged the state and city.

ICE CAR 179

2/10/2020                    State court memo: ICE agents should ID selves in courts | Newsday

## Sign up to get the latest updates

Get Newsday's Breaking News alerts in your inbox.

| Email address | Sign up |

By clicking Sign up, you agree to our privacy policy.

Court spokesman Lucian Chalfen did not say whether the courts would heed the advocates' demands but said court officials are open to more meetings on the issue.

Particularly at risk for deportation are women arrested at massage parlors.

The society's Kate Mogluescu said she's alarmed with the twentyfold uptick in arrests at massage parlors during stings: In 2016, the NYPD arrested 631 people for offering massage without a license, up from 31 in 2012. About 91 percent are not citizens, about 37 percent are illegally in

## Sign up for the Newsday Update newsletter.                                    ✕

Enter your email address

Sign up

By signing up, you agree to our privacy policy.

Newsday subscriber? Log in

Try our new Search

| search newsday.com | 🔍 |

ICE CAR 180

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536



**U.S. Immigration
and Customs
Enforcement**

JUN 0 5 2017

Ms. Mary Campbell McQueen
President
National Center for State Courts
Executive Office
300 Newport Avenue
Williamsburg, VA  23185

Dear Ms. McQueen:

Thank you for meeting with U.S. Immigration and Customs Enforcement (ICE) representatives on May 16, 2017 regarding sensitive locations and courthouses.

On October 24, 2011, ICE implemented ICE Policy No. 10029.2: *Enforcement Actions at or Focused on Sensitive Locations*. This policy remains in effect and provides that enforcement actions at or focused on sensitive locations such as schools, hospitals, and places of worship should generally be avoided. The policy explains that such actions may only take place when prior approval is obtained from an appropriate supervisory official, or there are exigent circumstances necessitating immediate action without supervisor approval.

Courthouses are not sensitive locations under ICE policy. Nonetheless, enforcement actions are only initiated at or near courthouses when ICE officers are seeking specific criminal aliens and have information that leads them to believe those individuals are present at the location, rather than individuals who may be "collaterally" present, such as family members or friends who may accompany the target alien to court appearances or functions. When arrests at or near courthouses are planned, ICE officers do so discreetly, generally conducting the arrest outside public areas of the courthouse and in a manner so as not to draw attention. With any planned enforcement action, ICE officers exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public. While officers conduct themselves as discreetly as possible, consistent with officer and public safety, they make every effort to limit the time spent at arrest locations.

In situations where the risk of injury to the public, alien, and/or the officer is significantly increased, because the alien can more readily access a weapon, resist arrest, or flee, ICE officers and special agents are required to locate and arrest these aliens in public places. Because courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting officers and persons being arrested are substantially decreased.

ICE CAR 181

Ms. Mary Campbell McQueen
Page 2

The men and women of federal law enforcement perform their duties with the highest degree of professionalism and public service. As ICE undertakes the necessary enforcement of our country's immigration laws, ICE officers and special agents will continue to take prudent and reasonable actions within their lawful authority to achieve their mission.

Thank you again for your interest in this important matter.

Sincerely,

Thomas D. Homan
Acting Director

ICE CAR 182

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT



**U.S. Immigration and Customs Enforcement Response to Policy Guidance
Regarding Court Houses vs. Court Rooms to the National Center for State Courts**
June 05, 2017

The arrest of persons in a public place based upon probable cause has long been held by the United States Supreme Court as constitutionally permissible. Further, U.S. Immigration and Customs Enforcement (ICE) officers and agents are authorized by federal statute to make arrests of aliens where probable cause exists to believe that such aliens are in violation of immigration laws.

While courthouses do not fall under ICE policies concerning enforcement actions at or focused on sensitive locations, enforcement actions at or near courthouses are only initiated when ICE officers are seeking specific, targeted individuals and have information that leads them to believe those individuals are present at the location. With any planned enforcement action, ICE officers exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public. Consistent with officer and public safety, ICE officers also make every effort to limit the time spent at the planned place of arrest.

Some jurisdictions have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and Special Agents to enter prisons and jails to make arrests. Such policies threaten public safety, rather than enhance it. As a result, ICE officers and Special Agents are required to locate and arrest these aliens in public places, rather than in secure jail facilities where the risk of injury to the public, the alien, and the officer is significantly increased because the alien can more readily access a weapon, resist arrest, or flee. Courthouse visitors are typically screened upon entry to search for weapons and other contraband, so the safety risks for the arresting officers and persons being arrested are substantially decreased.

As ICE undertakes the necessary enforcement of our country's immigration laws, its officers and agents will continually improve their operations to meet the challenges to effective enforcement. While these law enforcement personnel will remain mindful of concerns by the public and governmental stakeholders regarding enforcement activities, they will continue to take prudent and reasonable actions within their lawful authority to achieve their mission.

There are no ICE policies that address *Court Houses vs. Court Rooms*.

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT
SENSITIVE**

1

ICE CAR 183

Message

| | |
|---|---|
| **From**: | J. Gingerich [jdgingerich@ualr.edu] |
| **Sent**: | 9/12/2017 4:58:34 PM |
| **To**: | Albence, Matthew [/O=IRMMAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Albence, Matthew] |
| **Subject**: | Re: Updated policy re: courthouse arrest activities |

Appreciate the update.

On Tue, Sep 12, 2017 at 11:57 AM, Albence, Matthew <Matthew.Albence@ice.dhs.gov> wrote:

We are currently working on the revised policy. I expect the new policy to be completed within the next 30 or so days.

**From:** J. Gingerich [mailto:jdgingerich@ualr.edu]
**Sent:** Tuesday, September 12, 2017 12:56 PM
**To:** Albence, Matthew <Matthew.Albence@ice.dhs.gov>
**Subject:** Updated policy re: courthouse arrest activities

I was asked to confirm that no action has been taken regarding any revision of ICE policy; if correct, is there any projected timeline? Thanks very much.

-JD

--
**J.D. Gingerich**

Director, State Courts Partnership

William H. Bowen School of Law

University of Arkansas at Little Rock

1201 McMath Avenue

Little Rock, AR  72202

jdgingerich@ualr.edu

(501) 324-9950

--
**J.D. Gingerich**
Director, State Courts Partnership
William H. Bowen School of Law
University of Arkansas at Little Rock
1201 McMath Avenue
Little Rock, AR  72202
jdgingerich@ualr.edu
(501) 324-9950